**FILED**

JUN - 6 2008

Clerk, U.S. District and
Bankruptcy Courts

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG ALLAN WILLIAMS,                  :
                                       :
          Petitioner                   :
                                       :       Case: 1:08-cv-00971
     v.                                :       Assigned To : Huvelle, Ellen S.
                                       :       Assign. Date : 6/6/2008
R. MARTINEZ, WARDEN, ET AL.,           :       Description: Habeas Corpus/2255
                                       :
          Respondents                  :


**MEMORANDUM**

June 3, 2008

**Background**

Craig Allan Williams ('Petitioner"), an inmate presently confined at the

Allenwood United States Penitentiary, White Deer, Pennsylvania ("USP-

Allenwood"), initiated this *pro se* petition pursuant to 28 U.S.C. §§ 2241 & 2254.

The Petition is accompanied by an *in forma pauperis* application.  Named as

Respondents are USP-Allenwood Warden R. Martinez and Kenneth L. Wainstein,

the United States Attorney for the District of Columbia.[1]  Petitioner will be

---

[1] The only properly named Respondent in a federal habeas corpus action is the
petitioner's custodial official, in this case the Warden at USP-Allenwood.

1



granted leave to proceed *in forma pauperis*. However, for the reasons outlined below, his action will be transferred to the United States District Court for the District of Columbia.

Petitioner states that on March 16, 1990, he was convicted of first degree murder while armed following a jury trial in the District of Columbia Superior Court. On April 11, 1990, Williams was sentenced to a twenty (20) year to life term of imprisonment.

In his present action, Williams claims entitlement to federal habeas corpus relief on the grounds that his District of Columbia conviction violated his due process rights. Specifically, the Petition contends that his conviction was improper because his "appellate counsel, was ineffective in failing to raise trial counsel's ineffective cross-examination of Sandra Plummer[2] and argue that the trial court's determination [that the Parkway Guest House records would not have helped the petitioner's defense] was plainly wrong and without evidence to support it." Record document no. 1, p. 12.

**Discussion**

Habeas corpus petitions are subject to summary dismissal pursuant to Rule

---

[2] Plummer is described as being the only eyewitness to the crime and as testifying that Petitioner committed the murder.

2

4 ("Preliminary Consideration by the Judge") of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254 (1977). *See, e.g., Mutope v. Pennsylvania Board of Probation and Parole*, 2007 WL 846559 *2 (M.D. Pa. March 19, 2007)(Kosik, J.).  It is noted that the Rules are applicable to § 2241 petitions under Rule 1(b).  *See, e.g., Patton v. Fenton*, 491 F. Supp. 156, 158-59 (M.D. Pa. 1979).

Rule 4 provides in pertinent part: "If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner.  A petition may be dismissed without review of an answer "when the petition is frivolous, or obviously lacking in merit, or where. . . the necessary facts can be determined from the petition itself. . . ." *Gorko v. Holt*, 2005 WL 1138479 *1 (M.D. Pa. May 13, 2005)(McClure, J.)(quoting *Allen v. Perini*, 424 F.2d 134,141 (6th Cir. 1970).

Although Petitioner filed this action in part pursuant to § 2241, District of Columbia offenders are considered state prisoners for purposes of the federal habeas corpus statutes. *See Madley v. United States Parole Comm'n*, 278 F.3d 1306, 1309 (D.C. Cir. 2002).  As a state prisoner, Williams must solely rely on 28

3

U.S.C. § 2254 to bring claims challenging the validity or the execution of his

District of Columbia sentence. *See Coady v. Vaughn*, 251 F.3d 480, 486 (3d Cir.

2001). Thus, based on the nature of Petitioner's present claims, his action will be

considered a petition solely brought pursuant to § 2254.

"The federal habeas corpus statute straightforwardly provides that the

proper respondent to a habeas petition is 'the person who has custody over [the

petitioner]. 28 U.S.C. § 2242, *see also* § 2243. . . .'[T]hese provisions contemplate

a proceeding against some person who has the **immediate** custody of the party

detained, with the power to produce the body of such party before the court or

judge, that he may be liberated if no sufficient reason is shown to the contrary."

*Rumsfeld v. Padilla*, 542 U. S. 426, 434-35 (2004)(emphasis in original)(citations

omitted). There is no question that as a result of his present USP-Allenwood

confinement, this Court has jurisdiction over Williams' petition.

However, notwithstanding the issue of jurisdiction, a court may transfer

any civil action for the convenience of the parties or witnesses, or in the interest of

justice, to any district where the action might have been brought. 28 U.S.C. §

1404(a); *see also, Braden v. 30th Judicial Circuit of Kentucky*, 410 U.S. 484

(1973). Habeas proceedings are generally considered civil in nature. *See Hinton*

4

*v. Braunskill*, 481 U.S. 770, 776 (1987);  *Parrott v. Government of Virgin Islands*, 230 F.3d 615, 620 (3d Cir. 2000)(the term "civil action" includes habeas petitions).

As previously noted, Williams is challenging the legality of his District of Columbia Superior Court conviction.  The trial court is located within the jurisdiction of the United States District Court for the District of Columbia.  All records of conviction, transcripts of proceedings, witnesses, counsel, and conviction records are likewise located within the District of Columbia.  Thus, for the convenience of the parties and in the interest of justice, the action will be transferred to the United States District Court for the District of Columbia.  *See Nelson v. United States of America*, Civil No. 3:CV-06-1239 slip op at 5  (M.D. Pa. July 25, 2006)(Conaboy, J.)(directing transfer of a 2254 petition challenging a District of Columbia Superior Court conviction to the United States District Court for the District of Columbia).  An appropriate Order will enter.


   s/ James F. McClure, Jr.
James F. McClure, Jr.
United States District Judge
IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

5

CRAIG ALLAN WILLIAMS,     :
      Petitioner       :
                                   :
     v.                        :     CIVIL NO.4:CV-08-1053
                                   :
                                   :     (Judge McClure)
R. MARTINEZ, WARDEN, ET AL.,   :
      Respondents     :
                                   :

## ORDER

June 3, 2008

In accordance with the foregoing Memorandum, **IT IS HEREBY**

**ORDERED THAT:**

    1.    Petitioner is GRANTED leave to proceed *in forma pauperis* for the sole purpose of filing this petition.

    2.    The Clerk of Court is directed to TRANSFER this case to the United States District Court for the District of Columbia.

    3.    The Clerk of Court is directed to CLOSE the case.

                       s/ James F. McClure, Jr.
                       James F. McClure, Jr.
                       United States District Judge

6
08-971
ESH

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

*Craig A. Williams*

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __68888__
(EXCEPT IN U.S. PLAINTIFF CASES)

*Pro Se P/A*

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
*# 05723-000*

### DEFENDANTS

*R. Martinez, et al*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

Case: 1:08-cv-00971
Assigned To : Huvelle, Ellen S.
Assign. Date : 6/6/2008
Description: Habeas Corpus/2255

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff

□ 3 Federal Question (U.S. Government Not a Party)

■ 2 U.S. Government Defendant

□ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### □ A. Antitrust
□ 410 Antitrust

### □ B. Personal Injury/Malpractice
□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

### □ C. Administrative Agency Review
□ 151 Medicare Act

Social Security:
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

Other Statutes
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If Administrative Agency is Involved)

### □ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### □ E. General Civil (Other) OR □ F. Pro Se General Civil

Real Property
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

Personal Property
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

Bankruptcy
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

Immigration
□ 462 Naturalization Application
□ 463 Habeas Corpus- Alien Detainee
□ 465 Other Immigration Actions

Prisoner Petitions
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

Property Rights
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

Federal Tax Suits
□ 870 Taxes (US plaintiff or defendant

□ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

Other Statutes
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.

□ 460 Deportation
□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)



| ☑ **G.** *Habeas Corpus/ 2255* | ☐ **H.** *Employment Discrimination* | ☐ **I.** *FOIA/PRIVACY ACT* | ☐ **J.** *Student Loan* |
|---|---|---|---|
| ☑ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ **K.** *Labor/ERISA (non-employment)* | ☐ **L.** *Other Civil Rights (non-employment)* | ☐ **M.** *Contract* | ☐ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*28 USC 2241*

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 **DEMAND $** Check YES only if demanded in complaint **JURY DEMAND:** ☐ YES ☑ NO

**VIII. RELATED CASE(S) IF ANY** No. (See instruction) ☐ YES ☑ NO If yes, please complete related case form.

DATE *6.6.08* SIGNATURE OF ATTORNEY OF RECORD *VCD*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

I:\forms\js-44.wpd

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


CRAIG A. WILLIAMS

v.                                    Civil Action No.  08 0971

                                                       JUN - 6 2008
R. MARTINEZ, ET AL


The above entitled action, transferred from the U.S. District Court for the _MIDDLE_ _____

_____DISTRICT OF PENNSYLVANIA_____, has been received and filed.  It was

assigned to Judge _HUVELLE_____.  Any subsequent pleadings filed must contain both our

civil action number and the initials of the judge assigned this action.

To assist the Clerk's Office in properly recording all counsel of record and to ensure that

each counsel entered is authorized to practice before this Court pursuant to Local Civil Rule

83.8, counsel for all parties must enter their appearance in accordance with our Local Civil Rule

83.6.  Timely compliance with this requirement will enable the Clerk's Office to ensure prompt

delivery of notices and orders.

                              NANCY MAYER-WHITTINGTON, CLERK


                      By _Maureen Higgins_____
                         Deputy Clerk

cc: CRAIG WILLIAMS
    DENNIS PFANNENSCHMIDT
    KENNETH WAINSTEIN


*Denotes attorney not a member of the bar of the U.S. District Court for the District of Columbia

CLOSED, HABEAS, PROSE, PRSLC

# United States District Court
## Middle District of Pennsylvania (Williamsport)
### CIVIL DOCKET FOR CASE #: 4:08-cv-01053-JFM-JVW

Craig Allan Williams v. Martinez et al
Assigned to: Honorable James F. McClure, Jr
Referred to: Pro Se Law Clerk JV
Cause: 28:2241 Petition for Writ of Habeas Corpus (federa

Date Filed: 05/30/2008
Date Terminated: 06/03/2008
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: U.S. Government Defendant

**Petitioner**

**Craig Allan Williams**

represented by **Craig Allan Williams**
05723-000
USP Allenwood
PO Box 3000
White Deer, PA 17887
PRO SE

V.

**Respondent**

**R. Martinez**
*Warden*

represented by **Dennis Pfannenschmidt**
U.S. Attorney's Office
228 Walnut Street
Suite 202
Harrisburg, PA 17108
717-221-4482
Email: Dennis.Pfannenschmidt@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Kenneth L. Wainstein**
*United States Attorney for the District of Columbia*

| Date Filed | # | Docket Text |
|---|---|---|

| 05/30/2008 | 1 | PETITION for Writ of Habeas Corpus, filed by Craig Allan Williams.(lg, ) (Entered: 05/30/2008) |
|---|---|---|
| 05/30/2008 | 2 | Application by petitioner to proceed ifp. (lg, ) (Entered: 05/30/2008) |
| 05/30/2008 | 3 | APPENDIX by Craig Allan Williams to 1 Petition for Writ of Habeas Corpus. (Attachments: # 1 continued)(lg, ) (Entered: 05/30/2008) |
| 05/30/2008 | | PRO SE LETTER ISSUED w/ Notice & Consent Form. (lg, ) (Entered: 05/30/2008) |
| 06/03/2008 | 4 | MEMORANDUM AND ORDER: Granting petitioner leave to proceed in forma pauperis for the sole purpose of filing this petition; directing the clerk to transfer the case to the U.S.D.C. for the District of Columbia; directing the clerk to close the case. Signed by Honorable James F. McClure, Jr on 6/3/08. (km, ) (Entered: 06/03/2008) |
| 06/05/2008 | 5 | MOTION for Leave to Proceed in forma pauperis by Craig Allan Williams.(ts, ) (Entered: 06/05/2008) |

# PACER Service Center

## Transaction Receipt

06/05/2008 16:23:18

| PACER Login: | us3871 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 4:08-cv-01053-JFM-JVW |
| Billable Pages: | 2 | Cost: | 0.16 |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


CRAIG ALLAN WILLIAMS

                    Petitioner,

     v.                                    Case No.: 08 1053

R. MARTINEZ, Warden

                    Respondent.

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS


Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
Post Office Box 3000
White Deer, PA 17887

TABLE OF CONTENTS

Motion to vacate, set aside or correct sentence, with
Guest House receipt attachments (filed 4/10/92) . . . . . . 1

Transcript of trial court's oral ruling denying motion
to vacate, set aside or correct sentence (11/19/92) . . . . . 16

Brief of Appellant (filed 3/24/94) . . . . . . . . . . 33

Williams v. United States, 1995 WL 929016 (D.C. 1995)
(memorandum opinion affirming convictions) . . . . . . . 52

Motion to vacate conviction or reduce sentence or, in
the alternative, to re-enter nunc pro tunc order deny-
ing previous § 23-110 motion, without attachments
(filed 8/19/98) . . . . . . . . . . . . . . . . 55

Williams v. United States, 760 A.2d 505 (D.C. 2000)
(opinion and order affirming denial of second § 23-110
motion) . . . . . . . . . . . . . . . . . . 69

Williams v. United States, 770 A.2d 560 (D.C. 2001)
(order granting rehearing en banc and outlining con-
tents of superseding briefs -- issued 4/5/01) . . . . . . 71

Williams v. United States, 783 A.2d 598 (D.C. 2001)
(en banc memorandum opinion directing Superior Court
to vacate and reenter 11/19/92 order denying § 23-110
motion -- issued 10/18/01) . . . . . . . . . . . . 72

Superior Court's order vacating and reentering 11/19/92
order denying § 23-110 motion (filed 1/8/02) . . . . . . 82

Motion to recall mandate, without appendix (filed
12/25/05) . . . . . . . . . . . . . . . . . 83

Court of Appeals order denying pro se motion to recall
mandate (filed 9/1/06) . . . . . . . . . . . . . 109

Court of Appeals order denying pro se motion for expla-
nation of the court's denial of motion to recall mandate
(filed 12/5/06) . . . . . . . . . . . . . . . . 110

Petition for rehearing and rehearing en banc, with correspondence
attachments (filed 9/22/06) . . . . . . . . . . . . 111

Court of Appeals order denying pro se petition for re-
hearing and rehearing en banc (filed 1/12/07) . . . . . . 120

Trial transcript -- the government's proffer of its
evidence (3/6/90) . . . . . . . . . . . . . . . 122

Trial transcript -- direct examination of Sandra
Plummer (3/7/90) . . . . . . . . . . . . . . . 123

Trial transcript -- cross-examination of Sandra Plummer
and stipulation (3/8/90) . . . . . . . . . . . . 151

Trial transcript -- defense theory of case and note from
jury (3/12/90) . . . . . . . . . . . . . . . . 156

Grand Jury testimony of Sandra Plummer (12/22/88) . . . . . 160

Days Inn Hotel Receipt . . . . . . . . . . . . 162-163

Notes of appellate counsel [Matthew W. Greene] . . . . 164-169

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original and two copies of my "Appendix To Petition For Writ Of Habeas Corpus" was mailed via U.S. Mail, first class, postage prepaid this 27th day of _May_ 2008, to:

United States District Court
Middle District of Pennsylvania
Attn:  Office Of The Clerk
235 North Washington Avenue
Post Office Box 1148
Scranton, Pennsylvania 18501

_Craig Allan Williams_
Signature of Petitioner

28a1t31

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CRIMINAL DIVISION - FELONY BRANCH**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. F-14042-88 |
| v. | : | JUDGE GREENE |
| CRAIG A. WILLIAMS | : | |

### MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE
### (D.C. CODE SECT. 23-110) OR FOR NEW TRIAL (SUP.CT.CR. RULE 33)

Following his conviction by a jury, this Court senten-
ced Mr. Craig A. Williams, the defendant, on April 11, 1990, to
imprisonment for 20 years to life for First Degree Murder While
Armed and one year for Carrying a Pistol Without a License. De-
fendant appealed, then moved to stay the appeal pending the fil-
ing of this Motion. Concurrently with this Motion, defendant
Williams is moving the Court of Appeals for dismissal of his
pending appeal.

Defendant Williams herein moves, under D.C. Code sect.
23-110, to vacate, set aside or correct the sentence. Alterna-
tively, defendant moves for a new trial under Sup. Ct. Cr. Rule
33.

As grounds, defendant Williams respectfully argues that
he was denied due process and the effective assistance of trial
counsel. In support, defendant urges, as follows:

1. Counsel was ineffective in erroneously advising defen-
   dant not to testify, because he could be impeached with
   his prior conviction in F14043-88, upon which this
   Court had yet to enter a sentence.

[A1]

of Appeals has ordered that this motion be filed within 30 days
of its Order of March 30, 1992.

### INTRODUCTION

Section 23-110 is substantially identical to 28 U.S.C.
2255, such that interpretations of this federal statute provide
guidance in construing section 23-110. Neverdon v. District of
Columbia, 468 A.2d 974 (D.C.App. 1983); Butler v. United States,
388 A.2d 883 (D.C.App. 1978). Denial of the right of effective
assistance of counsel because of the defense attorney's knowing
failure to present exculpatory evidence may appropriately be
raised in a proceeding under 28 U.S.C. 2255. United States v.
Thundershield, 478 F.2d 241, 243 (8th Cir. 1973).

To show ineffective assistance of counsel, the applic-
able standard is whether the representation was so grossly incom-
petent as to "blot out" the essence of the defense. Godfrey v.
United States, 454 A.2d 293 (D.C.App. 1982).

Under Sup.Ct.Cr. Rule 33, a new trial based on newly
discovered evidence may be granted on a motion brought within two
years of final judgment. The evidence must be 1) discovered
since the trial; 2) have been diligently sought by the moving
party; 3) not merely cumulative or impeaching; 4) material to the
issues; and 5) of such a nature that a new trial would probably
produce an acquittal. Townsend v. United States, 549 A.2d 724
(D.C.App. 1988), cert. denied, 490 U.S. 1102 (1989); Wright v.
United States, 387 A.2d 582 (D.C.App. 1978).

-4-

[A2]

**FACTS AND ARGUMENT**

## I.   ERRONEOUS ADVICE ON IMPEACHMENT

Defendant would have testified in his own defense in this case, but for the erroneous advice of defendant's counsel that he could be impeached with a prior conviction in this Court in case No. F14043-88. [3] However, "under D.C. Code sect. 14-305 (1981), a defendant . . . may not be impeached with a prior guilty verdict unless and until there is a jugdment of conviction premised on a sentence." Langley v. United States, 515 A.2d 729, 734 (D.C. App. 1986). This Court did not enter a judgment and sentence in that case (and in this case) until April 11, 1990, a month after the trial in this case concluded.  (3/12/90 Tr. 36)

Because defendant was dissuaded from testifying based upon counsel's error, his defense was "blotted out."  In the parallel situation in Langley, supra, the defendant decided not to testify when the trial court made the error on a motion in limine and told the defendant he could be impeached with a conviction on which he had not been sentenced.  The Court of Appeals reversed. By parallel reasoning, this Court should vacate defendant's sentence, because his decision not to testify was based on the same erroneous pre-trial statement of the law.  Because the trial court committed the error in Langley and appointed counsel made

---

[3]    To establish these and other facts, on January 16, 1992, counsel submitted a written request to the Public Defender Service (PDS) for access to the files of defendant's trial counsel, Mr. Shawn Moore, formerly of the PDS.  Although PDS has promised to deliver these files, as yet, defendant's counsel has not received them and is not able, at this time, to provide support for the factual statements in this paragraph.

-5-

[A3]

the error in this case makes no difference to the defendant and
to the injustice visited upon him.

II.  DELAYING/FAILING TO CONDUCT PROPER INVESTIGATION

        As in most drug-related cases, defendant's counsel
knew, or should have known, that prompt investigation of the
facts of this case was of paramount importance.  Such an investi-
gation to learn as much as possible about the facts and to obtain
statements is necessary because the witnesses often are arrested,
moved or, sometimes, even killed.  When a potential witness is
charged in another case, they also develop incentives to be bias-
ed in favor of the government and against the defense in an unre-
lated case, such as this one.

        Defendant's counsel, however, took or allowed investi-
gators to take two months before sending out investigators and
then, instead of going to the scene of the David Golden killing,
they went to the wrong address.  As a result, at least one poten-
tial witness or lead to other witnesses was lost to the defense,
namely, Tony Fletcher.  Counsel did not contact him until after
he was charged in another case, became a government grand jury
witness in return for immunity protection, and was lost to the
defense as a willing assistant in locating other witnessses.  [4/]

        Defense counsel also failed to locate and secure wit-
nesses (several of whom defendant identified to counsel), who
could have given evidence that the government's star witness
Sandra Plummer 1) admitted she killed David Golden, 2) was a drug

---

        [4]     Same as in footnote 3, supra.

-6-

[A4]

seller, 3) frequented crack houses, 4) carried a gun and 5) could not have spent the night of Golden's killing with defendant in Virginia, as she testified. [5]

Counsel was also ineffective in failing to visit the crime scene. Had he done so, he would have been better informed and able to more closely cross-examine the government witnesses on what, where and when they saw something that they testified about. [6]

## III. PLUMMER CROSS-EXAMINATION

Counsel was ineffective in cross-examining Plummer to show that she and defendant were not together at the Parkway Guest House, as she testified on direct examination. (3/6/90 Tr. 336) Had he used the guest house registration records, he could have shown that she and defendant were not registered there at the same time.

The guest registration records (Attach. 1) show that Plummer was at the guest house on October 23, 1988, but not in the morning with defendant (as she testified). Rather, she

---

[5]    An investigation could produce statements from at least seven such witnesses, whose identities defendant is unwilling to reveal except in an ex parte proceeding in which confidentiality is assured. One of these witnesses could say that Plummer said she killed David Golden; that she was involved in drug dealing with Tony Fletcher; and that she frequented a crack house, where she would spend the night. Another could confirm that Plummer also told him that she killed Golden. Four others could testify that Plummer sold drugs in Butler Gardens; and that she carried a gun. Another such witnesses could testify that, on the night Golden was killed, the witness saw defendant in the S.E. area of the District.

[6]    Same as footnote 3, supra.

-7-

registered at 11 pm at night and stayed until the next morning at
8 am. The registration record, which the government introduced
to show that defendant registered on October 23, 1988, however,
shows that he registered at 7:30 am and departed at 3:30 pm the
same day. (Note: Defendant dated the registration with the ap-
parently incorrect date of "Oct 24, 1988" when all the other reg-
istrations in sequence are for October 23rd.) [7]/

IV. MENTAL HEALTH AND DRUG PROBLEMS

Defendant's counsel was aware, or should have been
aware, that defendant Williams suffered from mental and drug
problems. These could have formed the basis of an insanity de-
fense based on defendant's "abnormal mental condition," as a re-
sult of which defendant "either lacked substantial capacity to
conform his conduct to the requirements of the law, or lacked
substantial capacity to appreciate the wrongfulness of his con-
duct." Inst. 5.07, Criminal Jury Instructions for the District
of Columbia (3rd ed.) See also, Mangrum v. United States, 418
A.2d 1071 (D.C.App. 1980), cert. denied, 449 U.S. 997 (1981);
Bethea v. United States, 365 A.2d 64 (D.C.App. 1976), cert.
denied, 433 U.S. 911 (1977).

In preparation for sentencing, defendant's counsel ob-
tained a psychiatric evaluation of defendant. On April 2, 1990,
after the trial of March 6-16, 1990, Dr. Neil Blumberg rendered
his written opinion that defendant Williams suffered from "a

---

[7]    Upon investigation, defendant can present evidence to
authenticate the Parkway Guest House records.

-8-

[A6]

severe Personality Disorder with primarily antisocial features"
and from "a significant history of alcohol abuse and polysub-
stance abuse." (Attach. 2)

Defendant's medical records confirm Dr. Blumberg's
opinion. Moreover, these records were available and provided to
defendant's counsel a year before the trial, following defendant
Williams' written authorization for disclosure on January 7,
1989. (Attach. 3)

The records of the D.C. General Hospital show that, on
June 19, 1987, over a year before the Herbert-Hathaway shootings,
the hospital's psychiatric evaluation of Williams was that he was
a candidate for hospitalization but that, because no bed was
available, he was referred elsewhere. (Attach. 4)   He entered a
mental health live-in program, awaiting treatment.  On October
21, 1987, his medical records show he told his case manager he
had lost his job and, because he had a $500/day cocaine habit, he
was taking it from drug dealers.  He said he knew this could get
him killed.  Because of defendant's body language and general be-
havior and demeanor, the case manager questioned Williams' denial
of "homicidal ideation." (Attach. 5)  As of the last entry on
July 28, 1988 (four months before the shootings), Williams' medi-
cal records note:  "He is in continued need of mental health ser-
vices at this time." (Attach. 6) [8]/

---

[8]     Upon investigation, defendant can present evidence to
authenticate his mental health records.

Even though he had these mental health records, defendant's counsel failed to even interview the defendant's case manager or counselor to develop support or these records.  On August 4, 1989, well before trial, defendant's counsel had defendant interviewed by a doctor who recommended further testing of defendant.  Counsel, however, failed to pursue it. [9]

### CONCLUSION

For the reasons above, this Court should vacate, set aside or correct the sentence of defendant and/or grant a new trial.  However, should the Court not be able to grant the motion because of a lack of factual support, it should suspend determination of the motion and reopen a proceeding under 11 D.C. Code sect. 2605 on defendant's request for investigative and other services to obtain such support.

Dated:  April 10, 1992.          Respectfully submitted,

DENNIS LAW CORPORATION
1255-23rd Street, N.W., 5th Floor
Washington, D.C. 20037-1194
(202) 857-2508

By _____
        Michael J. Dennis
   Counsel for Defendant Williams
(Appointed for 23-110/Rule 33 Motion)

---

[9]  Same as footnote 3, supra.

-10-

[A8]

*Parkway Guest House*
1262 TALBERT ST. SE
WASHINGTON D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date 10-22-88

Name _David Marsh_

Address _2215 Fairchild ST SE_

City _Washington_ State _D.C._

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 115 Am | 1 | 17.00 | BCS | 315 Am |

Remarks

H        17.00

No. 37101

---

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date 10-22-88

Name _T. King_

Address _2738 Bruce PL SE_

City _Washington_ State _D.C._

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 115 | 6 | 17.00 | BCS | 3.6 Am |

Remarks

H        17.00

No. 37102

---



*Parkway Guest House*
1262 TALBERT ST SE
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

No. 37103

ATTACHMENT 1
Page 1 of 7

[A9]

## Parkway Guest House
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Date 10-23-88

Name Louis Jenkins

Address 1304 Euclid St

City Wash     State D.C.

Money, Jewels, and other valuable packages must be placed in
the office otherwise the management will not be responsible
for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 3 30 Arr | 46 | 23.80 | BW5 | 8 30 am |

Remarks                    23.00

No. 37104

## Parkway Guest House
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Date 10-23-8

Name

Address

City     State

Money, Jewels, and other valuable packages must be p
the office otherwise the management will not be res
for any loss.

| Arrived | Room | Rate Tax | Clerk | De |
|---------|------|----------|-------|-----|

23.00

No. 37105

## Parkway Guest House
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

No. 37106

ATTACHMENT 1
Page 2 of 7

[A10]

*Parkway Guest House*
1262 TALBERT ST S.E
WASHINGTON, D C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Date 10-23-88

Name *Melvin M. Maddox*

Address 1495 Bangor S.T S.E #4

City _____ State _____

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 7:60 Am | 5 | 21.00 | BC5 | 1:10 Am |

Remarks

2100··

No. 37107

---

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date OCT 24, 1988

Name *Craig Ward*

Address 2344 Patty Pl SE

City DC State _____

Money, Jewels, and other valuable packages must be placed the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 7:20 Am | 4 | 26.00 | BC5 | 3:32 Pm |

Remarks

·6.00··

No. 37108



*Parkway Guest House*
1262 TALBERT ST S.E.
WASHINGTON D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Date 10-23-88

Name _____

Address _____

City _____ State D.C.

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departing |
|---------|------|----------|-------|-----------|
| | 5 | 21.00 | R80 | 4:45 |

Remarks

2100··

No. 37109

ATTACHMENT J
Page 3 of 7

[A11]

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date 10-23-88

Name Albert G Green

Address 8th T Mac Place -E

City Wash        State TC

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 6 15 pm | 5 | 18.00 | BCS | 8 15 pm |

Remarks

H        18.00

No. 37111

---

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date 10-23-8

Name Al Washington

Address 1420 C St NE

City Wash        State DC

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Dep |
|---------|------|----------|-------|-----|
| 5 10 pm | 6 | 21.00 | BCS | 8 |

Remarks

H        21.00

No. 37110

---

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date 10-23-88

Name

Address 3847-34th St SE

City Wash DC        State DC

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 6 37 pm | 1 | 18.00 | BCS | 8 35 pm |

Remarks

18.00

No. 37112

ATTACHMENT 1
Page 4 of 7

[A12]

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D. C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Name _H Usury_ Date _10-23-88_

Address _135 Nit co rose wort_

City _cm 24_ State _Dc_

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 7:30 pm | 7 | 18.00 | BLS | 9:30 pm |

Remarks

| | | H | 18.00 |

No. 37113

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D. C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Name _James Lessons_ Date _10-23-8_

Address _2908 S ST SE_

City _____ State _____

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | D |
|---------|------|----------|-------|---|
| 8:22 pm | 8 | 21.00 | BLS | |

Remarks

| | | H | 21.00 |

No. 37114

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D. C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Name _Patrice Brown_ Date _10-23-88_

Address _1650 Gel St_

City _Washington_ State _DC_

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 8:10 pm | 2 | 18.00 | BLS | 10:10 pm |

Remarks

| | | H | 18.00 |

No. 37115

[A13]

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Date 10/23/88

Name _____

Address _____

City Washington D.C. State _D.C._

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 8 45 pm | 4 | 18.00 | BCS | 10.45 pm |

Remarks

18.00

No. 37116

---

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Date _____

Name _____

Address _____

City _____ State ___

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Depart. |
|---------|------|----------|-------|---------|
| 9 45 pm | 5 | 18.00 | BCS | 11 |

Remarks

18.00

No. 37117

---

*Parkway Guest House*
1262 TALBERT ST. S.E.
WASHINGTON, D.C. 20020
PHONE 678-9835

Notice: No Refunds To Guests After Receipt is Issued

Date October 23 88

Name Sharon Dummer

Address 2290 Hunter Pl. S.E.

City WDC State ____

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 11 pm | 4 | 39.00 | BCS | 8.00 am |

Remarks

No. 37118

ATTACHMENT 1

[A14]

## Parkway Guest House
### 1262 TALBERT ST. S.E.
### WASHINGTON, D.C. 20020
### PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date _10-23-88_

Name _Mr & Mrs Love_

Address _4150 Buns R SE_

City _____ State _____

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 11 15 pm | 5 | 21.00 | BLS | 2 05 Am |

Remarks

H     21.00

No. 37119

## Parkway Guest House
### 1262 TALBERT ST. S.E.
### WASHINGTON, D.C. 20020
### PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date _10-23-88_

Name _HAROLD THOMAS_

Address _619 13TH SE_

City _____ State _____

Money, Jewels, and other valuable packages must be placed the office otherwise the management will not be responsi for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 11 30 pm | 6 | 18.00 | BLS | 12 Am |

Remarks

N     18.00

No. 37120



## Parkway Guest House
### 1262 TALBERT ST. S.E.
### WASHINGTON, D.C. 20020
### PHONE 678-9835

Notice: No Refunds To Guests After Receipt Is Issued

Date _10-24-88_

Name _CEDRIC FREEMAN_

Address _____

City _Wash_ State _DC_

Money, Jewels, and other valuable packages must be placed in the office otherwise the management will not be responsible for any loss.

| Arrived | Room | Rate Tax | Clerk | Departure |
|---------|------|----------|-------|-----------|
| 10 30 Am | 6 | 18.00 | BLS | 1 30 Am |

Remarks

18.00

No. 37121

ATTACHMENT 1
Page 1 of 7

[A15]

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

```
------------------------X
UNITED STATES OF AMERICA :
                         :
                         :
          v.             :   Criminal Action Numbers
                         :         F-14043-88
                         :         F-14042-88
CRAIG A. WILLIAMS,       :
                         :
          Defendant.     :
------------------------X
```

Washington, D.C.

Thursday, November 19, 1992

The above-entitled action came on for a hearing before the Honorable HENRY GREENE, Associate Judge, in Courtroom Number 314.

**APPEARANCES:**

On behalf of the Government:

DAVID BAUM, Esquire
CAROLYN KOLBEN, Esquire
Assistant United States Attorneys

On behalf of the Defendant:

MICHAEL DENNIS, Esquire
Washington, D.C.

ELIZABETH GRAYBILL,
OFFICIAL COURT REPORTER                    Telephone:  879-1082

[A16]                                                         1

TABLE OF CONTENTS
MOTION
WITNESSES


On behalf of the Defendant:

SHAWN MOORE

     Direct examination by Mr. Dennis. . . . . . . . .13
     Cross-examination by Ms. Kolben . . . . . . . . .55
     Cross-examination by Mr. Baum . . . . . . . . . .72
     Redirect examination by Mr. Dennis. . . . . . . .78

CRAIG WILLIAMS

     Direct examination by Mr. Dennis. . . . . . . . .85
     Cross-examination by Ms. Kolben . . . . . . . . .93
     Cross-examination by Mr. Baum . . . . . . . . . 108
     Redirect examination by Mr. Dennis. . . . . . . 113

EXHIBITS

|                              | Marked | Admitted |
|------------------------------|--------|----------|
| On behalf of the Government: |        |          |
| Number One . . . . . . . .   | 57     | 119      |
| Number Two . . . . . . . .   | 58     | 119      |
| Number Seven . . . . . . .   | 95     | 98       |
| Number Eight . . . . . . .   | 95     | 98       |
| On behalf of the Defendant:  |        |          |
| ✓Number One . . . . . . . .  | 27     | 117      |
| Number Two . . . . . . . .   | 36     | 117      |
| Number Three . . . . . . .   | 43     | 117      |
| Number Four. . . . . . . .   | 47     | 117      |
| Number Five. . . . . . . .   | 48     | 117      |
| Number Six . . . . . . . .   | 48     | 117      |
| Number Seven . . . . . . .   | 49     | 117      |
| Number Eight . . . . . . .   | 52     | 117      |
| Number Nine. . . . . . . .   | 91     | 117      |

MISCELLANY

Proceedings, November 19, 1992. . . . . . . . .  3
Afternoon session . . . . . . . . . . . . . . . 71
Court Reporter's certificate. . . . . . . . . . 54

[A17]

2

```
 1        A    Yes.

 2        Q    And, in that letter, Mr. Williams lists the

 3   things he'd like you to do?

 4        A    Correct.  Are you talking about with respect

 5   to the 42 case, or the whole -- the entire document?

 6        Q    It does relate to both cases, doesn't it?

 7        A    Yes.

 8        Q    And, in the 42 case, the one where you said

 9   the only witness was Tony Fletcher --

10        A    Yes.

11        Q    -- Mr. Williams discusses the 42 case on

12   Page 4?

13        A    Yes.

14        Q    And, he tells you he wants you to interview

15   David's other girlfriend, Windy?

16        A    Correct.

17        Q    He says he wants you to interview Tony and

18   Teena?

19        A    I see Tony and Teena, yes.

20        Q    And, there is an address and a phone number

21   there?

22        A    Right.

23             THE COURT:  What was the other girlfriend?

24             THE WITNESS:  Windy, W-i-n-d-y.

25             THE COURT:  Thank you.
```

28

1     Q    And, Sandy?

2     A    Get as much dirt as you can on Anthony Shepard

3  and Sandy, that's right.

4     Q    So, Tony Fletcher was not the only witness he

5  wanted you to contact in the 42 case?

6     A    He wanted me to contact other people.  I don't

7  think, from what I knew of the 42 case, that these were

8  possible witnesses.  However, if they are -- if they are

9  indeed witnesses, then, you'd be accurate, yeah.

10     Q    Well, let's talk about it some.  What happened

11  at the corner of H and 46th Street?  That's where the

12  killing took place, was it not?

13     A    Right.

14     Q    So, contacting the people in those houses are

15  potential witnesses?

16     A    Well, I believe, Mr. Dennis, that I wrote an

17  investigative memo and asked the investigators to do

18  some canvassing in the building.

19     Q    So, those are potential witnesses?

20     A    Correct.

21     Q    And, David's other girlfriend, the David

22  referred to there is David Golden?

23     A    Correct.

24     Q    And, his other girlfriend Windy is another

25  potential witness?

30

1    A    Yes.

2    Q    And --

3         THE COURT:  Were some of these --

4         THE WITNESS:  Well, the point with respect to

5    Tony Fletcher would have been that of all the people

6    mentioned thus far, that if anyone had any knowledge of

7    what happened other than -- other than -- other than

8    Sandra Plummer, it would have been Tony Fletcher, in

9    other words, somebody who might provide an alibi for Mr.

10   Williams, or something -- you know, something along

11   those lines.  That was the significance of Tony

12   Fletcher.

13        The other people mentioned were not people

14   that I thought could provide any kind of alibi testimony

15   or anything of that nature.  Perhaps they could have

16   provided some testimony on Ms. Plummer's drug use, or

17   things like that.  But, in terms of any kind of intimate

18   knowledge at all of the Golden killing, no.

19        BY MR. DENNIS:

20   Q    Well, you knew that Mr. Williams was telling

21   you that Sandra Plummer shot David Golden?

22   A    In part.

23   Q    She shot David Golden at least one time?

24   A    She shot him -- Mr. Williams is telling me

25   that Ms. Plummer fired the first shot.  He then took the

32)

1      Q    Did you ever learn prior to trial, that Sandra

2   Plummer would say she had spent her entire stay at the

3   Guest House -- at the Parkway Guest House with the

4   defendant?

5      A    No.

6      Q    Now, did you, or your investigator, ever go to

7   the Parkway Guest House to obtain or review documents?

8      A    The investigator went and got documents, yes.

9   The -- I think the registration slips, or copies of

10  them.

11     Q    And, was there any particular reason that you

12  didn't use these documents at trial?

13     A    I didn't think that they would help show that

14  Ms. Plummer was lying.  There was something of a problem

15  with that, I think the date on one of them, they were

16  kind of out of sequence, and just in terms of cross-

17  examination, I didn't think that they were going to help

18  prove up that she was lying.

19          THE COURT:  Okay.  We've got -- we do have to

20  stop right here. I wanted to accommodate Mr. -- do you

21  have cross-examination?

22          MR. BAUM:  I did, briefly, Your Honor.

23  Probably shorter than Ms. Kolben.

24          THE COURT:  Do you have other objections?

25          THE WITNESS:    I can stay around.


69

1      Q    So, it's your testimony that the mistake you made
2    was when you signed the registration at the Guest House?  Or
3    is it your testimony that the mistake you made was in your
4    affidavit?

5      A    No, the mistake I made as to the date of my
6    check-in time was made at the Guest House on the 23rd; it
7    was actually the 24th.

8      Q    Now, it's your testimony that you were never with
9    Sandra Plummer at the Guest House on the 23rd, or the 24th;
10   correct?

11     A    Correct.

12     Q    So, it's your contention that it was purely
13   coincidental that the receipts from the Guest House, as they
14   stand, show that you were assigned to Ms. Plummer's room on
15   October 24th, after she had already checked in?

16     A    No, it does not show that I was signed to Ms.
17   Plummer's room.  What the record shows was that I came
18   in -- may I see a copy of it, please?

19     Q    Sure.

20          (A pause.)

21     A    No, the whole thing.

22                      (Thereupon, Government's Exhibits
23                      Number 7 and 8  was marked for
24                      identification.)

25          MS. KOLBEN:    Your Honor, at this time, what I'm

                                                              95

[A22]

```
 1  showing the witness is the receipt marked Parkway --
 2          THE COURT:  Have you shown it to Mr. Dennis?
 3          MS. KOLBEN:   Mr. Dennis has a copy.
 4          THE COURT:  Well, I want to make sure Mr. Dennis
 5  knows what Mr. Williams is looking at.
 6          MR. DENNIS:   I want to make sure it's the same
 7  thing.
 8          THE COURT:  So, show it to Mr. Dennis and then
 9  show it to Mr. Williams.
10          MS. KOLBEN:  Court's indulgence, please?
11          (A pause.)
12          MS. KOLBEN:  Your Honor, at this time, I'm going
13  to show the defendant what's been marked as Government's
14  Exhibit 7 and Government's Exhibit 8.
15          THE COURT:  And, these are a portion of records
16  attached to your --
17          MS. KOLBEN:  To defense counsel's original motion.
18          THE COURT:  Okay.
19          BY MS. KOLBEN:
20      Q    And, Government's Exhibit 8, which I'm showing
21  you, is a receipt dated October 24th, 1988, with your
22  signature, showing that you checked in at seven thirty a.m.,
23  to Room 4; isn't that correct?
24      A    No, that's not -- what you were saying, you're
25  showing him is correct, but the date on this receipt is not
```

96

[A23]

1    correct.

2         Q    And, it should have been what date?

3         A    It should have been the 23rd; the receipt, the

4    bottom of the receipt that you were just discussing is

5    Number 37108.  The receipt before that is 37107, which is

6    for ten, twenty three, eighty eight.

7         Q    Okay, so it's your contention that this should be

8    October 23rd, 1988?

9         A    Yeah.

10        Q    And, that you checked in at seven thirty a.m. on

11   the 23rd and that you checked out at three thirty on the

12   23rd; correct?

13        A    Three thirty, p.m., yes.

14        Q    And, you were in Room Number 4; correct?

15        A was in Room Number 4.

16        Q    Okay.  Now, I'm going to show you what's been

17   marked as Government's Exhibit 7, which is Sandra Plummer's

18   receipt, which is Receipt Number 37118, dated October 23rd,

19   1988, which reflects that she checked in at eleven p.m. and

20   checked out at eight o'clock a.m.; correct?

21        A    I don't know when she --

22             THE COURT:  What number receipt is that?  I'm

23   sorry.

24             MS. KOLBEN:    37118.

25             THE COURT:    37118.

97

[A24]

1              THE WITNESS:     According to the receipt, she

2     checked in at eleven p.m.  I actually don't know when she

3     checked in.  I received a call from the Parkway Guest House

4     and I met Plummer and Fletcher in the general area --

5              BY MS. KOLBEN:

6         Q    And, it's just purely coincidental --

7         A    -- around eight, you know, in the morning.

8         Q    That would be eight in the morning on the

9     twenty --

10        A    The twenty third.

11        Q    Of the 23rd.  So, it's purely coincidental that

12    you were both assigned to the Room Number 4?

13        A    No, that was on the 24th right there.  Eight in

14    the morning ont he 24th.

15        Q    And, it's just purely coincidence you were both

16    assigned to Room 4?

17        A    Yes.

18             MS. KOLBEN:    Your Honor, I'd ask that these two

19    documents be admitted.

20             THE COURT:    They will be received.  I said, I'd

21    receive everything that was attached.

22                            (Thereupon, Government's Exhibits

23                             7 and 8 were admitted.)

24             BY MS. KOLBEN:

25        Q    Was there anybody there filling out the dates on

98

[A25]

1    Motion for New Trial, in the 43 case.

2              THE COURT:  Just a moment.

3              (A pause.)

4              What pages were they?

5              MR. BAUM:  Government's Opposition to Defendant's

6    Motion.  That's the main Government pleading, at Page --

7    Pages 6 at the bottom all the way through Page 8.

8              THE COURT:  Okay.

9              MS. KOLBEN:   Your Honor, is there anything the

10   Court wants to hear --

11             THE COURT:  No, no.

12             MS. KOLBEN:  Thank you.

13             THE COURT:   Okay.  With regard to this matter,

14   I'm going to deny the motion for relief, pursuant to

15   23 D.C.Code, Section 110, because I believed that the record

16   quite plainly shows that none of the grounds asserted by Mr.

17   Williams entitles him to relief, in regard to either of the

18   two cases.

19             With respect to Case F-14043-88, which involved

20   the killing of Shawn Herbert, and the assault with intent to

21   kill Harold Hathaway on November 22nd, 1988, first of all,

22   I've already dealt with the allegations concerning the

23   alleged bias of the jury foreperson in that case.  The

24   allegation was, that because of a post trial interview with

25   the Washington Post, the foreperson said the jury believed

                                                        140

11/19/92

1  wholly speculative assertion and apparently, not relied upon

2  heavily by Mr. Dennis today.

3           With regard to F-14042-88, the motion to vacate in

4  that case, and that relates to the killing of David Golden

5  on October 22nd, 1988, first the allegation that Mr. Moore

6  erroneously advised Mr. Williams not to testify, because he

7  could not be impeached by his prior -- because he could be

8  impeached by his prior conviction in F-14043-88 is just not

9  true, because I don't believe that Mr. Moore ever told Mr.

10  Williams that.  He told him other reasons that would be

11  unadvisable to testify, and Mr. Williams, as he testified

12  himself today, weighed those reasons and decided not to

13  testify.  But, that's certainly was not ineffective

14  representation by Mr. Moore.

15           With regard to the alleged delays in that

16  investigation, the record just refutes the allegations that

17  there were alleged delays.  Mr. Moore's investigation was

18  thoroughly, was thorough, it was timely, there was no

19  proffer as to what exculpatory evidence, any alleged lost

20  witnesses would have given in this case, there was no

21  proffer as to the identification of any witnesses, no

22  affidavits from them, to the effect that they would have

23  testified that Sandra Plummer admitted she killed Mr.

24  Gold -- Mr. Golden, or that would have sustained any of

25  other -- any of Mr. Williams' other allegations about Sandra

148

[A27]

## 11/19/92

1  Plummer.

2  　　　　Again, Mr. Williams lies -- relies wholly upon his

3  allegations against Ms. Plummer, which based on the jury's

4  assessment of his testimony in two different cases, and this

5  Court's assessment of his testimony, both in those cases and

6  in this proceeding, reflects that it is wholly unreliable,

7  and wholly incredible.

8  　　　　With regard to -- and of course, there's also

9  evidence that is set forth in the Government's opposition,

10 that counsel made very substantial efforts to locate defense

11 witnesses in that case, at Pages 32 to 34 of the

12 Government's opposition.

13 　　　　The allegation about the failure of counsel to

14 visit the crime scene is just one more example of wholly

15 unsupported speculation by Mr. Williams.   In fact, Mr.

16 Moore, the Court is satisfied, did visit the crime scene.

17 And, there's no evidence to the contrary.

18 　　　　With regard to the alleged ineffectiveness in

19 cross-examining Ms. Plummer, that allegation is basically,

20 as I understand it, that Mr. Moore failed to show, through

21 the Guest House registration records, that she and the

22 defendant were not registered there at the same time.   I

23 believe that, when one examines those records, as Government

24 counsel showed today, and as a careful examination of the

25 records reflects, that one can conclude, from those records,

149

[A28]

## 11/19/92

1  that indeed, the defendant and Ms. Plummer were there at the

2  same time.  And thus, Mr. Moore's conclusions that those

3  records would not have assisted Mr. Williams' defense, I

4  think is well-taken.

5       The Guest House registration shows, there's one

6  with Mr. Williams' name, that shows registration, that shows

7  a seven thirty a.m., and a three thirty p.m., arrival and

8  departure on October the 24th.  But, as Mr. Williams'

9  testimony made clear, the sequence of other records makes it

10  clear, that that occurred on October 23rd.  Ms. Plummer's

11  receipt shows an eleven p.m. arrival on the 23rd, and an

12  eight a.m., departure from the same room, on the 24th.

13  Thus, even the records themselves, particularly given the

14  coincidence concerning the room number, strongly suggest

15  that these two folks were together at the same time.

16       Now, Ms. Plummer's testimony corroborates the time

17  of the defendant's arrival at the Guest House on October

18  23rd, but she says they registered in her name, when in

19  fact, it was in the defendant's name.  She says they left

20  the Guest House on October 24th, and the record shows that,

21  while she left on the 24th, he left at three thirty, p.m.,

22  on the 23rd.  But, when one looks at that three thirty p.m.

23  on the 23rd, it appears that a change was made in the "p",

24  and that it could have possible been an "a", and that

25  indeed, Mr. Williams could have left at three thirty a.m. on

150

[A29]

**11/19/92**

1   the 24th.

2        So, if you look at these records carefully, I have

3   to subscribe to Mr. Moore's conclusion, that -- that it's

4   very unlikely that they would have helped Mr. Williams'

5   defense in this case.

6        Regarding the failure to develop an insanity

7   defense in this case, it seems to me the remarks I made with

8   regard to Case F-14043-88 are equally apposite to

9   F-14042-88.

10        So, for all of those reasons, I am satisfied that

11   the defendant has failed to show that he's entitled to

12   relief in this case.

13        I think the last thing that warrants observation

14   in this case is that, while these are extremely serious

15   offenses for which Mr. Williams was convicted, and

16   nevertheless, he had what my notes and my recollection

17   reflects, were lengthy and fair trial in which he was

18   represented by one of the most able lawyers that this Court

19   has come to know in my eleven and a half years on the bench

20   in this City.  And, it is troubling to me, that Mr. Moore

21   was placed in the position he was in this case, and having

22   to take a good deal of time from his professional

23   responsibilities, both in court today and in preparation for

24   this proceeding, both before today and in affidavits he

25   prepared for the Government, to defend what is essentially

                                          151

11/19/92

1  unassailable conduct by a lawyer.  Mr. Moore prepared for

2  the trials in these two cases, and advocated on behalf of

3  Mr. Williams with more thorough preparation, care,

4  imagination, zeal, and ability than one sees from counsel

5  most of the time in this Court.  And, it is really

6  unfortunate that a lawyer of the estimable ability of Mr.

7  Moore, should be put to having to defend his representation

8  when it was such an extraordinary level of ability as that

9  which he supplied to Mr. Williams in this case.

10        Nevertheless, I felt constrained under the case

11  law as I read it in this jurisdiction, to require Mr. Moore

12  to testify regarding those matters where his credibility was

13  put in issue as to whether or not he had done certain kinds

14  of preparation, or done certain kinds of things on Mr.

15  Williams' behalf, or whether he had given Mr. Williams, or

16  failed to give Mr. Williams certain kinds of advice.  And,

17  Mr. Williams' allegation in that regard were spun largely of

18  whole cloth, but nevertheless, it seemed to me, I was not in

19  a position to rely on Mr. Moore's affidavits in this case,

20  based on the case law, as I understand it.  And, it was for

21  that reason that I required a hearing in this case.  It came

22  as no surprise to me, that none of the allegations about Mr.

23  Moore's conduct were borne out by the hearing.

24        So, a jacket entry should reflect the denial in

25  each of these cases, of the motions for relief, pursuant to

152

[A31]

11/19/92

1  23 D.C. Code 110, and the Court's oral reasoning in support

2  of its rulings will be part of the transcript of these

3  proceedings.

4          Thank you.

5          I will return to you this Grand Jury testimony,

6  which is under seal, since it was not considered by the

7  Court in reaching this determination.

8          Okay, thank you.

9          And, I will permit the -- the motion that we said

10 will be filed under seal to be filed under seal, and then, I

11 will get with you on what proceedings you do and don't have

12 in the Court file in this case.

13         MR. BAUM:  Thank you, Your Honor.

14         THE COURT:  Thank you.

15         Okay, Marshal, thank you, you can step him back.

16         (Thereupon, the proceedings in this case on this

17     date were concluded.)

18

19              * * * * * *

20

21

22

23

24

25

153

[A32]

# BRIEF OF APPELLANT

---

# District of Columbia

# Court of Appeals

---

**NOS. 90-627 & 93-CO-144**

---

*CRAIG A. WILLIAMS,*

Appellant,

vs.

*UNITED STATES OF AMERICA,*

Appellee.

---

APPEAL FROM THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION

---

DENNIS LAW CORPORATION
MICHAEL J. DENNIS
1255-23rd Street, N.W., 5th Floor
Washington, D.C. 20037-1194
(202) 857-2508

Cr. No. F14042-88

**[A33]**

# Table of Contents

| | | | Page |
|---|---|---|---|
| ISSUES | | | 1 |
| STATEMENT OF THE CASE | | | 2 |
| | NATURE OF THE CASE, PROCEEDINGS BELOW AND DISPOSITION | | 2 |
| | STATEMENT OF FACTS | | 2 |
| ARGUMENT | | | 14 |
| | I. | STATEMENTS IN CUSTODY WERE INADMISSIBLE | 14 |
| | II. | OTHER CRIMES EVIDENCE IMPROPERLY ADMITTED | 18 |
| | III. | GOVERNMENT'S OPENING STATEMENT WAS IMPROPER | 19 |
| | IV. | PLUMMER CROSS-EXAMINATION WAS INEFFECTIVE | 20 |
| | V. | GOVERNMENT'S CLOSING ARGUMENT IMPROPER | 21 |
| | VI. | A MISTRIAL SHOULD HAVE BEEN GRANTED | 22 |
| | VII. | THE TRIAL COURT LACKED AUTHORITY AND JURISDICTION TO ENTER POST-TRIAL ORDERS TO PAY COSTS | 23 |
| | VII. | CONCLUSION | 25 |

_Did not address_ (handwritten annotation next to item IV)

## ISSUES

1.    Whether the trial court erred in denying appellant's motion to suppress evidence of his statements while in police custody.

2.    Whether appellant's counsel was ineffective in cross-examining the government's chief witness.

3.    Whether evidence of appellant's other crimes was properly admitted.

4.    Whether the trial court should have declared a mistrial because of the government's opening statement.

5.    Whether appellant's counsel was ineffective in not objecting to the government's closing argument.

6.    Whether the trial court should have granted appellant's mistrial motion.

7.    Whether the trial court had authority under the Victims of Violent Crime Compensation Act of 1981, D.C. Code §§ 3-401, *et seq.*, to order appellant to make a payment from a source other than prison pay.

8.    Whether the trial court had jurisdiction, during the pendency of this appeal from its judgment, to alter its judgment to require appellant to make a payment from a source other than prison pay.

## STATEMENT OF THE CASE

NATURE OF THE CASE, PROCEEDINGS BELOW AND DISPOSITION

Mr. Craig A. Williams appeals his conviction for First Degree Murder While Armed and for Carrying a Dangerous Weapon-Felony, upon which he was sentenced on April 11, 1990, to 20 years imprisonment for murder and one year for the weapons charge. Appellant filed timely notice of this appeal on April 27, 1990.

Appellant Williams also appeals the granting of the government's post-trial motion, filed July 10, 1992, for an order requiring partial payment of costs. The Superior Court, the Honorable Henry F. Greene, judge presiding, entered his order on the motion on January 10, 1993, from which appellant filed timely notice of appeal on January 29, 1993.

STATEMENT OF FACTS

This case arises from the murder of David Golden on October 22, 1988.

Pretrial Appellant Williams moved pretrial to suppress his statements made while in police custody. After his arrest, officers of the Metropolitan Police Department interviewed appellant for a prolonged period, only a portion of which was recorded on audiotape. At the hearing on appellant's motion, the government presented the audio tape and the testimony of Detective Alfonso Terrell Based on the testimony, a review of the poor quality audio tape and

- 2 -    **[A36]**

"from seeing Mr. Williams in a previous trial," the trial court found that Mr Williams made a knowing and intelligent waiver of his right to remain silent. (3/7/90 Tr. 204)

Officer Terrell testified that he stood by as Detective Villars read Mr. Williams his rights from the PD 47 form in the interview room at the police station. (3/7/90 Tr. 167-170) As appellant responded to each question, Detective Villars wrote "Yes" next to the question on the PD 47 form and then initialed the card. (3/7/90 Tr. 168-170) When asked why appellant did not fill in the answers, Detective Terrell testified that he was not sure whether or not Mr. Williams refused to write in the answers. (3/7/90 Tr. 180-181) After Detective Villars finished reading appellant his rights, appellant refused to sign the form. (3/7/90 Tr. 170) Detective Terrell testified that appellant said "(h)e would talk, but he didn't want to sign anything." (Id.) The police never asked appellant why he did not want to sign the PD 47 form and he never volunteered a reason for not signing. (3/7/90 Tr. 170-171)

The interview continued and went on for approximately 90 minutes more. (Id.) When the interview was continued, it was recorded on audiotape. (3/7/90 Tr. 171) Detective Terrell testified that the police asked appellant if they could record the interview on videotape and that appellant refused to agree to videotaping. (3/7/90 Tr. 171-172) Upon reviewing the audiotape, the trial court found that appellant had not been advised of his rights while the tape was running, but that "there was a reference to the fact that Mr. Williams had previously been warned of his rights." (3/7/90 Tr. 199) The trial court observed, however, that it "could not be very confident in reaching any conclusions about anything based on listening to the tape" because of the poor quality of the recording. (3/7/90 Tr. 162-163) In fact, the tapes were not played at the trial because they were of "very poor quality." (3/7/90 Tr. 161)

Detective Terrell testified that, during the interview, appellant said that on the day David Golden was killed "he had met with him [Golden] between eight and 8:30 at 2200 Hunter Place." (3/7/90 Tr. 173) He told them he went to see Mr. Golden with his girlfriend Ms. Plummer and they they had driven together to some place in southeast Washington where Mr. Williams was dropped off at about ten o'clock. (3/7/90 Tr. 173-174). Appellant did not say where he was when Mr. Golden was killed. (3/7/90 Tr. 174)

Following the presentation of evidence at the pretrial hearing, the trial court ruled that by a preponderance of the evidence the government met its burden of showing a knowing and intelligent waiver by appellant Williams of his rights. Specifically, the court stated:

"I guess if the burden is preponderance of the evidence, I really have to discredit Detective Terrell's testimony to conclude that the government failed to carry that burden, and I don't think I have any basis to discredit his testimony. I mean, this isn't a situation where the defense has put on any evidence suggesting that he did not waive. So the only evidence I have is the detective's testimony."

"It certainly seems to me it -- you know, if I had to find it by a reasonable doubt, I wouldn't, but I think it's clear there's a preponderance of the evidence, based on the detective's testimony, that his man waived his rights."

"The Court has noted -- I mean, I've seen any number of cases where the defendant has refused to sign things. There is a lay view, I suspect, in the community that you don't get in trouble if you don't sign things. It's clear to me both from listening to the tape and from seeing Mr. Williams in a previous trial, that Mr. Williams is a very intelligent individual, and I suspect strongly that he was calculating that as long as he wasn't

seen doing what he was doing, and as long as he didn't actually sign something, it couldn't get him into trouble, but I don't -- that's obviously not the law, and I credit Detective Terrell's testimony."

"I think, under the circumstances, I find a knowing and intelligent waiver by Mr. Williams of his rights, so I'm going to deny the motion to suppress these statements to Detective Terrell." (3/7/90 Tr. 204-205)

Also just before the trial, counsel extensively discussed with the trial court the extent to which the government would be allowed to adduce evidence of appellant's threats against the prosecution witness Sandra Plummer and her family as an explanation for why Plummer first gave the police an exculpatory statement denying that she or appellant were involved in shooting Golden. (3/6/90 Tr. 227-241) The trial court ruled that the government would not be allowed to introduce evidence of these threats in its direct examination of Plummer, even if the government is "drawing the sting" by revealing in its questioning of Plummer that she gave the exculpatory statement. (3/6/90 Tr. 228, 236-237) The trial court ruled that only if appellant's cross-examination of Plummer "opened the door" to further testimony about the exculpatory statement would the government be permitted to elicit evidence of appellant's threats. (Id.) Given the trial court's holding, appellant's counsel then announced that his cross-examination of Plummer would be "significantly limited." (3/6/90 Tr. 240)

Trial  In its opening statement, despite the trial court's ruling and the announcement of appellant's counsel moments before, the government told the jury that appellant threatened Plummer. The government stated that evidence would be adduced that, after Plummer observed appellant shoot Golden, that she "ran with Mr. Williams in terror and stayed with him

- 5 -  [A39]

for the next two months in terror" and that she would testify "that her life was threatened, her family (sic) life was threatened." (3/6/90 Tr. 243-244) Pointing to appellant, government counsel told the jury he "terrorized Sandra Plummer, threatening her life that if she told what she will tell you today, he would kill her." (3/6/90 Tr. 254)

Plummer testified at trial that she and appellant were at the scene at the time of the murder of David Golden on October 22, 1988. (Tr. 313-318) For the next two days, appellant kept Plummer, first delivered by Tony Fletcher to a Days Inn Motel in Arlington, Virginia, where they stayed for a day, then appellant took Plummer to a guest house in Southeast Washington, where they stayed a day, and departed on the morning of October 24, 1988. She and appellant had had a boyfriend-girlfriend relationship for approximately nine months since January 1988. (Tr. 260) By contrast, she said that appellant told her, he had been close friends with Golden since the early 1970's. (Tr. 273) Plummer said she first met Golden three days earlier, on October 19, 1988, at Golden's apartment. (Tr. 267-268)

Plummer testified that the next day, on October 20, 1988, she and appellant returned to Golden's apartment. (Tr. 269) Later that day, they went to a used car lot, where Golden said he had a contact who could provide cocaine. (Tr. 276, 281) Plummer said that Golden and appellant each contributed $300 together to buy $600 worth of cocaine. (Tr. 281) Golden took the money and left the car lot with the contact to pick up the drugs. (Tr. 282) They agreed that Golden would return with the drugs and meet appellant that evening. (Tr. 283) Plummer denied that it had been her money that Golden took. (Tr. 412) She testified that appellant came looking for Golden, saying that Golden had not come by with the drugs as agreed. (Tr. 283-285)

On October 21, 1988, appellant told Plummer that he had seen Golden selling drugs but that, when appellant asked if Golden had the money or purchased the drugs, Golden said he was waiting for the drugs, that the drugs he was selling belonged to someone else and asked if appellant wanted the $300, to which appellant responded in the negative. (Tr. 286). Plummer testified that appellant told her he was going to kill Golden because Golden was making a fool of him, and that Golden had really used appellant's $300 to buy himself a car. (Tr. 291-292)

Over appellant's objection, the trial court allowed the government to elicit from Plummer that, on the night of October 21st, she was with appellant on Benning Road and H Street, where appellant sold drugs. (Tr. 435-440, 446-447) Tony Fletcher later also testified that, on that night, he was on Benning Road with appellant and Plummer and that, between that night and the next morning, he sold cocaine with appellant. (3/12/90 Tr. 12-14)

Plummer testified that, on the morning of October 22, 1988, she was in a car with appellant and Fletcher, when appellant told her and Fletcher that he was planning to kill "Dave" and insisted that Plummer join him. (Tr. 298-300) She said that appellant "went into details" telling Fletcher "everything he had planned to do," including the plan to tell Golden a fictitious story about some Jamaicans who had been giving him trouble that he needed Golden's help to "do" them, and appellant's plan of "doing" Golden instead. (Tr. 295-296, 300) Fletcher also testified that, on that morning, he drove with Plummer and appellant to Hunter Place, S.E., where Plummer lived. However, Fletcher did not testify to any statements about killing, but rather testified only that appellant said he needed to go to collect a $300 debt which Golden owed him. (Tr. 300; 3/12/90 Tr. 14-15) Plummer said that she and appellant went to Golden's apartment,

where appellant told Golden he wanted Golden to join him in going to Benning Road and H Street to "do" some Jamaicans. (Tr. 301-302) Pamela Harrington, Golden's girlfriend, testified that appellant came to the apartment she shared with Golden and woke them up at about 8:30 am that morning. (Tr. 592) Plummer testified that Golden left with her and appellant in Golden's car, with Golden driving, Plummer in the passenger seat and appellant in the back seat. (Tr. 303) Plummer testified that, when Golden briefly left the car, appellant reiterated that he was going "to do" Golden. (Tr. 306) Elizabeth Golden, decedent's mother, testified that her son came to her house that morning and that she saw a lady in the front seat and a heavyset black man in the back of her son's black Ford. (Tr. 598)

Plummer further testified that, after they reached Benning Road and H Street, she started to leave the car when she heard a loud sound in her ear, that she left the car and ran to the alley. (Tr. 313) At the time, she was wearing a long, light pink coat. (Tr. 313-314) When she looked back, she said she saw appellant outside the car, leaning in to reach something in the front seat area, then she saw that he had Golden's gun in his hand. (Tr. 318)

Linda Spriggs, who resided on H Street and was leaving her home in a car with her husband driving on October 22, 1988, testified that before noon she saw a woman standing by the alley in a long white coat with her arms crossed as if she were holding something. (Tr. 451, 454-458, 462) She also saw a man in the driver's seat and another on the passenger side of a parked car. (Tr. 457, 459, 465) When she heard three shots, she told her husband to drive away. (Tr. 462)

Gregory Jones, who was in the back seat of the Spriggs car at the time, testified that he noticed a girl in a white trench coat walking up H Street and also noticed a car with

- 8 -  [A42]

temporary license plates. (Tr. 483-485) He next heard three shots and turned to see a man lean-

ing into the car on the passenger side who then walked toward the girl. (Tr. 485-486) Although

he could not recall the man's complexion, he told the police the man had a medium complexion;

and he was unable to select anyone from police photographs. (Tr. 488-489) Police Detective

Jeffrey Mayberry testified that, on October 25, 1988, he showed Jones a nine photograph display

which contained appellant's photo, but he was unable to select anyone (3/12/90 Tr. 34-35)

Leo Spriggs, Linda's husband and a Metropolitan Police Department detective,

testified that at about 10 am on October 22, 1988, as he drove past, he saw a black female in a

white coat near the end of the alley on H Street and a dark-colored car parked on the street. (Tr.

470-471) He did not see anyone in or near the car. (Tr. 472) When he heard what sounded like

three gunshots, his wife told him to drive away. (Tr. 472) He turned and saw a heavy black

male walking toward the female near the alley. (Tr. 473) When he found two police officers on

duty, he returned to the scene with them in his car and drove around the area, looking for the

woman in the white coat. (Tr. 474-475)

Lorenzo Miller of 730-46th Street, S.E., testified that, on October 22, 1988, he

was watching TV there when he heard a gunshot. (Tr. 493, 496) He looked out his window and

saw a lady in a white coat standing outside a dark car. (Tr. 496-497) After going to another

window, he saw a man come out of the car and go in the passenger side of the car, then he heard

two more gunshots. (Tr. 499) He next saw the man take something from the front seat of the

car and take it up the alley toward the young woman. (Tr. 500) Then the man, who was stocky,

and the woman went quickly up the alley. (Tr. 501-503) Miller said he would not be able to

identify the man or woman if he saw them again. (Tr. 503)

-9- **[A43]**

Police officer Louis Cooper testified that, at 11:45 am on October 22, 1988, he responded to the corner of 46th and H Streets, S.E., to investigate a homicide inside a parked 1977 Ford. (Tr. 504-505) He recovered a shell casing, a bullet, a metal medallion that appeared to have been struck by a bullet and additional shell casings outside the car consistent with the one inside the car. (Tr. 511-515) Officer Cooper also found five fingerprints outside the car and six inside, none of which (according to stipulation) belonged to defendant. (Tr. 518-519, 640) Joseph Masson, a firearms identification expert, testified regarding the four .45 caliber automatic bullets (GX 10-14) he compared with four .45 caliber fired shell casings (GX 2-5) and said they could have been one at one time. (Tr. 575-577) He testified that all bullets were fired from the same gun, a Colt .45 caliber semiautomatic pistol. (Tr. 579-580) After examining a pullover sweater, he said that the muzzle of a firearm had been up against the front portion when fired. (Tr. 581-583) Dr. Rak Woon Kim, deputy chief medical examiner, testified as an expert in forensic pathology about his autopsy of Golden and the decedent's four gunshot wounds. (Tr. 566-567) He said that the cause of death was multiple gunshot wounds. (Tr. 566-567, 572)

Plummer further testified that, after she and appellant left the scene through the alley, they went to the apartment of Tony Fletcher. (Tr. 319, 322) Plummer testified that appellant told Fletcher, "It's done. I did him." (Tr. 324) Fletcher testified that Plummer and appellant were at his apartment when he arrived there at about 11:30 am. (3/12/90 Tr. 16) By contrast to Plummer's testimony concerning appellant's statement to Fletcher about "doing" Golden, however, Fletcher said that appellant never answered his question about what had happened. (3/12/90 Tr. 17) Plummer also testified that, at Fletcher's apartment, appellant put his two guns on the table, that Fletcher told appellant that he should let Fletcher get rid of the guns

- 10 - **[A44]**

and that appellant would not let Fletcher take the guns out. (Tr. 324) Fletcher, on the other hand, testified to the contrary that he did not see appellant with a pistol or pistols on that morning and only told appellant that, if he had a weapon, he should take it and leave. (3/12/90 Tr. 17, 24-25)

In the afternoon, Plummer, Fletcher and appellant went to a motel in Arlington, where they registered using Fletcher's identification and Plummer's name and address. (Tr. 325-326; 3/12/90 Tr. 17-18) Plummer testified that, in the motel room, appellant told her he had shot Golden twice in the chest. (Tr. 392)

The government also questioned her about a conversation she had with appellant about the shooting. In response to the government's prodding, she testified that he discussed his prior relationship with Golden, including that they had had a relationship since the 1970's, "that they were in some groups or organizations together" and "they had been locked up together." (Tr. 372-372) Appellant's counsel moved for a mistrial, arguing that an instruction to attempt to wipe the inflammatory remark from the jurors' minds would be worse than useless, because it would only reinforce the prejudice. (Tr. 373-380) The trial court denied the motion and decided, instead, to give a cautionary instruction. (Tr. 383-385) The trial court then gave an instruction which purported to repeat Plummer's testimony about appellant being "in jail" with Golden, then told the jury that it was irrelevant and was being stricken. (Tr. 391)

Plummer testified that, on October 23, 1988, she and appellant left the motel in Arlington and took a cab to the home of someone named "Moe" on Wade Road, S.E., where appellant and Moe talked about doing something to the barrel of appellant's gun, which appellant left with Moe (Tr. 333-334) She said that she and appellant then went to a "guest house" on

- 11 -   **[A45]**

Talbert Street, S.E., where they registered and spent the night together, then left together on October 24, 1988. (Tr. 334, 336, GX 35) Plummer said that they went first to Golden's apartment and then to Plummer's residence, where her sister gave her two business cards left by police detective's Herman Johnson and Dwayne Stanton who had been there the day Golden was shot. (Tr. 336-338) She said that, in the presence of appellant's brother and another person, appellant discussed what Plummer would say if questioned by the police and told her not to "fuck up" or he would kill her. (Tr. 339-340) Plummer testified that, later that day, she was with appellant when he telephoned to one of the two detectives. (Tr. 339) She said that she then spent about a week with appellant at the home of appellant's brother in Silver Spring, where appellant threatened her life and that of her family when she wanted to leave. (Tr. 341-342)

Police Detective Herman Johnson testified that he investigated the Golden murder and that, on October 26, 1988, he received a phone call from a caller who identified himself as "Craig" and complained about the police going to his house with their guns out. (Tr. 604) Johnson said that, without Johnson mentioning the Golden murder investigation, appellant told him he was not the last one with "that man" and that appellant had seen him with two girls in Butler Gardens. (Tr. 605) By contrast to the testimony of his sister, Sandra Plummer, he did not testify that appellant made phone calls which "threatened" his sister in the way she testified. Nor was there any corroboration from police records that, when the police first made contact with Sandra Plummer, that she told them about any threatening phone calls from appellant. (Tr. 352-353)

Police Detective Alfonso Terrell testified that, on November 26, 1988, after appellant was arrested, he took a statement in which appellant said that appellant and appellant's girlfriend met Golden at his girlfriend's apartment and that Golden dropped off appellant and his

- 12 - [A46]

girlfriend somewhere. (Tr. 602) Appellant told Terrell that he last saw Golden at about 10 am that morning. (Id.)

William Plummer, the brother of Sandra Plummer, testified that he met and spoke several times on the phone with appellant in October 1988. (Tr. 609-610) During Thanksgiving 1988, appellant telephoned four times asking for his sister. (Tr. 610) Plummer said that the second time he called, appellant said that Sandra did the shooting and that, during one of the calls, appellant said he was going to call the police and say she was the one who killed Golden. (Tr. 611) Police Detective Evelyn Jones testified that, on November 25, 1988, she received a call from a man who asked to speak with Detective Johnson, who was not in. (Tr. 618) She said the caller then said he wanted to leave the message for Johnson that his name was Craig Williams and that his girlfriend Sandra Plummer shot Golden and that he was in the car at the same time. (Id.)

Tony Fletcher testified that, after the trial commenced, appellant's father who lived across from Fletcher asked him to come to the phone. (3/12/90 Tr. 19) He testified that appellant was on the phone and told him that he thought everything was going well in the trial except that, if Fletcher testified, he would "put the nail in the coffin." (3/12/90 Tr. 19-20)

Post-trial  As part of the judgment, the trial court entered an order assessing costs on April 11, 1990, directing that appellant pay $500 pursuant to the Victims of Violent Crime Compensation Act of 1981, D.C. Code sections 3-401, et seq. The order required this amount to be taken from appellant's "prison pay." On July 10, 1992, while appellant's appeal from this judgment was pending in this Court, the government filed a motion, requesting the trial court to amend its order to require appellant to make payment from amounts he had recently recovered

court should not have sat silently but, *sua sponte,* should have declared a mistrial to correct such a plain error. *Id.; see Thomas v. United States,* 557 A.2d 1296, 1304 (D.C. 1980).

IV.

PLUMMER CROSS-EXAMINATION WAS INEFFECTIVE.

To show ineffective assistance of counsel, the applicable standard is whether the representation was so grossly incompetent as to "blot out" the essence of the defense. *Godfrey v. United States,* 454 A.2d 293 (D.C.App. 1982).

Appellant's counsel was ineffective in cross-examining Plummer to show that she and defendant were not together at the Parkway Guest House, as she testified on direct examination. (3/6/90 Tr. 336) Had he used the guest house registration records, he could have shown that she and defendant were not registered there at the same time, which was material to the issue of whether she was with appellant at all, including at the time of Golden's shooting.

The guest registration records (introduced at trial as GX 35) show that Plummer was at the guest house on October 23, 1988, but not in the morning with appellant (as she testified). Rather, she registered at 11 pm at night and stayed until the next morning at 8 am. The registration record, which the government introduced to show that appellant registered on October 23, 1988, however, shows that he registered at 7:30 am and departed at 3:30 pm the same day. (Note: Appellant dated the registration with the apparently incorrect date of "Oct 24, 1988" when all the other registrations in sequence are for October 23rd.)

- 20 -    [A48]

Because Plummer was the chief government witness against appellant, this failure

of counsel "blotted out" an opportunity to show her lack of credibility and trustworthiness on an

essential element of the crime -- whether or not appellant was present with Plummer at the scene

of the crime. Proper cross-examination on her testimony on this point could have led to her ad-

mission that appellant was not present at the shooting of Golden and that the killing was done by

another, which was the essence of appellant's defense. (3/12/90 Tr. 100)

V.

GOVERNMENT'S CLOSING ARGUMENT IMPROPER.

Appellant's counsel was also ineffective in not objecting to the government's clos-

ing argument. The government misstated the evidence by characterizing the testimony of Gold-

en's mother, saying that "she saw a heavy set man with facial hair and dark complexion in the

backseat" of the car her son was in on the morning he was killed. (3/12/90 Tr. 46) (Emphasis

added.) In fact, she testified only that it was "a heavyset dark-skinned man in the back." (3/8/90

Tr. 599) Appellant's counsel did not object to this attempt to link a witness' description more

closely with appellant's appearance.

Nor did appellant's counsel object when the government, in closing argument,

misstated the evidence in attempting to rehabilitate Plummer and respond to the argument that

she should have gone to Golden or to the police when she knew he was going to be killed. The

government stated that Plummer was "the only person who knew they were going to do Dave,

that David was going to die" (and, therefore, would presumably give her identity away if she

- 21 - [A49]

"(O)nce an appeal has been filed, control over the order or judgment appealed vests in the appellate court" and the trial court may proceed only with litigation unconnected with the order or judgment on appeal. *Horton v. U.S.*, 591 A.2d 1280, 1283 n. 7 (D.C.App. 1991). In this appeal, appellant appealed the order and judgment of April 11, 1990, which included the provision that appellant make payment from his prison pay. Thus, the trial court also had no jurisdiction, on January 10, 1993, to alter or amend those orders and judgments to provide for a different mode of payment.

IV.

CONCLUSION

For the reasons stated above, this Court should reverse and remand for retrial because of the failure to suppress evidence of appellant's statements while in police custody; the ineffectiveness of appellant's counsel; the improper admission of appellant's "other crimes" evidence; and the failures of the trial court to grant a mistrial, . The Court should also reverse and vacate the trial court's order, entered without authority or jurisdiction, that appellant make payment from a source other than prison pay.

Dated: March 24, 1994                        Respectfully Submitted,

<div style="margin-left:50%">

Michael J. Dennis
DENNIS LAW CORPORATION
1255-23rd Street, N.W,, 5th Floor
Washington, D.C. 20037-1194
(202) 857-2508

</div>

*CERTIFICATE OF SERVICE*

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 24th day of March, 1994, to:

John R. Fisher, Esq.
Assistant U.S. Attorney
555-4th Street, N.W.
Washington, D.C. 20001

Michael J. Dennis

*PO 36*

Only the Westlaw citation is currently available.

District of Columbia Court of Appeals.

Craig A. WILLIAMS, Appellant,
v.
UNITED STATES, Appellee.

Nos. 90-CF-627, 93-CO-144.

Jan. 17, 1995.

Appeal from the Superior Court of the District of Columbia Criminal Division, (Hon. Henry F. Greene, Trial Judge).

Before STEADMAN and SCHWELB, Associate Judge, and PRYOR, Senior Judge.

MEMORANDUM OPINION AND JUDGMENT

*1 Appellant appeals his conviction for first-degree murder while armed, D.C.Code § 22-2401 (1989), and carrying a pistol without a license, D.C.Code § 22-3203 (1989). In addition to a period of incarceration, appellant was ordered to pay $500 pursuant to the Victims of Violent Crime Compensation Act of 1981, D.C.Code § 3-401 to § 3-415 (1989). His assertions on appeal include the following: (1) that statements made while in custody were inadmissible; (2) there were trial errors involving "other crimes evidence" and the opening statement of the prosecutor; (3) there was ineffective assistance of counsel; [FN1] and (4) the court erred in applying the Violent Crimes Compensation Act. We affirm.

The evidence at trial established that appellant killed his long-time acquaintance, David Golden, because Golden had borrowed $300 for the purchase of crack cocaine for resale, only to spend the money on a car. The primary evidence was the testimony of appellant's girlfriend, Sandra Plummer, who was present during the planning and commission of the murder. Other police and medical witnesses testified at trial.

The events elicited at trial revealed that appellant planned and carried out the killing of Golden for keeping the $300. On the evening in question, appellant told Golden that some Jamaican guys were giving him trouble and that he needed Golden's help. Golden, Plummer, and appellant drove to an alley and Plummer heard a "loud pow." She jumped out of the

car and ran into the alley. Meanwhile, appellant got out of the car, leaned into the front seat and took Golden's gun. The two then fled. Golden had been shot four times.

Several witnesses saw Plummer and appellant at the scene of the shooting. Appellant took evasive measures regarding the investigation of the crime including: trying to get the ballistics of the weapon changed, and directing Plummer to tell a fabrication to the police. Plummer was told by appellant that she would be killed if she did not tell the police his version of the story. Finally, appellant called the police on November 25, 1988 to inform them that Plummer had committed the murder.

I.

Appellant argues that the trial court erred in denying his motion to suppress statements made to a police detective after he was arrested and read his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436 (1966). Appellant refused to sign the card indicating a written waiver of his *Miranda* rights. However, appellant was read his *Miranda* rights and agreed to speak with the officers without counsel. Besides declining to sign the rights card, he refused to be recorded on videotape. However, he did agree to being recorded on audiotape. After listening to the audiotape the trial judge ruled as follows:

.... It's clear to me, both from listening to the tape and from seeing Mr. Williams in a previous trial, that Mr. Williams is a very intelligent individual, and I suspect strongly that he was calculating that as long as he wasn't being seen doing what he was doing, and as long as he didn't actually sign something, it couldn't get him in trouble, but I don't--that's obviously not the law, and I credit Detective Terrell's testimony.

*2 In denying the suppression motion the trial court relied in part, in concluding that the statement was made knowingly, intelligently, and voluntarily, on information about appellant gained by the judge during a previous trial involving appellant. Appellant did not raise the alleged error at the time and thus our review is under a plain error standard. Reversal is appropriate in such circumstances only where the error is "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc). [FN2]

Although it is inappropriate in deciding this

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

P037

suppression question to rely on appellant's testimony in a different case, *see Turman v. United States,* 555 A.2d 1037 (D.C.1989) (per curiam), the judge is allowed to consider appellant's previous contact with the justice system in addition to the specific circumstances of this case. Viewed in this way, we find no plain error by the trial judge.

II.

Appellant alleges that the trial court erred when it allowed the prosecutor on redirect examination to elicit testimony of appellant's illegal sale of drugs. The trial court ruled that defense counsel's cross-examination (the question not the answer) "suggested" to the jury that Plummer gave $300 to Golden to purchase narcotics. Therefore, the court allowed the prosecutor to elicit testimony regarding appellant's involvement in narcotics sales on the night before the murder. "The scope of redirect examination rests within the sound discretion of the trial court and will not be reversed absent a clear showing of abuse." *Carpenter v. United States,* 635 A.2d 1289, 1293 (D.C.1993). It is not an abuse of discretion when the redirect flows from a question rather than an answer. *See Hairston v. United States,* 497 A.2d 1097, 1103 (D.C.1985) (no abuse of discretion where redirect examination "clarified a possible misleading impression from the defense inquiry," even though witness answered "no" to cross-examination question). Although a question is not evidence and the jury is routinely so instructed, we conclude in this case the trial court did not abuse its discretion in deciding to allow a clarification of the subject.

Appellant also argues that the trial court should have declared a mistrial when the prosecutor referred in opening statement to threats that appellant made against Plummer, contrary, it is asserted, to a pretrial ruling of the court. However, defense counsel failed to object or request a mistrial. The jury was instructed that opening statements are not evidence. We have found no reversible error where the evidence did not later match the opening statement. *See Owens v. United States,* 497 A.2d 1086, 1091-92 (D.C.1985) (no reversible error for misstatement of evidence in opening statement when jury instructed that opening statement not evidence), *cert. denied,* 474 U.S. 1085 (1986). We have also found no reversible error where evidence failed to show that defendant threatened decedent the day before the shooting, as the prosecutor had stated in opening, when the court instructed the jury that the

prosecutor's opening statement was not evidence. *Robinson v. United States,* 361 A.2d 199, 200 (D.C.1976). We note that Plummer did testify during the trial, without objection, that appellant threatened her. [FN3] Therefore, there is no reversible error.

*3 Appellant also claims that the trial court erred in declining to grant a mistrial when Plummer volunteered on direct examination that appellant and Golden may have been "locked up" together. The trial judge instructed the jury that the testimony was irrelevant, that he was striking it, and that the information could not be used in any way during the jury's deliberations. A trial court's decision to grant or deny a mistrial will not be disturbed on appeal "unless it appears unreasonable, irrational, or unfair, or unless the situation is so extreme that failure to reverse would result in a miscarriage of justice." *Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989) (citation omitted). We have found no error when a defendant's criminal record is- testified to and the court takes or offers to take curative measures. *See Goins v. United States,* 617 A.2d 956, 959-960 (D.C.1992); *Hardy v. United States,* 119 U.S.App. D.C. 364, 365, 343 F.2d 233, 234 (1964), *cert. denied,* 380 U.S. 984 (1965). The trial court did take curative measures. Therefore, it was not an abuse of its discretion to deny the motion for a mistrial.

III.

Finally, appellant challenges the trial judge's January 10, 1993 order requiring that funds belonging to appellant be used to pay his fine under D.C.Code § 3-414. [FN4] The original sentence included an order that appellant pay $500. The judge specifically stated that such costs "shall be paid today or [shall] be taken from prison pay." The government later learned that appellant had $590 available to him as a result of a court order releasing the money seized by the police. Appellant argues that the trial court's language that the costs shall be paid today or from prison pay, and the language of D.C.Code § 3-414 precludes the court from ordering that the new money be used to pay the costs. D.C.Code § 3-414 states in part:

> If at the time of conviction or plea [a defendant] is indigent, as determined by the Court, and is later employed for wages, salary or other compensation while released on probation or parole, or is incarcerated in any facility of the Department of Corrections and is paid wages for work performed therein, the amount of cost shall

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

P038

1995 WL 929016                                                    Page 4
(Cite as: 1995 WL 929016, *3 (D.C.))

be paid from such wages, salary, or other
compensation.

The language of the statute makes no limitation on
the source of funds that can be used to pay the costs.
The language regarding persons who are indigent is
designed to make sure the debt is paid. The statute
provides for garnishment of wages as one means of
collecting the costs. However, the statute does not
limit other means. If the appellant had the $590 at
the time of sentencing, there would be no question
that the court could order that the money be paid
towards costs. We find no error with the court's new
order requiring that the new money not constituting
"wages, salary or other compensation" be used to pay
costs. To hold otherwise would fly in the face of the
Act's purpose "to provide for the payment of
compensation to innocent persons killed or injured as
the result of violent crime committed in the District of
Columbia." See D.C. City Council, Judiciary
Committee Report on Bill 4-361, the "Victims of
Violent Crime Compensation Act of 1981"
(December 16, 1981), at 1.

*4 Accordingly, it is

ORDERED and ADJUDGED that the judgment on
appeal herein be, and the same is hereby, affirmed.

FN1. We do not consider nor resolve in this
appeal issues relating to the denial of relief
by the trial court as to assertions of
ineffective assistance of counsel. In
addition to discussion at oral argument, we
have reviewed the records respecting this
question, and conclude that the necessary
steps to effectuate an appeal on these issues
have not been accomplished. Counsel
for appellant has been appropriately
informed by order of this court. Lastly,
we observe and are aware that a
similar circumstance exists in other
cases pending before this court
involving the same appellant, Nos.
90-CF-557 and 90-CF-217.

FN2. Appellant contends that the trial court
erred because the standard is more than a
preponderance of the evidence and the trial
judge inappropriately considered what he
learned about Mr. Williams in another trial.
However, the Supreme Court has stated that
the "preponderance of the evidence" is the
correct standard at suppression hearings.
United States v. Matlock, 415 U.S. 164, 178
n. 4 (1974); see also Martin v. United
States, 567 A.2d 896, 907 (D.C.1989), cert.
denied, 113 S.Ct. 632 (1992).

FN3. See Payne v. United States, 516 A.2d
484, 491-92 n. 14 (D.C.1986) with regard to
the admissibility of evidence of threats to
show consciousness of guilt.

FN4. The trial court did not lose jurisdiction
over the enforcement of the fine, in the
absence of a stay.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

RECEIVE
AUG 0 5 1998
~~CHAMBERS OF~~
JUDGE GREENE

COPY

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION -- FELONY ~~BRANCH OF~~

UNITED STATES OF AMERICA        :
                                :        CRIMINAL NO. F-14042-88
                                :
CRAIG A. WILLIAMS               :        Judge Henry F. Greene

MOTION TO VACATE CONVICTION OR REDUCE
SENTENCE PURSUANT TO D.C. CODE SEC. 23-110

*1 9 1998*

OR, IN THE ALTERNATIVE, TO RE-ENTER NUNC PRO TUNC
THE ORDER DENYING THE PREVIOUS 23-110 MOTION

TO THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA:
HON. HENRY F. GREENE

COMES NOW Craig A. Williams, defendant in the trial of this case, and respectfully files this motion to move the trial court to set aside two Judgments pursuant to D.C. Code 23-110:   (1) the judgment of guilty entered pursuant to sentencing in this case (2) the denial of the previous 23-110 motion pursuant to this Court's order of November 19, 1992.  Mr. Williams requests that if (2) above is not vacated, then the order be re-entered nunc pro tunc to allow for appeal of that order.[1]

Mr. Williams requests that the above actions be taken because of ineffective assistance of counsel.  Mr. Williams requests a hearing on this motion.

OVERVIEW

Mr. Williams underwent a murder trial in 1990.  Following that trial, a hearing was held on November 19, 1992 on Mr. Williams' motion for new trial on grounds of ineffectiveness of trial

_____

[1]As explained further below, it appears that prior counsel failed to timely file a viable notice of appeal from the denial of the previous 23-110 motion on 11/19/92.

counsel. The motion was denied. The Court of Appeals, in their opinion of January 17, 1995, has refused to review any issues related to the ineffectiveness of Mr. Williams' trial counsel because it "concluude[d] that the necessary steps to effectuate an appeal on these issues have not been accomplished." Memorandum Opinion, p. 1 n.1. (attached).

This motion is filed to address this issue and issues remaining from the first 23-110 hearing.

Mr. Williams is entitled to have these issues of ineffectiveness heard by the Court of Appeals. However, as stated above, the Court of Appeals refuses to review the denial of the previous 23-110 hearing on the basis that no adequate notice of appeal was timely filed. Therefore, appellant requests that the issues raised by this motion be visited by this Court so that an order can be entered that is (1) proper and (2) appealable, if necessary.

STATEMENT OF THE CASE

**The 23-110 Motion**

A 23-110 hearing was held on November 19, 1992.[2] At the hearing, the following issues were presented for review by the Court: failure of trial counsel to develop support for an insanity defense, delay in investigation, erroneous advisement of defendant

---

[2]At a prior hearing on July 30, 1992, the court had reviewed the pleadings and had indicated issues that it thought merited a hearing and those it felt did not. Motion Hearing, 11/19/92, Tr. 3-4. Mr. Williams' counsel did not raise any issues beyond those set out at the earlier hearing. Motion Hearing, 11/19/92, Tr. 11-12

2

[A56]

not to testify, failure to visit the crime scene, to locate and secure witnesses, and trial counsel's ineffectiveness in cross-examining Ms. Plummer on the Guest House receipts.    Tr. 148-151.

At hearing, the issue of the Guest House receipts was not raised by Mr. Williams' attorney in his direct examination of Mr. Williams' trial counsel.    It was only brought up by the United States attorney in her cross-examination.

The issue of the Guest House receipts was pivotal because Ms. Plummer, the chief prosecution witness at trial stating that Mr. Williams had committed the murder, testified that she and Williams and arrived together at the Guest House after the murder, did not leave until the next morning (October 24th, 1988) and that they left together at that time.    Therefore any evidence proving her testimony false would have been relevant in impeaching her credibility and the credibility of all her testimony.

Mr. Williams testified that the receipt that he signed, no. 37108, showed that he checked in at 7:30 a.m. on the 23rd and that he checked out at 3:30 p.m. on the 23rd. tr. 97.[3]    There was also a receipt, apparently signed by Sandra Plummer, showing a check-in time of 11 p.m. on the 23rd and a check-out time of 8:00 a.m. on the 24th.    Government Exhibit 7, tr. 97-98.    Williams testified that he was not together with Ms. Plummer at the Guest House. Instead, he met Plummer and Fletcher in the vicinity of the Guest

---

[3]From examining the sequence of the receipts it is clear that the receipt should be labeled for the 23rd. Mr. Williams testified that he mistakenly wrote the 24th on the receipt. tr. 96-97, 98-99.

House that morning. Tr. 98.

Neither Mr. Williams' counsel nor the Government pointed out that another Parkway Guest House receipt shows another couple registered in the same room, from 8:45 p.m. to 10:45 p.m., on the 23rd. where Plummer alleges she and Williams were staying. (Receipt for Mr. and Mrs. Davis, No. 37116)(Exhibits 7 and 8, Attached to Williams' first 23-110 motion). This receipt was key because it helped prove that neither Mr. Williams nor Ms. Plummer could have been in the Guest House from 8:45-10:45 p.m. on October 23, 1988. However, this key evidence was never argued at hearing.

**No Notice of Appeal**

A review of the trial jacket in the Clerk's office reveals no signed and timely notice of appeal from the November 19, 1992 ruling. The file contains the first page of a Notice of Appeal stamped December 3, 1992 (attached hereto) however, the second page is missing and there is no signature or identification of counsel. Also present in the trial jacket is an notice of appeal "from the ruling of November 19, 1992." However, this notice of appeal is also unsigned and it has the caption for a different case (F-14043-88)(attached hereto).

Because an appeal was not processed, 23-110 counsel filed a motion with the trial court and, on June 7, 1993, the trial court signed an "Order Directing Clerk to Process Appeal" in F-14042-88 (date stamped June 14, 1993 (attached).

However, an appeal on the denial of the 23-110 motion was still not processed by the clerk and no transcript of the hearing

4

[A58]

was forwarded to Mr. Williams' appellate counsel, Mr. Dennis, prior to his filing of a direct appeal.[4]

**Appeal**

Meanwhile a direct appeal of Mr. Williams' 1990 sentencing was processed (together with an appeal from a 1993 ruling regarding the payment of costs in the case). Wishing to preserve all rights of his client, Mr. Williams' appellate counsel briefed the issue of ineffective cross-examination of Ms. Plummer regarding the Parkway Guest House in the Appeal Brief on Mr. Williams' behalf.

At oral argument on the direct appeal from the conviction, the panel inquired as to whether Mr. Williams had noted a timely appeal from the denial of the 23-110 motion and why there was no record of such an appeal in the Court of Appeals.[5]

In its Memorandum Opinion of January 17, 1995, denying Mr. Williams' Direct appeal, the Court of Appeals refused to consider any issues regarding ineffectiveness of trial counsel. It stated it had reviewed "the records respecting this question" and that it "conclude[d] that the necessary steps to effectuate an appeal on these issues have not been accomplished." Memorandum Opinion, p. 1 n.1. (attached).

This decision was affirmed on Petition for Rehearing.

Present counsel now files this motion to assure that the trial

---

[4]This transcript was recently forwarded to undersigned counsel in the last few months. Upon information and belief, it was not available to appeal counsel, Mr. Dennis, at the time of the briefing and argument of the direct appeal.

[5]In fact, no appeal file was ever generated to review the denial of the 23-110 motion.

5

**[A59]**

court's denial of the prior 23-110 hearing can receive appellate review and to fully air all issues related to ineffective assistance of counsel in connection with the 23-110 hearing and at trial.

## ARGUMENT

1. PREVIOUS 23-110 COUNSEL WAS INEFFECTIVE IN PERFECTING AN APPEAL FROM THIS COURT'S DENIAL OF DEFENDANT'S 23-110 MOTION.

The Court of Appeals has found that an effective notice of appeal from the Order denying the 23-110 motion was not filed.

This ruling finds support in the case file. There is no signature on either "notice of appeal" in the file as required under D.C. App. R. 3(a).

The duty to properly effectuate a notice of appeal belongs to trial, or in this case motions, counsel. D.C. App. R. 3(a) provides that any notice of appeal shall be signed by the individual appellant or by counsel for appellant. See also Super. Ct. Crim. R. 37. It must be filed within 30 days after entry of the judgment or order from which the appeal is taken, in a criminal case. D.C. App R. 4(b).

Failure to file a timely notice of appeal, when instructed to do so, constitutes ineffective assistance of counsel. See Evitts v. Lucey, 469 U.S. 387 (1985); Samuels v. United States, 435 A.2d 392, 395 (D.C. 1981); Hargett v. United States, 380 A.2d 1005, 1006-07 (1977), cert denied, 439 U.S. 932 (1978); Hines v. United States, 237 A.2d 827, 828-29 (D.C. 1968). In such a case, the

6

[A60]

appropriate remedy is for the trial court to vacate the order and re-enter it in order that the defendant may pursue a timely appeal.

The prejudice here is obvious. By the failure to effectuate the notice of appeal, Mr. Williams has been denied any appellate review of the denial of the 23-110 motion on 11/19/92.

2.  THE 23-110 HEARING PREVIOUSLY HELD IN THIS CASE SHOULD BE REOPENED AS PRIOR 23-110 COUNSEL WAS INEFFECTIVE IN PRESENTING EVIDENCE OF TRIAL COUNSEL'S INEFFECTIVENESS TO THIS COURT.

Prior 23-110 counsel was ineffective in failing to properly present the issue of trial counsel's ineffectiveness to this court. This Court still needs to hear raised the facts fully illuminating the ineffectiveness of trial counsel.

The extensive 23-110 hearing failed to reveal that trial counsel had a dated hotel registration record of another couple, the Davises, registered in the hotel room during the day Plummer testified she was there alone with appellant.[6]

Mr. Williams' trial counsel testified that his investigator had gotten registration slips from the Parkway Guest House but that he did not use them at trial because he didn't think they would help show that Ms. Plummer was lying. Motion Hearing, 11/19/92 tr.

---

[6]Receipt #37116 Mr. and Mrs. Bob Davis, Rm. 4 8:45 - 10:45p.m. Parkway Guest House. The receipt was attached to the prior 23-110 motion submitted by Mr. Williams' attorney, but not argued or used in examination at the hearing.

At hearing, no issue regarding any of the Guest House receipts was raised by Mr. Williams' attorney in his direct examination of Mr. Williams' trial counsel. It was only brought up by the United States attorney in her cross-examination.

69.   These receipts were Government exhibits 7 and 8.   Motion Hearing, 11/19/92 tr. 95-98. He acknowledged that he knew that one of the dates on the receipts was out of sequence.   Motion Hearing, 11/19/92 tr. 69.   But Mr. Williams' attorney did not explore or question the trial attorney on the Guest House issue in his redirect examination.   Motion Hearing, 11/19/92 tr. 78-83.

Mr. Williams testified that the receipt that he signed, no. 37108, showed that he checked in at 7:30 a.m. on the 23rd and that he checked out at 3:30 p.m. on the 23rd.   tr. 97.[7]  There was also a receipt, apparently signed by Sandra Plummer, showing a check in time of 11 p.m. on the 23rd and a check out time of 8:00 a.m. on the 24th.   Government Exhibit 7, tr. 97-98.   Williams testified that he was not together with Ms. Plummer at the Guest House. Instead, he met Plummer and Fletcher in the vicinity of the Guest House that morning.   Tr. 98.

Neither Mr. Williams counsel nor the Government pointed out that another Parkway Guest House receipt shows another couple registered in the same room, from 8:45 p.m. to 10:45 p.m., on the 23rd. where Plummer alleges she and Williams were staying. (Receipt for Mr. and Mrs. Davis, No. 37116)(Exhibits 7 and 8, Attached to Williams first 23-110 motion).   This receipt was key because it helped prove that neither Mr. Williams nor Ms. Plummer could have been in the Guest House from 8:45-10:45 p.m. on October

---

[7]From examining the sequence of the receipts it is clear that the receipt should be labeled for the 23rd.  Mr. Williams testified that he mistakenly wrote the 24th on the receipt.  tr. 96-97, 98 99.

8

[A62]

23, 1988. However, this key evidence was never argued at hearing.

At trial, Ms. Plummer testified that she stayed at the Parkway Guest House with Williams from October 23rd until the morning of October 24, when they left together. Tr. 3/6/90 336. In support of this, the United States showed Ms. Plummer several receipts from the Guest House, of which she discussed only the one she signed. Tr. 3/6/90 335-36. These guest house receipts were later submitted into evidence (GX-35) by the United States, who stipulated as to their authenticity. Tr. 3/8/90 535.

Therefore, the crucial physical evidence of trial counsel's ineffectiveness, the Davis receipt, was never raised at the 23-110 hearing. Trial counsel was ineffective in failing to use the Davis receipt as the receipt was in his possession, but was never brought to Court's consideration.

The error here is prejudicial to Mr. Williams. Clearly, if this Court had concrete evidence that Plummer's testimony could be directly contradicted, then the 23-110 motion may reasonably have been granted. It was clear that the jury was intensely interested in the Guest House receipts as they requested the "hotel receipt and other evidence" in a note during deliberations. 3/12/90, tr. 112-13.

The Court acknowledged that it was Mr. Williams' position that trial counsel had failed to pursue the inconsistencies between Ms. Plummer's testimony and the hotel records. Tr. 131. However, the position taken by the Court in denying the significance of the receipts, and that the receipts necessarily place Mr. Williams in

Ms. Plummer's room, tr. 149-50, is not supported by the evidence.

The Court argued that the receipt itself is ambiguous. 150-51. Government Exhibit 8. It appears to read p.m. but may have been altered from a.m. tr. 150-51 However, even if the jury were to determine that it had originally read 3:30 a.m., this would mean that Mr. Williams had left the room at least four and one-half hours before Ms. Plummer. And, if the Davis receipt is credited, then that would tend to support the fact that Williams checked out at 3:30 p.m. and that his receipt read 3:30 p.m. This would mean that Williams had checked out of the Guest House seven and one-half hours before Plummer checked in and that neither was there from 3:30 p.m. to 11:00 p.m. on October 23, 1988. These receipts, in particular the Davis receipt, could have reasonably tended to discredit Ms. Plummer's trial testimony that she and Mr. Williams had spent the day of the 23rd and the morning of October 24th, 1988 together at the Guest House and had left together.

Mr. Williams' 23-110 counsel failed to argue the significance of the Davis receipt or to examine trial counsel regarding the receipt. Therefore, it is arguable that, because of this, the Court failed to recognize the inconsistency of the receipts with Ms. Plummer's testimony at trial and the potential for Ms. Plummer's significant impeachment by defense counsel--had he effectively used the guest house receipts in cross-examining her. (The Court concluded that it is very unlikely that they would have helped Mr. Williams' defense). See tr. 149-51.)

2.    THE TRIAL PROCEEDINGS HELD IN THIS CASE SHOULD BE RECOMMENCED AS TRIAL COUNSEL WAS INEFFECTIVE IN DISCREDITING THE CHIEF WITNESS AGAINST THE DEFENDANT.

In the original murder trial, the prosecution had only one alleged witness to the murder of David Golden. Sandra Plummer testified appellant committed the murder.

The credibility of Sandra Plummer was the central issue in this case. Plummer was the only witness to identify appellant. Plummer was admittedly appellant's former girlfriend. Plummer testified that appellant committed the murder in her presence and then kept her continuously by his side in two hotels over the next two days.

Ms. Plummer testified at trial that she had registered together with Mr. Williams at the Parkway Guest House sometime in the morning of 10/23/88. 3/7/90 tr. 333-35. She testified that she was with Mr. Williams from the 23rd continuously into the morning of the 24th, when she left with Mr. Williams. 3/7/90 tr. 336. So the evidence at trial was that Williams and Plummer arrived together, did not leave until the 24th and that they left together at that time.

Ms. Plummer's trial testimony was consistent with her grand jury testimony. Plummer testified to the Grand Jury that she and Williams slept all the day of the 23rd and into the 24th at the Guest House and that they left together in the morning of the 24th. Grand Jury Testimony 12/22/88, tr. 56.

However, due to trial counsel's ineffectiveness, Plummer was

never cross-examined regarding this evidence and it was never introduced at trial.[8]

The prejudice to Mr. Williams in this case is clear. Physical evidence that Plummer was <u>not</u> with Williams for the two days following the murder and that contradicts her sworn testimony at trial and to the grand jury that she was at the guest house with Williams throughout the evening of the 23rd, casts doubt upon her testimony that Williams killed Golden. This jury agreed. It sent a note about an hour and forty-five minutes into deliberations which specifically requested to see "the hotel receipt and all of the other evidence." (Tr. 3/12/90, p. 112-13). This doubt is further corroborated by the testimony of Mr. Fletcher at trial. Mr. Fletcher, who was with Ms. Plummer and the defendant on the day of the killing, contradicted Plummer on several points. He did not testify to any statements alleged by Plummer that Mr. Williams said that he was planning to "kill" or "do" the decedent, nor that Williams had confessed anything after the killing, or that he had

---

[8]The standards which govern claims of ineffective assistance of counsel were articulated by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S.668 (1984) as follows:

> First, the defendant must show that counsel's performance was deficient....Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. <u>Id</u>., at 687.

The Court stated that "[t]he benchmark for judging a claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id</u>. at 686.

seen any guns on Mr. Williams.  With Plummer properly impeached, the jury could have reasonably weighed Fletcher's testimony more heavily and considered an acquittal.

Finally, there is an issue relating to the United States' complicity relating to the failure to explore the Guest House issue.  The United States had the Guest House receipts, in fact, it introduced them as its exhibits at trial.  GX-35, 3/7/90  tr. 335 3/8/90 tr. 535.  Having these receipts in its possession, it surely must be charged with knowledge of the inconsistencies of these receipts with Mr. Plummer's grand jury and trial testimony;  in particular, the Davis receipt, the Williams receipt and the Plummer receipt.  Simply put, the receipts raise a significant issue that Plummer presented false testimony on the Guest House stay--namely that she was at the Guest House with Mr. Williams and that they were together continuously until morning--yet the prosecutor let the testimony stand.  This may well be reversible error as a violation of due process.  See U.S. v. Thomas, 98 F.2d 1298 (7th Cir. 1993);  U.S. v. Necoechea, 986 F. 2d 1273 (9th Cir. 1993); Sanders v. Sullivan, 863 F.2d 218 (2nd Cir. 1988);  Miller v. Pate, 386 U.S. 1.

### REQUEST FOR RELIEF

WHEREFORE, for the reasons stated above, Mr. Craig A. Williams respectfully requests this Court set aside two Judgments pursuant to D.C. Code 23-110:  (1) the judgment of guilty entered pursuant to sentencing in this case (2) the denial of the previous 23-110 motion pursuant to this Court's order of November 19, 1992.  Mr.

13

[A67]

Williams requests that if (2) above is not vacated, then the order

of November 19, 1992 be re-entered <u>nunc pro tunc</u> to allow for

appeal of that order.

                              Respectfully submitted,


                              _____
                              Brian C. Plitt
                              1239 C. Street, S.E., Ste. 4
                              Washington, D.C.  20003-2234
                              (202) 546-5493
August 5, 1998                D. C. Bar No. 408746

                              ATTORNEY FOR CRAIG A. WILLIAMS


                    <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing Motion has been
served, by mailing first-class postage prepaid, to the Office of
the Felony Trial Division, United States Attorney, Special
Proceedings Division, 555 4th Street, N.W., Washington, D.C.
20001, this **5th** day of August, 1998.


                              _____
                              Brian C. Plitt

*P040*

760 A.2d 205
(Cite as: 760 A.2d 205)

Page 1

District of Columbia Court of Appeals.

Craig A. WILLIAMS, Appellant,
v.
UNITED STATES, Appellee.

No. 98-CO-1911.

Argued Sept. 6, 2000.
Decided Oct. 5, 2000.

Petitioner, who was convicted of first-degree murder while armed and of carrying a pistol without a license, filed second motion for postconviction relief, alleging that counsel rendered ineffective assistance on first motion. The Superior Court, Henry F. Greene, J., denied motion. Petitioner appealed. The Court of Appeals held that petitioner could not prevail on claim, as constitution did not require appointment of counsel for postconviction proceedings.

Affirmed.

*206 Matthew W. Greene, Fairfax, VA, appointed by the court, for appellant. Christopher Warnock, Washington, DC, also appointed by the court, was on the brief for appellant.

Roy W. McLeese, III, Assistant United States Attorney, with whom, Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, G. Paul Howes, M. Evan Corcoran, and Florence Pan, Assistant United States Attorneys, were on the brief for appellee.

Before TERRY and SCHWELB, Associate Judges, and NEWMAN, Senior Judge.

PER CURIAM:

On March 16, 1990, a jury convicted Craig A. Williams of first-degree murder while armed and of carrying a pistol without a license. On April 10, 1992, Williams filed a motion to set aside his sentence pursuant to D.C.Code § 23-110 (1996), alleging that his trial counsel had been constitutionally ineffective. On November 19, 1992, following a hearing, the trial judge denied the motion.

Williams filed a timely direct appeal from his conviction. His attorney failed, however, to perfect a separate appeal from the trial judge's order denying his § 23-110 motion. In his brief on direct appeal, Williams, who was by then represented by a second attorney, included in his submission arguments relevant to the claim that his trial attorney had been ineffective. On January 17, 1995, in an unpublished Memorandum Opinion and Judgment (MOJ), this court addressed Williams' direct appeal and affirmed his convictions on the merits. The court concluded, however, that Williams had failed to take the necessary steps to effectuate an appeal with respect to his allegations of ineffective assistance of trial counsel. Accordingly, the court declined to consider or resolve these issues. Williams filed a petition for rehearing, which this court denied on June 13, 1996.

[1] On August 19, 1998, Williams, through a third attorney, filed a second § 23-110 motion to vacate his sentence. In the second motion, Williams alleged that the attorney who represented him in his first § 23-110 motion was constitutionally ineffective by failing to perfect a timely appeal from the order denying that motion. The government filed an opposition to the second motion in which it argued, inter alia, that Williams' claim was precluded by Lee v. United States, 597 A.2d 1333 (D.C.1991). This court had held in Lee, on essentially identical facts, that "the Constitution does not ... require the appointment of counsel for post-conviction *207 proceedings," and that the defendant therefore "cannot prevail on a claim that his counsel was constitutionally ineffective in relation to that motion." Id. at 1334. On September 15, 1998, the trial judge denied Williams' second § 23-110 motion "[f]or the reasons asserted persuasively and at length in the government's Opposition." Williams filed a second notice of appeal.

Williams candidly acknowledges in his brief in this court that
> appellant's attempt to resuscitate his first § 23-110 by presenting evidence that § 23-110 counsel was constitutionally ineffective is barred by Lee. This [c]ourt in M.A.P. v. Ryan, 285 A.2d 310 (D.C.1971) made [it] clear that a division of this [c]ourt cannot overrule a previous division and consideration of the resuscitation by this division of the [c]ourt is at an end.

Williams seeks, instead, to preserve this issue for review by this court en banc or by the Supreme Court.

[2][3] Williams also contends that the trial judge erred by refusing to entertain the second § 23-110 motion on its merits or to hold an evidentiary hearing on that motion. But "[t]he court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." D.C.Code §

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

*P041*

760 A.2d 205
(Cite as: 760 A.2d 205, *207)

23-110(e).    It is true that "strict principles of *res judicata* do not apply to [§ 23-110] motions."  *E.g.*, *Dantzler v. United States*, 696 A.2d 1349, 1355 (D.C.1997) (citing *Neverdon v. District of Columbia*, 468 A.2d 974, 975 (D.C.1983)).  Given the explicit provision of § 23-110(e) and our holding in *Lee*, however, we conclude that the trial judge did not abuse his discretion by declining to entertain Williams' second motion.

*Affirmed.*

END OF DOCUMENT

**[A70]**

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

*PC43*

770 A.2d 560
(Cite as: 770 A.2d 560)

Page 1

District of Columbia Court of Appeals.

Craig A. WILLIAMS, Appellant,
v.
UNITED STATES, Appellee.

No. 98-CO-1911.

April 5, 2001.

Before WAGNER, Chief Judge; TERRY*, STEADMAN, SCHWELB*, FARRELL, RUIZ, REID, GLICKMAN, and WASHINGTON, Associate Judges; NEWMAN*, Senior Judge.

Prior report: 760 A.2d 205

ORDER

PER CURIAM:

On consideration of appellant's petition for rehearing and rehearing en banc, and the opposition thereto, it is

ORDERED by the merits division* that the petition for rehearing is denied; and it appearing that the majority of the judges of this court has voted to grant the petition for rehearing en banc, it is

FURTHER ORDERED that appellant's petition for rehearing en banc is granted and that the opinion and judgment of October 5, 2000, are hereby vacated. It is

FURTHER ORDERED that the Clerk shall schedule this matter for argument before the court sitting en banc as soon as the calendar permits. It is

FURTHER ORDERED that the parties shall simultaneously file new briefs on or before June 4, 2001, and shall file responsive briefs no later than July 19, 2001. Each party shall file ten copies of its briefs. These new briefs shall be specifically designed for consideration by and addressed to the en banc court and shall supersede all briefs previously filed in this appeal. In addition to any other arguments or points raised in their briefs, the parties shall address the following issues:

1. Does an attorney appointed to represent a defendant on appeal under the Criminal Justice Act, and who files a contemporaneous motion to vacate sentence under D.C.Code Section 23-110 in accordance with *Shepard v. United States*, 533 A.2d 1278 (D.C.1987), have a statutory duty to take necessary steps to preserve the denial of that motion for appellate review?

2. If so, does the breach of that duty violate due process, *see Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *see also, e.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), which may constitute "cause" and therefore excuse the failure to note an earlier appeal in a subsequent collateral attack proceeding?

3. If the answer to question 1 is "no," does the due process right to effective assistance of counsel on direct appeal, *see Evitts, supra*, include the obligation of counsel to preserve for appeal the denial of a contemporaneous Section 23-110 motion?

4. In cases where a motion under Section 23-110 alleging ineffective assistance of counsel has been filed contemporaneously with a direct appeal that has been stayed, *see Shepard, supra*, may and, if so, should this court eliminate the requirement that a separate notice of appeal be filed from the denial of the Section 23-110 motion. *See Hall v. United States*, 559 A.2d 1321 (D.C.1989); *In re E.G.C.*, 373 A.2d 903 (D.C.1977)?

5. Does Superior Ct. Civ. R. 60(b)provide a vehicle for relief from an order denying a Section 23-110 motion *561 based on appointed counsel's negligent failure to note an appeal?

6. Is this an appropriate case for this court to reconsider the rule of *Shepard, supra*, and, if so, should the court continue to follow that rule?

It is FURTHER ORDERED that the Public Defender Service is invited to simultaneously file a brief as amicus curiae addressing these issues. It is

FURTHER ORDERED that any requests for extension of time will be looked upon with disfavor and will be granted only upon a showing of good cause.

END OF DOCUMENT

[A71]

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

*po45*

District of Columbia Court of Appeals Reports

WILLIAMS v. U.S., *783 A.2d 598* (D.C. 2001)

Craig A. Williams, Appellant, v. United States, Appellee.

No. 98-CO-1911

District of Columbia Court of Appeals.

Argued En Banc September 10, 2001

Decided October 18, 2001

Appeal from the Superior Court of the District of Columbia (Hon. Henry F. Greene, Trial Judge)
**Page 599**

## ON REHEARING EN BANC

*Matthew> <W>. <Greene* and *Christopher Warnock*, both appointed by the court, for appellant.

*Roy W. McLeese, III*, Assistant United States Attorney, with whom *Roscoe C. Howard, Jr.*, United States Attorney, and *John R. Fisher* and *Elizabeth H. Danello*, Assistant United States Attorneys, were on the brief, for appellee.

*Timothy P. O'Toole*, Public Defender Service, with whom *James Klein*, Public Defender Service, was on the brief, as *amicus curiae*.

Before Wagner, *Chief Judge*, Terry, Steadman, Schwelb, Farrell, Ruiz, Reid, Glickman, and Washington, *Associate Judges*, and Newman, *Senior Judge*.

Opinion for the court by *Associate Judge* Farrell.

Concurring opinion by *Associate Judge* Ruiz at page 10.

Concurring opinion by *Associate Judge* Glickman, with whom *Senior Judge* Newman joins, at page 11.

Farrell, *Associate Judge*:

We granted rehearing en banc in this case to consider whether relief is available to a criminal defendant whose appointed counsel on direct appeal fails to note a requested appeal from the denial of a motion alleging ineffective assistance of trial counsel filed during the direct appeal. For the reasons that follow, we hold that the breach of counsel's statutory duty to note an appeal in these circumstances entitles the defendant to a new opportunity to appeal the denial.
**Page 600**

[A72]

*PO46*

I.

A jury found appellant (Williams) guilty of first-degree murder and carrying a pistol without a license. Williams filed a timely notice of appeal and, represented by new counsel, also filed a motion in Superior Court under D.C. Code § 23-110 (2001) alleging ineffective assistance of trial counsel. In doing so, he acted in conformity with this court's decision in *Shepard v. United States*, 533 A.2d 1278 (D.C. 1987), which held that, in general, "if an appellant does not raise a claim of ineffective assistance of [trial] counsel during the pendency of the direct appeal, when at the time appellant demonstrably knew or should have known of the grounds for alleging counsel's ineffectiveness, that procedural default will be a barrier to this court's consideration of appellant's claim." *Id.* at 1280. Consistent with its usual practice, this court stayed the direct appeal pending decision on the § 23-110 motion. *Id.*

The trial court scheduled a hearing on the motion for November 19, 1992, and appointed appellate counsel to represent Williams in that proceeding. Following the hearing, the court denied the motion in open court, and Williams' counsel noted what purported to be an appeal from that order. *See, e.g., Hall v. United States*, 559 A.2d 1321, 1322 (D.C. 1989) (separate notice of appeal must be filed from denial of § 23-110 motion). But the notice of appeal, as it appeared in the record, lacked a second page and thus did not contain the signature of either Williams or his counsel. *See* D.C. App.R. 3 (a) ("The notice of appeal shall be signed by the individual appellant or by counsel for appellant."). Appellate counsel proceeded to brief the merits of issues in the combined appeals, including the ineffectiveness claim raised by the denial of the § 23-110 motion. At oral argument, however, a division of this court raised the issue of the incomplete notice of appeal, and subsequently issued a memorandum opinion and judgment affirming Williams' convictions but stating that, because the steps necessary to effectuate an appeal from the denial of the § 23-110 motion had not been accomplished, the court was neither "consider[ing] nor resolv[ing] . . . issues relating to the denial of relief by the trial court as to assertions of ineffective assistance of counsel."  This court then issued its mandate and later denied a petition for rehearing "without prejudice to appellant seeking further relief [on the ineffective assistance claim] before the trial court."

Again represented by new counsel, Williams filed a second § 23-110 motion in Superior Court alleging ineffective assistance by his appellate counsel in failing to perfect the appeal from the denial of his first motion.[fn1]  The government responded by citing *Lee v. United States*, 597 A.2d 1333 (D.C. 1991), in which appellate counsel, after filing a § 23-110 motion during
**Page 601**
the pendency of the direct appeal, had failed to file a separate notice of appeal from the order denying the motion. Rejecting a claim of ineffectiveness similar to Williams', the *Lee* court observed that "[t]he Constitution does not . . . require the appointment of counsel for post-conviction proceedings," citing (*inter alia*) *Coleman v. Thompson*, 501 U.S. 722 (1991), and that "[t]here is likewise no statutory basis for an unqualified right to appointment of counsel." *Id.* at 1334. The court therefore held that "[s]ince Lee had no constitutional right to counsel

*PO47*

for his § 23-110 motion, he cannot prevail on a claim that his counsel was constitutionally ineffective in relation to that motion." *Id.* at 1334.

The trial court in this case perceived itself bound by *Lee* and denied the second § 23-110 motion. On appeal, a division of this court likewise concluded that the issue of counsel's effectiveness in failing to note the appeal properly was controlled by *Lee*, and affirmed.[fn2] *See Williams v. United States*, 760 A.2d 205 (D.C. 2000).

II.

Sitting en banc, we now hold that when, as in *Lee* and this case, a convicted defendant entitled to representation under the District of Columbia Criminal Justice Act appeals his conviction, and while the appeal is pending appointed counsel files a § 23-110 motion in accordance with *Shepard*, counsel has the statutory duty to take the steps necessary to effect an appeal requested by the defendant from the denial of that motion. Failure to fulfill this duty requires that the order of denial be vacated and re-entered so that an appeal may be properly noted. In so holding, we find it unnecessary to address additional issues which the parties were asked to brief for the en banc court. In particular, we decline in this case to reconsider the rule of *Shepard* set forth above, and our opinion presumes the continued operation of that rule.

In relevant part, the Criminal Justice Act provides: "A person for whom counsel is appointed shall be represented at every stage of the proceedings from such person's initial appearance before the court *through appeals*, including ancillary matters appropriate to the proceedings." D.C. Code § 11-2603 (2001) (emphasis added). *Shepard* implicitly recognized the obligation that appointment to represent a convicted defendant under this provision places on counsel conducting the direct appeal to weigh filing a § 23-110 motion based on ineffectiveness of counsel. As we explained in *Doe v. United States*, 583 A.2d 670, 674 (D.C. 1990):
Page 602

> [Although] *Shepard* [did] not address the question
> of whether the express or implied duties of counsel
> appointed for a direct appeal include giving advice
> or taking actions with respect to the filing of
> § 23-110 motions based on the ineffectiveness
> of trial counsel[,] . . . it placed upon the
> client, appellant on direct appeal, a duty to
> pursue recognizable avenues of § 23-110 relief
> for ineffectiveness of trial counsel, or face a
> procedural bar to later efforts to do so. We think
> it follows that an inherent part of counsel's
> responsibility on direct appeal is to consider
> whether the client's interests require the filing
> of a motion under § 23-110 based on
> ineffectiveness of counsel.

In *Doe* we outlined the duties of appellate counsel in regard to such a

*PO48*

motion, *id.* at 674-75,[fn3] but we did not, because we had no occasion
to, consider whether among those responsibilities is preservation of the
denial of the § 23-110 motion for review by this court. In our
judgment, however, that duty flows inescapably from the appointment of
counsel and the procedure that *Shepard* commands.

The *Shepard* procedure, as we were careful to point out in that
case, applies only when "appellant during the pendency of his direct
appeal demonstrably knew or should have known of the grounds for alleging
his [trial] attorney's ineffectiveness." 533 A.2d at 1280. In that
sense, the ineffectiveness claim is no different from any of the myriad
claims that may be raised on direct appeal, except that it, far more
probably than others, will require amplification through evidence not
present, and findings not possible, within the four corners of the trial
record. Hence, as we said in *Shepard*, our past decisions had "suggested
that an appellant who is aware of a basis for alleging ineffective
assistance of trial counsel should file, during the pendency of direct
appeal, a [corresponding] § 23-110 motion" because, "[w]here it is
appropriate, that motion can furnish appellant a means of making a record
regarding matters relevant to the ineffectiveness claim that do not
appear in the record of the case on direct appeal." *Id.*[fn4] But the
distinguishing feature of the ineffectiveness claim which *Shepard*
addressed is that it can, and therefore must — so *Shepard* held
— be raised within the framework of the direct appeal by the
attorney appointed for the appeal. We perceive no reason why the
obligations of counsel appointed for direct appeal, *Doe,*
**Page 603**
*supra*, should not include the taking of ministerial steps necessary to
insure review requested by the defendant of the order denying the §
23-110 motion and any accompanying record. *See Plan for Furnishing
Representation To Indigents Under the District of Columbia Criminal
Justice Act*, Section IV, para. 3 ("In cases where an appeal is available
as of right, . . . [and i]f requested to do so by the [defendant],
counsel shall file a timely notice of appeal. . . .").

The fact that, under *Shepard*, the vehicle for mounting the claim of
ineffectiveness is this jurisdiction's statutory post-conviction
procedure does not change the character of appellate counsel's
obligation. Indeed, in *Snell v. United States*, 754 A.2d 289, 292 (D.C.
2000), we recognized that an alternative procedure — remand of the
record of the direct appeal might be necessary to adjudicate such a claim
where the convicted defendant was no longer "in custody" as required by
§ 23-110.[fn5] The practical link forged by *Shepard* between the
direct appeal and the § 23-110 proceeding is at least strong enough
to impose on appellate counsel the duty here of effecting an appeal from
the denial of the motion.

### III.

The remaining question is whether the Criminal Justice Act provides
a remedy for the failure of counsel to note a requested appeal from the
denial of a § 23-110 motion filed in accordance with *Shepard*.
Decisions of this court and the Supreme Court dictate the answer.
Together, *Qualls v. United States*, 718 A.2d 1039, 1040 (D.C. 1998), and
*Corley v. United States*, 416 A.2d 713, 714 (D.C. 1980), hold that
appointed counsel's duty to provide continued representation "through

[A75]

P049

appeals," § 11-2603, includes the obligation to file a timely, non-frivolous petition for a writ of certiorari requested by the defendant. *Corley* went on to decide the proper remedy for appellate counsel's failure (in that case) to inform the defendant of his right to file such a petition. The remedy was to "reaffirm" the judgment on direct appeal in order to start the time running for the filing of a new petition for certiorari.[fn6] *Id.* *Corley* relied on two Supreme Court decisions that had construed the federal Criminal Justice Act in the same way. Specifically, in *Wilkins v. United States*, 441 U.S. 468, 469 (1979), and *Schreiner v. United States*, 404 U.S. 67, 67 (1971), the Court held that the federal statute requires appointed counsel to pursue the proceedings through the filing of a timely certiorari petition,[fn7] and that where appointed counsel has failed to file a requested petition, the proper remedy is to re-enter the appellate judgment and appoint new counsel to file a timely petition. *See also Doherty v. United States*, 404 U.S. 28, 29 (1971).
**Page 604**

What is true of a certiorari petition following direct appeal must also be true of an appeal from the denial of a § 23-110 motion brought in conjunction with the direct appeal. *Cf. Rodriguez v. United States*, 395 U.S. 327, 332 (1969) (where retained counsel failed to file notice of direct appeal after unsuccessfully requesting leave for defendant to proceed in forma pauperis, resentencing was required "so that [defendant] may perfect an appeal in the manner prescribed by the applicable rules"); *Brown v. United States*, 656 A.2d 1133, 1136 (D.C. 1995) (where defendant "was denied his statutory right to be represented by counsel" during hearing on motion filed in conformity with *Shepard,* that hearing "was a nullity" and did not bar a successive § 23-110 motion). Williams' statutory right to counsel entitled him to a properly noticed appeal from the denial of the motion brought pursuant to *Shepard.*[fn8] We therefore do not reach the question of whether the failure to effect an appeal in these circumstances is a denial of due process of law. *But see Evitts v. Lucey*, 469 U.S. 387 (1985) (due process violated when counsel representing defendant in first appeal as of right failed to file "statement of appeal" resulting in dismissal of appeal).

Accordingly, we vacate the denial of Williams' second § 23-110 motion and remand the case with directions for the Superior Court to vacate and reenter the November 19, 1992, order denying his motion alleging ineffective assistance of trial counsel, so that an appeal from that order may be noted in the required manner.

*So ordered.*

[fn1] In the second motion, Williams also challenged the adequacy of appellate counsel's conduct of the hearing on whether trial counsel had been constitutionally ineffective. But in the instant appeal Williams has not clearly differentiated between that claim of ineffectiveness of appellate counsel and the argument that counsel failed in his duty to note the appeal from the denial of the first motion. The division of this court therefore took this case as one in which the relief sought is a new appeal from the denial of the first § 23-110 motion, not a new hearing. *See, e.g.,* Pet. for Reh. and Reh. En Banc at 3 ("Mr. Williams' desire for the review of his claim of ineffective assistance of counsel on the merits was frustrated by his § 23-110 counsel's failure to

[A76]

*p050*

perfect his appeal of the denial of his first § 23-110 motion"). We do likewise, and reserve for another case the issue of what rights, if any, a defendant may have with respect to appellate counsel's *conduct* of the hearing on a claim of ineffectiveness of counsel made in accordance with *Shepard*.

[fn2] Recently the Supreme Court, interpreting the federal rules of appellate and civil procedure, held that the failure to sign a timely notice of appeal does not deprive the court of appeals of jurisdiction over the appeal. *See Becker v. Montgomery*, 121 S.Ct. 1801, 1804 (2001). Although *Becker* rested significantly on language of the federal rules not contained in this court's corresponding rules, it naturally invites the question of whether Williams' otherwise proper notice of appeal, defective only in that it lacked the required signature, was sufficient after all to effect the appeal under our rules, contrary to the division's opinion. We elect not to pursue that analysis, nor to resolve the ambiguities in the record — mentioned in the en banc briefs and at oral argument — as to whether counsel did in fact file a properly signed notice of appeal. We granted rehearing en banc to consider the analysis and result of *Lee* which the trial court and the division followed in this case. We are not inclined to defer that issue until another day, and so take the case on the same factual premise as did the division. We do note, however, the uncertainty from the record of whether any "failure" or "fault" can truly be attributed to appellate counsel in fulfilling his professional duties.

[fn3] We pointed out, for example, that if counsel and the appellant agree "that there exists an adequate basis for advancing a claim of ineffective assistance of trial counsel, . . . [t]he next step would be the filing of a § 23-110 motion accompanied by a request by appellant to the Superior Court for it to appoint appellate counsel or other counsel as § 23-110 counsel." *Doe*, 583 A.2d at 675. At the same time, we recognized that the Criminal Justice Act provides no "unqualified right to such appointment," but instead that appointment "is obligatory" whenever the trial court determines that a hearing is necessary on the motion. *Id.* at 672-73; *see Jenkins v. United States*, 548 A.2d 102 (D.C. 1988).

[fn4] Also, if the § 23-110 motion is denied, "the appeal from its denial can be consolidated with the direct appeal." *Shepard*, 533 A.2d at 1280. We observe, however, that *Shepard* does not *require* consolidation of the two appeals. If appellate counsel believes he has a meritorious issue in the direct appeal, he may request that the appeals not be consolidated and resolution of the direct appeal not be deferred — thus avoiding whatever additional delay the § 23-110 proceedings add to the combined appeals. *Cf. United States v. Lucas*, 314 U.S. App. D.C. 262, 67 F.3d 956, 958-59 (1995) (deferral of direct appeal pending resolution of post-trial motion caused part of multi-year delay between conviction and reversal for insufficient evidence). We expressly call the attention of counsel in future cases to the option of such a request.

[fn5] *Cf. also Watson v. United States*, 536 A.2d 1056, 1061 (D.C. 1987) (en banc) ("[I]n some cases [of claimed ineffective assistance of *appellate* counsel], the record may be remanded to the trial court . . . for a hearing and factual findings, with this court retaining jurisdiction pending the trial court's findings and a return of the

*POST*

record.").

[fn6] Corley's initial, *pro se* petition had been granted by the Supreme Court in order to vacate the judgment of this court and allow a determination on remand "of whether the District of Columbia Criminal Justice Act confers a statutory right to the assistance of counsel in filing a petition for a writ of certiorari." 416 A.2d at 713.

[fn7] In *Austin v. United States*, 513 U.S. 5, 8 (1994), the Court clarified that the duty does not include the assertion of frivolous claims. *See Qualls, supra* (adopting same qualification under the District's CJA).

[fn8] To the extent that *Lee v. United States, supra*, is inconsistent with this holding, it is overruled. It appears from the text of that opinion that the grounds on which we decide this case were not argued to the division in *Lee*.

    Ruiz, *Associate Judge*, concurring:

    I join the majority opinion that appellate counsel appointed under the Criminal Justice Act have an obligation to effect an appeal from the denial of a D.C. Code § 23-110 motion challenging the effectiveness of trial counsel. Like Judge Glickman, I see nothing in the statutory mandate that appointed counsel provide representation "through appeals," D.C. Code § 11-2603 (2001), that would limit counsel's responsibility to motions filed during the pendency of direct appeal pursuant to our *Shepard* rule. As I've already indicated, the significance of *Shepard* is that, by making § 23-110 the procedural vehicle for developing the record in order to supplement claims of ineffective assistance of trial counsel, the due process right to effective assistance of counsel on direct appeal encompasses appellate counsel's duties in connection with developing before the trial court and bringing to appeal these supplemental § 23-110 claims. *See (Charles) Thomas v. United States*, 772 A.2d 813, 829-30 (D.C. 2001) (Ruiz, J., dissenting in part) (citing *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)). That constitutional ground provides an additional basis for granting relief to appellant here, but in this case, the statutory right suffices.

    Glickman, *Associate Judge*, with whom Newman, *Senior Judge*, joins, concurring:

    I am pleased to join the majority opinion. I write separately to identify two implications of the analysis that the majority embraces. The first implication is that the defendant's due process right to the effective assistance of counsel on direct
**Page 605**
appeal extends to appellate counsel's obligation under District of Columbia law to pursue certain challenges by way of a motion in the trial court to set aside the conviction pursuant to D.C. Code § 23-110. The second implication is that a defendant must be granted a new opportunity to appeal from the denial of a § 23-110 motion if his appointed counsel neglects to note a timely appeal even if the motion was not pursued in conjunction with a direct appeal of the defendant's conviction.

<div align="center">[A78]</div>

P052

*Effective Assistance of § 23-110 Motion Counsel*

In *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985), the Supreme Court held that a criminal defendant is constitutionally entitled to the effective assistance of counsel in his first appeal as of right. A defendant is denied due process if the deficient performance of his appellate counsel deprives him of "'an adequate opportunity to present his claims fairly in the context of the State's appellate process.'" *Id.* at 402 (quoting *Ross v. Moffitt*, 417 U.S. 600, 616 (1974)). Such a deprivation occurred in *Evitts* when counsel's failure to file a "statement of appeal" as required by state procedural rules "essentially waived respondent's opportunity to make a case on the merits." *Id.* at 395 n. 6.

In holding that appellate counsel has a duty to note an appeal from the denial of a § 23-110 motion, the majority opinion in the present case relies in part on a mandatory feature of the direct appeal process in the District of Columbia. Under the law of the District, available claims of ineffective assistance of trial counsel are "essentially waived" if the claims are not pursued during the pendency of the direct appeal by means of a motion in the trial court pursuant to D.C. Code § 23-110. Although such Sixth Amendment claims are more likely to require amplification of the record, in principle they are "no different from any of the [other] myriad claims that may be raised on direct appeal." *Ante* at 6. Under *Shepard v. United States*, 533 A.2d 1278, 1280 (D.C. 1987) and *Doe v. United States*, 583 A.2d 670, 674 (D.C. 1990), such claims therefore "must . . . be raised within the framework of the direct appeal by the attorney appointed for the appeal." *Ante* at 7.[fn1] Furthermore, as the majority opinion states, "[t]he fact that, under *Shepard*, the vehicle for mounting the claim of ineffectiveness is this jurisdiction's statutory post-conviction procedure does not change the character of appellate counsel's obligation." *Ante* at 7. As the majority acknowledges, citing *Snell v. United States*, 754 A.2d 289, 292 (D.C. 2000), and *Watson v. United States*, 536 A.2d 1056, 1061 (D.C. 1987) (en banc), instead of requiring ineffective assistance

**Page 606**
claims to be heard under § 23-110, this court as easily could have required such claims to be raised as a formal part of the direct appeal via remand of the record to the trial court for an evidentiary hearing. *Ante* at 7. By whatever name — a "§ 23-110 motion hearing" or a "record remand" — the procedure is functionally the same, a proceeding to augment the record for purposes of permitting claims of ineffective assistance of trial counsel to be heard on their merits in the defendant's direct appeal.[fn2]

In short, under District of Columbia law, the § 23-110 motion to pursue Sixth Amendment ineffective assistance claims is an integral component of the defendant's direct appeal from his criminal conviction. The motion furnishes the defendant his only "'adequate opportunity to present his claims fairly in the context of the [District's] appellate process.'" *Evitts*, 469 U.S. at 402 (citation omitted). The obligations of appellate counsel are not limited, therefore, to the duty we recognize today to note a timely appeal from the denial of a § 23-110 motion filed in accordance with *Shepard*. Under *Evitts* the defendant in the District of Columbia has a due process right to the effective assistance of appellate counsel in the identification, investigation and prosecution

[A79]

*po53*

by § 23-110 motion of available claims of trial counsel
ineffectiveness.[fn3]

*Duty of Appointed Counsel to Appeal Denial of § 23-110 Motion*

Although the majority opinion appropriately emphasizes the
obligations of appellate counsel under *Shepard* and *Doe*, the holding of
the opinion is that it is "appointed counsel's duty to provide continued
representation `through appeals'" pursuant to D.C. Code § 11-2603
(2001), *ante* at 8, that obligates appointed counsel upon request to file
"a properly noticed appeal from the denial of the [§ 23-110] motion."
*Ante* at 9. That statutory obligation of appointed counsel is independent
of *Shepard* and *Doe*, and it is not limited to § 23-110 motions that
are filed while the direct appeal is still pending; for under D.C. Code
§ 11-2601 (3)(A) (2001), counsel may be appointed for persons
"seeking collateral relief" pursuant to § 23-110 at other times.
Successor counsel commonly are appointed, for example, to pursue
post-appeal § 23-110 motions raising ineffectiveness claims that
appellate counsel could not pursue because of a conflict of interest. *See
Ramsey v. United States,* 569 A.2d 142, 146 (D.C. 1990) (holding that the
failure to raise an ineffectiveness claim during the direct appeal in
accordance with *Shepard* does not bar consideration of a post-appeal
§ 23-110 motion raising the claim if the defendant was represented in
the direct appeal by the allegedly ineffective lawyer). Hence, if
appointed counsel breaches his statutory duty to take a timely appeal from
the denial of a § 23-110 motion, the defendant should be entitled to
the remedy that, the majority opinion holds, "the Criminal Justice Act
provides," *ante* at 8 — namely, reentry of the judgment so as to
permit the defendant to notice a timely appeal — whether or not the
motion is ancillary to a direct appeal.

[fn1] "[I]f an appellant does not raise a claim of ineffective assistance
of [trial] counsel during the pendency of the direct appeal, when at the
time appellant demonstrably knew or should have known of the grounds for
alleging counsel's ineffectiveness, that procedural default will be a
barrier to this court's consideration of appellant's claim." *Shepard,*
533 A.2d at 1280. "[I]t follows that an inherent part of counsel's
responsibility on direct appeal is to consider whether the client's
interests require the filing of a motion under § 23-110 based on
ineffectiveness of counsel." *Doe,* 583 A.2d at 674. "[C]ounsel on direct
appeal is obliged to make reasonable inquiry into the possibility of
ineffective assistance of counsel at trial by researching and developing
points thus uncovered that might give rise to a claim of ineffectiveness."
*Id.* at 675. Thereafter, if appellate counsel concludes that there is "an
adequate basis for advancing a claim of ineffective assistance of trial
counsel," appellate counsel should, *inter alia,* file a § 23-110
motion and "a request by appellant to the Superior Court for it to
appoint appellate counsel or other counsel as § 23-110 counsel."
*Id.*

[fn2] Indeed, to treat these two functionally equivalent procedures as if
they were different would raise due process (equal protection) concerns.
*See Bolling v. Sharpe,* 347 U.S. 497, 499 (1954).

[fn3] And also other claims that require the vehicle of a § 23-110
motion to be pursued because they depend on the development of facts

*P054*

outside the record.
**Page 607**

Copyright © 2003 Loislaw.com, Inc. All Rights Reserved

**[A81]**

*POSS*

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION -- FELONY BRANCH

UNITED STATES OF AMERICA        :       Criminal Case No. F-14042-88

    v.                              :       Judge Henry F. Greene

CRAIG A. WILLIAMS                :

ORDER

    Pursuant to the mandate of the Court of Appeals in <u>Williams v.</u>
<u>United States</u>, 783 A.2d 598 (D.C. 2001) (en banc), it is this _8th_
day of _January_ , 200<s>7</s>,

    ORDERED that this Court's November 19, 1992 order denying
defendant Williams's original D.C. Code § 23-110 motion in this
case is hereby vacated; and it is further

    ORDERED that this Court's November 19, 1992 order denying
defendant Williams's original D.C. Code § 23-110 motion in this
case is hereby reentered on this date.

_1/8/02_
_____
DATE

_____
Judge Henry F. Greene
( *Signed in chambers* )

cc:  Christopher Warnock, Esq., 3000 Connecticut Ave.,
     N.W., Suite G2, Washington D.C., 20008

     Matthew W. Greene, Esq., Smith & Greene, P.L.L.C.,
     3977 Chain Bridge Rd., Suite 201, Fairfax, Va., 22030

     Assistant United States Attorney Roy W. McLeese III,
     555 4th St., N.W., Rm. 8104, Washington, D.C., 20530

[A82]

*p005*

DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 90-CF-627 & 03-CO-321
(Cr. No. F-14042-88)

CRAIG ALLAN WILLIAMS,                                    Appellant,

    v.

UNITED STATES OF AMERICA,                                Appellee.

<u>MOTION TO RECALL MANDATE</u>

Procedural History

On April 13, 1989, appellant Craig Williams was indicted on
one count of first-degree murder while armed (D.C. Code §§ 22-2401,
- 3202), and one count of carrying a pistol without a license
(D.C. Code § 22-3204) ("CPWL"), stemming from the shooting death
of David Golden.  He was tried by a jury before the Honorable
Henry F. Greene and, on March 6, 1990, found guilty on both counts.
On April 11, 1990, the court sentenced appellant to serve concur-
rent terms of twenty years to life imprisonment for murder and
one year for CPWL.[1]

On April 27, 1990, appellant, through new counsel (Michael J.
Dennis), filed a timely appeal challenging his conviction (Appeal
No. 90-CF-627).  The appeal was stayed pending resolution of his
collateral-attack motion.  On April 10, 1990, appellant filed a
motion to vacate pursuant to D.C. Code § 23-110 alleging ineffec-
tive assistance of trial counsel, and also moved for a new trial

---

1.  At trial, appellant was represented by Public Defender Service
attorney Shawn Moore.

*P006.*

pursuant to Super. Ct. Crim. R. 33. After a hearing on November 19, 1992, the trial court held that appellant had failed to meet his burden of demonstrating ineffective assistance of trial counsel and denied appellant's motion in open court (11/19/92 Tr. 148-153).[2]

Appellant's counsel filed a notice of appeal, challenging the denial of his collateral-attack motion, but it was not signed by appellant or his attorney (Appeal No. 93-CO-144). This Court consolidated the appeals. Appellant's brief challenged his conviction and raised his ineffective-assistance-of-trial-counsel claim. In a Memorandum Opinion and Judgment filed January 17, 1995, this Court affirmed the judgment and convictions but declined to review the denial of appellant's § 23-110 motion, because "the necessary steps to effectuate an appeal . . . ha[d] not been accomplished." See Craig A. Williams v. United States, 1995 WL 929016 at n.1 (D.C. Jan. 17, 1995) ("Williams I") (App. A).[3]

On August 19, 1998, appellant, through new counsel (Brian C. Plitt), filed a second § 23-110 motion alleging, inter alia, that the attorney who represented him in his first § 23-110 motion was constitutionally ineffective for failing to appeal the denial of that motion. The trial court denied the motion by order dated September 15, 1998. Appellant filed a timely appeal (Appeal No. 98-CO-1911). On October 5, 2000, this Court affirmed appellant's

2. The order denying appellant's original § 23-110 motion was entered in conformity with the requirements of Super.Ct.Crim. R. 55(a).

3. "App." refers to the Appendix to this Motion.

-2-

[A84]

*P007*

convictions, holding that under Lee v United States, 597 A.2d
1333 (D.C. 1991), appellant could not prevail on his ineffective
assiatance of counsel claim because the Constitution did not re-
quire appointment of counsel for post-conviction proceedings.
See Williams v. United States, 760 A.2d 205, 206-207 (D.C. 2000)
("Williams II") (App.B).  Williams II was subsequently vacated
WHEH THE Court granted appellant rehearing en banc.  See Williams
v. United States, 770 A.2d 560 (D.C. 2001) ("Williams III") (App.
C).

    Thereafter, on October 18, 2001, this Court vacated the trial
court's September 15, 1998, denial of appellant's second § 23-110
motion that was at issue in Williams II.  The Court remanded the
case to the trial court "with directions . . . to vacate and reenter
the November 19, 1992, order denying [appellant's first § 23-110]
motion alleging ineffective assistance of trial counsel, so that
an appeal from that order may be noted in the required manner."
See Williams v. United States, 783 A.2d 598, 604 (D.C. 2001)
("Williams IV") (App. D).

    By written Order dated January 8, 2002, the trial court
vacated its November 19, 1992, order denying appellant's first §
23-110 motion, and reentered the Novemver 19, 1992, order.  On
February 7, 2002, appellant filed a timely notice of appeal (No.
03-CO-321).

    On appeal, appellant's counsel [Matthew W. Greene] challenged
the manner in which the trial court entered its November 19, 1992,
order.  On June 30, 2005, this Court held that the trial court's
recorded oral findings, entered on the docket, were sufficient to

*P008*

meet the requirements of law, and affirmed. See Williams v. United States, 878 A.2d 477 (D.C. 2005) ("Williams V") (App.E).

NOW COMES Appellant, Craig Williams (Pro se), and respect-fully moves this Honorable Court to Recall Mandate, pursuant to D.C. App. R. 41(c).

As grounds, appellant respectfully argues that he was denied due process and the effective assistance of counsel on first appeals.[4]  In support, appellant urges that counsel was ineffec-tive in failing to present crucial issues, including, but not limited to, the following:

1.  [In Appeal No. 03-CO-321] failing to argue that the trial court denied appellant a full and fair fact hearing and rendered § 23-110 inadequate or ineffec-tive to test the legality of appellant's detention.[5]

2.  [In Appeal No. 03-CO-321] failing to argue that the trial court's determination [that the Parkway Guest House records would not have helped appellant's defense in this case] was plainly wrong and without evidence to support it.

3.  [In Appeal Nos. 90-CF-627 & 03-CO-321] failing to argue that the prosecution knowingly permitted evidence [Sandra Plummer's testimony regarding the Parkway Guest House stay], known to be false or mis-leading, to go uncorrected before the trier of fact.

4.  Appellant seeks to revive the direct appeal from his conviction (Appeal No. 90-CF-627) and the appeal from the denial of his first § 23-110 motion (Appeal No. 03-CO-321).
5.  The trial court denied appellant's request for investigative services to obtain evidence to authenticate the Parkway Guest House records attached to his § 23-110 motion.
(Footnote Continued)

-4-  [A86]

*p009*

## INTRODUCTION

The approach taken by appellant, filing with this Court a motion to recall mandate, is a proper one to press his due process right to effective assistance of counsel, whether retained or appointed, on "first appeal." See Head v. United States, 626 A.2d 1382, 1383-84 (D.C. 1993) and Watson v. United States, 536 A.2d 1056, 1059 (D.C. 1987) (en banc), cert. denied, 486 U.S. 1010 (1988).

This Court noted the need for appellate counsel in order to be constitutionally effective to inform the Court of the "crucial issue . . . as well as the applicable law and its various ramifications."[6] Hines v. United States, 547 A.2d 988, 990 (D.C. 1988) citing Watson, 536 A.2d at 1069. See Griffin v. United States, 598 A.2d 1174 (D.C. 1993)(motion granted where appellate counsel failed to raise meritorious double jeopardy claims).

### THE LEGAL STANDARD

In determining whether a showing of "sufficient merit" has been made to recall the mandate, this Court must address two principal issues. One is whether the performance of counsel "fell below an objective standard of reasonableness." Watson, 536 A.2d

(footnote continued)
At trial, the records were submitted into evidence by the United States, who stipulated as to their authenticity. However, the § 23-110 court disregarded the government's acceptance of authenticity of its own evidence [in violation of the stipulation] and denied appellant's claim.
6. Reviewing court cannot successfully and constitutionally perform it's functions unless it considers a presentation devoted to arguments for accused, leaving court to determine whether and to what extent they have merit. Suggs v. United States, 391 F.2d 971 (D.C. Cir. 1968); United States v. Freeman, 514 F. 2d 1314, 1318 (D.C. 1975)("Reviewing court must weigh cumulative impact of numerous trial errors"), vacated, 595 F. 2d 306 (D.C. Cir. 1979).

P010

at 1065 (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)).
Stated another way, this Court must address "whether counsel's
conduct so undermined the proper functioning of the adversarial
process that the [judicial proceedings] cannot be relied on as having
produced a just result." Strickland, 466 U.S. at 686.  The other
inquiry addresses prejudice, i.e., "it must be established that
there is a reasonable probability that, but for counsel's unpro-
fessional errors, the result of the proceeding would have been
different." Watson, 536 A.2d at 1065 (quoting Strickland, 466 U.S.
at 694.

"In order to prevail on motion . . . movant must show that
counsel failed to raise an available issue on direct appeal which,
if factually supported, would create the reasonable probability of
reversal." Watson v. United States, 508 A. 2d 75, 86 (D.C. 1986).

### The Government's Evidence

On October 22, 1988 appellant asked Sandra Plummer if there
were woods, a parking lot, or any vacant area near where her brother
lived in the unit block of 46th Place, S.E., "[b]ecause I'm plan-
ning on doing somebody" (Tr. 3/7/90 297-298).  When she asked who,
he replied "Dave" (Id. at 298.)  When she protested, appellant took
his gun out of his belt, then asked her, "[a]re you with me or
not?" to which she replied, "Craig, okay, I'll go.  I will go."
(Id. at 298.)  Appellant told Sandra Plummer that he planned to
tell Golden a fictitious story about Jamaican guys who were giving
appellant trouble, such that he needed Golden's help (id. at 294-
295, 299).

-6-

[A88]

*P011*

~~Shortly thereafter, Tony Fletcher~~ drove appellant and Sandra
Plummer to the 2200 block of Hunter Place, where they sat in the
car while appellant explained the plan to Fletcher (Tr. 3/7/90
299-300).  Sandra Plummer exited the car and walked up the street,
which prompted appellant to follow her, and state, "[b]itch, if
you try it, I'll kill you," then grab her by the arm and lead her
across the street to Golden's apartment, with the .45 pistol in
her side (id. at 300).  When they reached the apartment, appellant
awakened David Golden, told him the story about Jamaicans at
Benning Road and H Street giving him trouble, and said he needed
Golden's help to "do" them (id. at 300-301).  Golden armed himself
with a 9 mm pistol (Id. at 303).

Once outside, Sandra Plummer got into the front passenger seat,
as she had been directed by appellant (Tr. 3/7/90  at 303).
Appellant got into the back of the car (id.).  Golden drove (id. at
303-304).

They reached Benning Road at H Streets and parked the car,
then, as Sandra Plummer reached for the door handle to get out of
the car she heard a "loud pow" (Tr. 3/7/90 310-313).  She then
jumped out of the car and ran into the alley (id. at 313).  As she
left the car she heard Golden say, "Craig, man, why?" (Id. at 317.)

When she reached the alley, Sandra Plummer heard appellant say
"Hey," which she took to mean stop (Tr. 3/7/90 318).  She looked
back and saw appellant outside of the car, almost on his knees,
leaning into the car and reaching around the front seat (id.).
When appellant stood up and put his coat over his arm, she noticed
that he had Golden's 9 mm pistol (id.).  Appellant then grabbed

-7- **[A89]**

*PO12*

Sandra Plummer, pointed the gun at her side, and directed her across the street to Tony Fletcher's apartment (<u>id</u>. at 319, 322).

After 1:00 p.m. appellant, Sandra Plummer, and Tony Fletcher left Fletcher's apartment and went to a Days Inn Hotel (Tr. 3/7/90 325). They registered using Fletcher's identification and Sandra Plummer's name and address (<u>id</u>. at 326-27)(Receipt for Plummer and Fletcher -- Government's Exhibit 34 -- App.F). Appellant brought the two guns with him (<u>id</u>.). Appellant told Plummer to go into the bathroom of the hotel and close the door (<u>id</u>. at 328). Plummer overheard a telephone conversation between appellant and "Moe," during which appellant explained why he had "done" Golden (<u>id</u>. at 329).

The next morning, at approximately 6:45 a.m. on October 23, 1988, Sandra Plummer and appellant took a taxicab from the Days Inn in Arlington to Wade Road, S.E., where an individual named "Moe" resided (Tr. 3/7/90 333). Once there, appellant and Moe talked about altering the ballistics of the gun, appellant left the gun with Moe,[7] and plummer and appellant went to a "guest house" on Talbert Street, S.E. (<u>id</u>. at 334). Appellant registered under Sandra Plummer's name, and the two spent the night there (<u>id</u>. at 336).

---

7. The question was asked [by a juror], "Who is Moe." With regard to the question, the court stated "You will have to rely on your recollection of the testimony and evidence on that issue." (3/12/90 Tr. 31).

-8-

[A90]

*PO13*

Plummer's testimony about the Parkway Guest House registra-
tion records (App. G) included the following discussion:

Q. [By the prosecutor] And when you got to -- did
you go to the guest house?

A. Yes, we did.

Q. When you got to the guest house, did you regis-
ter?

A. Yes.

Q. Were you with Mr. Williams when he did that?

A. Yes.

Q. Did you see him do anything in terms of register-
ing?

A. If I'm not mistaken, I was the one to put my
name on the registration.

Q. Let me ask you if you recognize or have you ever
seen, having shown defense counsel previously, Govern-
ment's Exhibit Number Thirty-five. Do you recognize
that?

A. Yes.

Q. What is Thirty-five?

A. Exhibit Thirty-five are receipts, one in particu-
lar from Craig and myself, the very first receipt.

Q. Do you recognize anything on Government's Exhibit
Thirty-five that you've seen before?

A. Yes.

Q. What is that?

A. Craig's name and his writing, his exact handwriting.

Q. And the day you checked into the guest house was
what morning, ma'am, what day?

A. It was the morning of Sunday, October 23rd, yes.

Q. And did you see Mr. Williams check in? Were you
with him when he did that?

-9-

[A91]

*P014*

A.  Yes.  I was mistaken.  The first time, he did.
Sorry.

Q.  How long -- on the way there, did you stop any-
where else?

A.  No.

Q.  How long were you at the guest house on the 23rd?

A.  Into the morning Monday, the 24th.

Q.  And what did you do on the 23rd at the guest
house?

A.  We slept practically all day.

Q.  On the morning of the 24th, did you go anywhere
with Mr. Williams?

A.  Yes.

Q.  Where was that?

A.  We were to go to my house.  However, before doing
so, Craig wanted to stop at the apartment where Dave
had lived.

(Tr. 3/7/90 334-336)

Q.  [By defense counsel] I'm going to hand you what's
been marked as Government's Exhibit Thirty-five.  Do
you remember seeing that yesterday?

A.  Yes.

Q.  Do you see a receipt with Mr. Williams' name on
there?

A.  Yes.

Q.  Ma'am, what's the date on that receipt?

A.  October 24th.

Q.  Does it have a year?

A.  Nineteen Eighty-eight.  I'm sorry.

Q.  Thank you.

(3/8/90 Tr. 419)

-10-

[A92]

*P015*

The essence of appellant's defense was that he was not pre-sent at the shooting of Golden and that the killing was done by another. (3/12/90 Tr. 100)

### The § 23-110 Motion

On April 10, 1990, appellant filed a § 23-110 motion (App.H) in conformity with this Court's decision in Shepard v. United States, 533 A.2d 1278 (D.C. 1987).

Appellant's motion alleged that his trial lawyer, Shawn Moore of the Public Defender Service, had provided ineffective representa-tion by, among other things, failing to properly cross-examine Sandra Plummer about the receipts from the Parkway Guest House. (11/19/92 Tr. 148-151) The court scheduled the matter for an evidentiary hearing because the § 23-110 motion stated facts, that if supported at the hearing, would have entitled appellant to relief. See Tr. (11/19/92) 152.

At the hearing, trial counsel testified that he had obtained the guest house receipts. 11/19/92 Tr. at 69. Trial counsel was asked by the government why he had not used them at trial and trial counsel stated that,

> I didn't think they would help show that Ms. Plummer was lying. There was something of a problem with that, I think the date on one of them, they were kind of out of sequence and just in terms of cross-examination, I didn't think they were going to help prove up that she was lying.

11/19/92 Tr. at 69.

At the 11/19/92 hearing the trial court found that appellant's receipt was improperly dated as, " . . . the sequence of other re-cords makes it clear that that [registration] took place on October

-11-

[A93]

*po16*

23rd." 11/19/92 Tr. at 150.

The trial court subscribed to counsel's conclusion, that --
that it's very unlikely that the guest house records would have
helped appellant's defense. (11/19/92 at 151)

At the conclusion of the hearing the trial court denied the
motion, Tr. at 152-53, finding that "none of the grounds asserted
by [appellant] entitles him to relief." (Tr. 140, 148-151).

### Previous Holding of the Court

In the 10/12/95 Opinion following direct appeal this Court
summarized the facts of the instant case as follows:

> The evidence at trial established that appellant
> killed his long-time acquaintance, David Golden,
> because Golden had borrowed 3000 for the purchase
> of crack cocaine for resale, only to spend the
> money on a car. The primary evidence was the
> testimony pf appellant's girlfriend, Sandra
> Plummer, who was present during the planning and
> commission of the murder. Other police and
> medical witnesses testified at trial.
>
> The events elicited at trial revealed that appel-
> lant planned and carried out the killing of Golden
> for keeping the 3000. On the evening in question,
> appellant told Golden that some Jamaican guys were
> giving him trouble and that he needed Golden's help.
> Golden, Plummer, and appellant drove to an alley
> and Plummer heard a "loud pow." She jumped out of
> the car and ran into the alley. Meanwhile, appellant
> got out of the car, leaned into the front seat and
> took Golden's gun. The two then fled. Golden had
> been shot four times.
>
> Several witnesses saw Plummer and appellant at the
> scene of the shooting. Appellant took evasive
> measures regarding the investigation of the crime
> including: trying to get the ballistics of the
> weapon changed, and directed Plummer to tell a
> fabrication to the police. Plummer was told by
> appellant that she would be killed if she did not
> tell the police his version of the story. Finally,
> appellant called police on November, 25 1988 to
> inform them that Plummer had committed the murder.

(10/12/95 Op. at 1.)

*POI7*

## Reasons To Recall Mandate

Appellant contends that (1) appointed counsel [Michael J. Dennis and Matthew W. Greene] reviewed the record (transcripts, court files, docket entries, motions, exhibits, appeal briefs) and failed to inform this Court of the crucial issue, the applicable law and portions of transcript pertinent to the argument; (2) appointed counsel knew or should have known the basis for the claims raised herein; (3) appointed counsel committed professional errors so serious that he was not functioning as counsel guaranteed by the Sixth and Fourteenth Amendments and the District of Columbia Criminal Justice Act [D.C. Code Section 11-2601 et. seq.]; and (4) the performance of appointed counsel was so clearly prejudicial to appellant's substantial rights as to jeopardise the very fairness and integrity of the appellate process.

### I.    DENIAL OF FULL AND FAIR FACT HEARING

Appellant contends that Matthew W. Greene (counsel appointed by the Court) was ineffective in failing to inform the Court of crucial issues.

Specifically, counsel failed to argue that the trial court denied appellant a full and fair fact hearing[8], and prevented the development of material facts, and rendered relief by 23-110 motion inadequate and ineffective to test the legality of detention.

---

8.  The trial court prevented the recovery and presentation of evidence to authenticate [indigent] appellant's Parkway Guest House registration receipt, then challenged the authenticity of same to deny appellant's ineffectiveness claim.

The court also denied investigative services to recover exculpatory evidence.

*po18*

Appellant presented the following issues in his § 23-110 motion and at the November 19, 1992 hearing on that motion: failure of trial counsel to develope support for an insanity defense; delay in investigation; erroneous advisement of appellant not to testify; failure to visit the crime scene, to locate witnesses; and trial counsel's ineffectiveness in cross-examining Sandra Plummer on the guest house receipts (App. H at 1-2; Tr. 11/19/92 at 148-151).[9]

Appellant argued that trial counsel was ineffective in cross-examining Plummer to show that she and appellant were not together at the Parkway Guest House, as she testified on direct examination. (App. H at 7-8)

The guest house registration records show that appellant checked into room four at 7:30 a.m. and checked out at 3:30 p.m. on the same day (Receipt # 37108); Mr. & Mrs. Bob Davis checked into room four at 8:45 p.m. and checked out at 10:45 p.m., on October 23, 1988 (Receipt # 37116); and Ms. Plummer's receipt (# 37118) shows that she checked into room four at 11 p.m., on October 23, 1988, and checked out at 8 a.m. October 24th.[10] These receipts were offered by the government (GX-35), who stipulated as to their authenticity. (3/8/90 Tr. at 535)

9. To obtain evidence in support of the above, appellant requested investigative services ex parte under 11 D.C. Code § 2605. (App. H at 2)
   After an adversary hearing on March 23, 1992, the court denied appellant's request without prejudice. (3/23/92 Tr. at 19)
   Thereafter, appellant made his motion on the understanding that, should the court find the motion (or any portion) lacking in merit only because of the absence of the supporting evidence which an investigation could supply, the court would suspend determination of the motion and reconsider the request for such services. (App. H at 3)

10. Appellant requested the services of an investigator so he can (if necessary) present evidence to authenticate the Parkway Guest House records. (App. H at n. 7)

*PO19*

Stipulations fairly entered into between prosecutor and defendant are controlling and courts are bound to enforce them." See Byrd v. United States, 485 A.2d 947 (D.C. 1984). "Valid stipulations as to evidence are binding on the parties thereto as well as on the courts." Cowan v. United States, 331 A.2d 323, 327 (D.C. 1975)(citing cases). See also Oubre v. Dist. of Columbia, 630 A.2d 699, 703 (D.C. 1993)(Same).

As the receipts were offered by the government it certainly could not impeach its own evidence. Jefferson v. United States, 474 A.2d 147, 149 (D.C. 1984). Thus the trial court had to dis-regard the government's acceptance of the authenticity of its own evidence in order to speculate regarding the possibility that a.m. was changed to p.m. (11/19/92 Tr. at 150)[11]

With regard to the failure to investigate at the November 19, 1992 hearing trial counsel indicated that appellant had asked him to interview a number of witnesses, including Tony Fletcher and Wendy, which trial counsel failed to do. (11/19/92 Tr. at 28, 30, 32).[12]

---

11.  Taken on its face the evidence indicates that appellant checked out seven and a half hours before Plummer checked in at 11 p.m. and the Davises receipt (# 37116) clearly contradicts Plummer's testimony that she and appellant arrived together, did not leave until the 24th and that they left together at that time. (3/7/90 Tr. 334-336).

12.  In his motion, appellant noted that trial counsel failed to locate and secure witnesses that appellant proffered would have given evidence that Plummer killed the decedent, sold drugs, frequented crack houses, carried a gun and could not have spent the night of the murder with appellant.  (App. H at 2)

-15-

[A97]

*P020*

Indeed appellant notes in his affidavit in support of his § 23-110 motion that Wendy [the mother of the decedent's son] could have provided exculpatory evidence.

Specifically, Wendy could have provided, inter alia, evidence that she met with appellant [on the eve of October 23, 1988 -- the day after the murder] at the Green Street apartment complex in Southeast (App. I at pages 2 & 4).

Indeed appellant proffered exculpatory evidence and identity of witness, which clearly contradicts Plummer's testimony that she and appellant arrived at the guest house together, did not leave until the 24th and that they left together at that time.

However, the trial court concluded that "there was no proffer as to what exculpatory evidence any alleged lost witnesses would have given . . . , there was no proffer as to identification of any witnesses . . ." (11/19/92 Tr. at 148)



The record makes clear that the trial court denied appellant a full and fair opportunity to litigate the issue of counsel's failure to investigate and ineffective cross-examination of Ms. Plummer. Had counsel raised these issues on appeal [No. 03-CO-321], appellant would have been entitled to relief. Thus, appellant has not only satisfied the Watson requirement of a sufficient showing of prejudice to justify recalling the mandate, he has shown prejudice in the Strickland/Watson constitutional sense needed to establish ineffective assistance.

-16-

[A98]

*P021*

II.    THE TRIAL COURT'S JUDGMENT IS PLAINLY WRONG
       OR WITHOUT EVIDENCE TO SUPPORT IT

Appellant contends that counsel [Matthew W. Greene] was
ineffective in failing to argue that the trial court's 11/19/92
judgment is plainly wrong and without evidence to support it.

An examination of the trial record strongly suggests that
appellant kidnapped Sandra Plummer and forced her to participate
in Golden's murder.  (3/7/90 Tr. at 297-299)  Indeed Plummer
testified that appellant led her into Golden's apartment build-
ing at gunpoint (tr. at 300-301); grabbed her by the arm and led
her away from the murder scene at gunpoint (tr. at 313, 317- 319);
and then kept her continuously by his side in two hotels over
the next two days (tr. 325, 333-336).[13]

Appellant argued that, contrary to Plummer's trial testimony,
the records show that he and Plummer were not at the guest house
at the same time (11/19/92 Tr. 149)

Following a hearing on the motion on November 19, 1992, Judge
Greene found that cross-examining Plummer about the guest house
records would not have assisted appellant's defense (11/19/92 Tr.

---

13.  "A person is guilty of kidnapping if he unlawfully removes
another . . . a substantial distance from the vicinity where [she]
is found, or if he unlawfully confines another for a substantial
period in a place of isolation, with any of the following purposes:
(a) to hold for ransom or reward; or as a shield or hostage; or.
(b) to facilitate commission of any felony or flight thereafter;
or (c). to inflict bodily injury on or to terrorize the victim or
another; or (c) to interfere with the performance of any govern-
mental or political function."  Quoting **"Black's Law Dictionary"**
(Sixth Centennial Edition 1891-1991) at page 870.

-17-

**[A99]**

*PO22*

149-151).  Ruling from the bench, Judge Greene stated, in relevant part:

> With regard to the alleged ineffectiveness in cross-examining Ms. Plummer, that allegation is basically, as I understand it, that Mr. Moore [Appellant's trial counsel] failed to show, through the Guest House registration records, that she and the defendant were not registered there at the same time.  I believe that, when one examines those records, as Government counsel showed today, and as a careful examination of the records reflects, that one can conclude, from those records, that indeed, the defendant and Ms. Plummer were there at the same time.  And thus, Mr. Moore's conclusions that those records would not have assistaed Mr. Williams' defense, I think is well taken.
>
> The Guest House registration shows, there's one with Mr. Williams' name, that shows registration, that shows a seven thirty a.m., and a three thirty p.m., arrival and departure on October the 24th.  But, as Mr. Williams' testimony made clear, the sequence of other records makes it clear, that that occurred on October 23rd.  Ms. Plummer's receipt shows an eleven p.m. arrival on the 23rd, and an eight a.m., departure from the same room, on the 24th.  Thus, even the records themselves, particularly given the coincidence concerning the room number, strongly suggest that these two folks were together at the same time.
>
> Now, Ms. Plummer's testimony corroborates the time of the defendant's arrival at the Guest House on October 23rd, but she says they registered in her name, when in fact, it was in the defendant's name.  She says they left the Guest House on October 24th, and the records shows that while she left on the 24th, he left at 3:30, p.m., on the 23rd.  But, when one looks at that three thirty p.m. on the 23rd, it appears that a change was made in the "p", and that it could [possibly] been an "a", and that indeed, Mr Williams could have left at three thirty a.m. on the 24th.
>
> So, if you look at these records carefully, I have to subscribe to Mr. Moore's conclusion, that -- that it's very unlikely that they would have helped Mr. Williams' defense in this case.

(11/19/92 Tr. 149-151.)

-18-

[A100]

*p023*

There are a number of flaws in the trial court's ruling.

First, the court claims that careful examination of the records reflect that appellant and Plummer were there at the same time. (Tr. at 149-150)

To the contrary, the records show that appellant checked out of room four at 3:30 p.m., seven and a half hours before Plummer arrived. (See App. G, Receipt Nos. 37108 & 37118)

Second, the court notes that "the coincidence concerning the room number, strongly suggest that these two folks were together at the same time." (Tr. at 150)

In actuality appellant can quite easily explain this fact as an examination of the receipts reveals that the guest house in question only appears to have eight rooms. (Id. App. G)

Third, the court states that the 3:30 p.m. check out time on appellant's receipt could have been 3:30 a.m. -- and that appellant could have left at 3:30 a.m. on the 24th. (Tr. at 150)

To the contrary, Mr. & Mrs. Bob Davis were registered in room four from 8:45-10:45 p.m. (see App. G, Receipt #37116). Therefore appellant could not have left at 3:30 a.m.

Further, the court's reasoning does not comport with the testimony. Plummer testified at trial that she and appellant arrived together at the guest house after the murder, did not leave until the next morning (October 24th, 1988) and they left together at that time. (3/7/90 Tr. at 334-336).[14]

---

14.  Plummer's trial testimony was consistent with her grand jury testimony. Plummer testified to the Grand Jury that she and appellant slept all the day of the 23rd and into the 24th at the Guest House and that they left together in the morning of the 24th. Grand Jury Testimony 12/22/88 Tr. at 56.

*P024*

Therefore any evidence proving her testimony false [duly noting that neither appellant nor Plummer could have been in the guest house from 3:30-10:45 p.m. on October 23rd] would have been relevant in impeaching her credibility and the credibility of all her testimony.[15]

Appellant submits that the trial court erred when it subscribed to trial counsel's conclusion that the receipts would not have helped appellant's defense.[16] Trial counsel was clearly wrong to base his refusal to use the receipts as impeachment evidence on their sequence; the sequence was a major aid to establishing facts favorable to appellant. The prejudice to appellant in this case is clear. Physical evidence that Plummer was not with appellant for the two days following the murder and that contradicts her sworn testimony at trial and to the grand jury that she was at the guest house with appellant throughout the evening of the 23rd, casts doubt upon her testimony that appellant killed Golden. The fact that Plummer and appellant were not registered in the same room at the same time undermines the credibility of all her testimony -- from forced participation to having been kidnapped and

---

15. It is interesting to note that the receipts clearly provide a basis for impeachment of Plummer's testimony that she and appellant were together on October 23 and 24, 1988. However, when the evidence contradicts the testimony of Sandra Plummer the court dismisses them as inaccurate or ambiguous. curiously, however, these same receipts are deemed accurate by the court when they show that Plummer and appellant registered in the same room albeit at different times.

16. Trial counsel stated that he did not think the receipts would be helpful in impeaching Ms. Plummer and offered only one reason to support that bald conclusion, that there was a problem with the sequence of the dates. (11/19/92 Tr. at 69) The trial court held that the sequence of the dates rather than being a negative factor actually supported appellant's testimony. (Tr. 150)

-20-
[A102]

P025

held hostage.[17]

Appellant submits that the trial court's ruling does not comport with the testimonial and documentary evidence. Rather, the court's rulings reveal both a bias towards appellant and favor for the government. This Court may set aside the trial court's judgment if there is an error of law or if the judgment is plainly wrong or without evidence to support it. See D.C. Code § 17-305(a)(1989); Williams v. United States, 576 A.2d 1339, 1342 (D.C. 1990).[18]

Appellant submits that the record makes clear that the trial court's judgment is plainly wrong or without evidence to support it. Had counsel raised these issues on appeal [No. 03-CO-321], appellant would have been entitled to relief. Thus, appellant has not only satisfied the Watson requirement of a sufficient showing of prejudice to justify recalling the mandate, he has shown prejudice in the Strickland/Watson constitutional sense needed to establish ineffective assistance.

---

17. Appellant duly notes that Plummer and Fletcher were registered in the same room at the same time (see App. F) and this record very strongly suggest that they were together for a substantial period (id.).

18. Indeed, the trial court erroneously concluded that appellant failed to proffer exculpatory evidence and identity of witness (see Motion at 15-16, supra.).

[A103]

*PO2L*

III.    **THE GOVERNMENT KNOWINGLY PERMITTED FALSE OR**
       **MISLEADING EVIDENCE TO GO UNCORRECTED BEFORE**
       **THE TRIER OF FACT**

"A prosecutor may not knowingly . . . permit evidence, known to be false [or misleading], to go uncorrected" before the trier of fact.  Woodall v. United States, 842 A.2d 690, 696 (D.C. 2004) (citations omitted).

Appellant contends that Michael J. Dennis and Matthew W. Greene were ineffective in failing to argue that the government violated appellant's right to due process when it knowingly permitted evidence (Plummer's testimony regarding the guest house stay), known to be false or misleading, to go uncorrected before the trier of fact.

Because a prosecutor's failure to correct known false or misleading testimony of a government witness violates due process, such failure requires reversal of a conviction unless there is no reasonable possibility that the falsehood affected the jury's verdict.  (Id.); see also Card v. United States, 776 A.2d 581, 601-02 (D.C. 2001) (citations omitted).

The importance of [the witness'] testimony . . . and the evidence of [the defendant's] guilt must be considered in determining whether the witness' false testimony could in any reasonable likelihood have affected the judgment of the jury.  Woodall, 842 A.2d at 699 (citation and quotation marks omitted).

To succeed in this claim, appellants bear the burden of establishing that:  (1) the prosecution's case included false testimony; (2) the prosecution knew, or should have known, of the falsehood; and (3) that the false testimony could have affected

*P027*

the judgment of the jury. Card, 776 A.2d at 602 (citation omitted).

In the instant case, Plummer testified that she had been kidnapped -- forced to participate in a murder -- and then held hostage in a hotel and a guest house over the next two days. Ms. Plummer testified that she and appellant arrived [at the Parkway Guest House] together and were continuously together until the next morning.

To the contrary, neither appellant nor Plummer could have been in the guest house from 3:30-10:45 p.m. on October 23, 1988. (See Receipt Nos. 37108 through 37117 -- App. B) They were not registered in the same room at the same time. Compare receipt Nos. 37108 & 37118 (App. B).

Appellant submits that he has established that the prosecution's case included false testimony.

Next, appellant submits that the United States had the Guest House receipts (App. B), in fact, it introduced them as its exhibits at trial (GX-35, 3/7/90 tr. 335, 3/8/90 tr. 535) and at the § 23-110 motion hearing (GX-8 & 9, 11/19/92 tr. 95-98).

Having these receipts in its possession, it surely must be charged with knowledge of the inconsistencies of these receipts with Plummer's grand jury and trial testimony; in particular, the Davis receipt, appellant's receipt and Plummer's receipt.

Although the receipts raise a significant issue that Plummer presented false testimony on, among other things, the guest house stay -- the government let the testimony stand.[19]

---

19. "Prosecutors . . . have a constitutional obligation to report to the trial court whenever witnesses lie under oath." Napue v. Illinois, 360 U.S. 264, 269-272 (1959). Thus the government failed to fulfill its bedrock obligation under due process by apprising the court and the defense that Plummer lied.

-23-
[A105]

*P028*

Appellant submits that he has established that the prosecution knew, or should have known, that Plummer was not at the guest house with appellant throughout the evening of the 23rd -- that Plummer and appellant were not registered there at the same time.

Appellant submits that there is a reasonable probability that false and misleading evidence could have affected the judgment of the jury.

The issue of the guest house stay was pivotal because Plummer, the chief prosecution witness at trial -- **the only witness stating that appellant had committed the murder** -- testified that she and appellant arrived together at the guest house after the murder, did not leave until the next morning (October 24th, 1988) and that they left together at that time. Therefore any evidence proving her testimony false would have been relevant in impeaching her credibility and the credibility of all her testimony.[20] However, the government failed to correct Plummer's false and misleading testimony. Thus the jury was never apprised of the fact that Plummer was not with appellant when he registered at the guest house -- they were not registered in the same room at the same time.

The prejudice to appellant in this case is clear. Physical evidence that Plummer was **not** with appellant for the two days following the murder and that contradict her sworn testimony at

---

20. The fact that Plummer was not with appellant for the two dats following the murder strongly suggests that she was with another.

*P029*

trial and to the grand jury that she was at the guest house with appellant throughout the evening of the 23rd, casts doubt upon her testimony that appellant killed Golden. The jury agreed. It sent a note about an hour and forty-five minutes into deliberations which specifically requested to see "the hotel receipt and all of the other evidence." (Tr. 3/12/90, p. 112-13). This doubt is further corroborated by the testimony of Fletcher at trial. Mr. Fletcher, who was with Plummer and appellant on the day of the killing, contradicted Plummer on several points. He did not testify to any statements alleged by Plummer that appellant said that he was planning to "kill" or "do" the decedent, nor that appellant had confessed anything after the killing, or that he had seen any guns on appellant. With Plummer properly corrected [impeached], the jury could have reasonably weighed Fletcher's testimony more heavily and considered an acquittal -- the jury could have concluded that appellant was not present at the shooting [which was the essense of appellant's defense (Tr. 3/12/90 at 100)].

Further, the false and misleading evidence affected the judgment of the court. At §23-110 hearing, Judge Greene credited Plummer's testimony. (See 11/19/92 Tr. at 149-151) The court found that Plummer and appellant arrived together [were registered in the same room at the same time] and did not leave until the next morning. (See id.)

The record makes clear that the government knowingly permitted false or misleading evidence to go uncorrected before the trier of fact. Had counsel raised this issue on appeal [Nos. 90-CF-627

-25- **[A107]**

*P030*

& 03-CO-321] appellant would have been entitled to relief.  Thus, appellant has not only satisfied the Watson requirement of a sufficient showing of prejudice to justify recalling the mandate, he has shown prejudice in the Strickland/Watson constitutional sense needed to establish ineffective assistance.

For the reasons set forth above, this Court should reopen the appeals [Nos. 90-CF-627 & 03-CO-321] to review the question of ineffective appellate counsel.[21]

Dated: *12-25-05*        By: *Craig A. Williams*
                             Craig Allan Williams (Pro se)
                             Reg. No. 05723-000
                             U.S.P. Allenwood
                             P.O. Box 3000
                             White Deer, PA 17887

---

21.  Appellant respectfully requests the appointment of counsel to augment his motion.

*P002*

# District of Columbia
# Court of Appeals



Nos. 90-CF-627 & 03-CO-321

CRAIG WILLIAMS,
                    Appellant,
                            F14042-88

    v.

UNITED STATES,
                    Appellee.

Before: Reid, Associate Judge; Wagner*, and Nebeker, Senior Judges.

## ORDER

On consideration of appellant's *pro se* motion to recall mandate, it is

ORDERED that the motion is denied.

PER CURIAM.

*Judge Wagner was Chief Judge at the time of decision; her status changed to Senior Judge on December 21, 2005.

Copies to:

Craig Allan Williams
Reg. #05723-000, U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887

Roy W. McLeese III, Esquire
United States Attorney's Office

aj

**[A109]**

*Poof*

# District of Columbia
# Court of Appeals

No. 03-CO-321

**CRAIG WILLIAMS,**
               Appellant,

                    **F14042-88**

     v.

**UNITED STATES,**
               Appellee.

FILED

DEC 5 2006

DISTRICT OF COLUMBIA
COURT OF APPEALS

**Before: Reid, Associate Judge; Wagner\*, and Nebeker, Senior Judges.**

## ORDER

On consideration of appellant's *pro se* motion for explanation of the court's denial of appellant's motion to recall mandate, it is

ORDERED that the motion for explanation is denied.

PER CURIAM.

\*Judge Wagner was Chief Judge at the time of decision; her status changed to Senior Judge on December 21, 2005.

Copies to:

Craig Allan Williams
Reg. #05723-000, U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887

Roy W. McLeese III, Esquire
United States Attorney's Office

aj

[A110]

P104

DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 90-CF-627 & 03-CO-321
(Cr. No. F-14042-88)

CRAIG ALLAN WILLIAMS,                                    Appellant,

    v.

UNITED STATES OF AMERICA,                               Appellee.

PETITION FOR REHEARING AND REHEARING EN BANC

COMES NOW, Appellant, Craig Williams, pro se and pursuant to
D.C. App. R. 40, respectfully submits this petition for rehearing
and rehearing en banc. In support thereof, appellant states as
follows:

1.   Statement of The Case

This case arises out of this Court's denial [without factual
findings and conclusions of law] of appellant's motion to recall
mandate (see Order of September 1, 2006, attached hereto as
Exhibit "A"; hereinafter referred to as "Panel Decision").

2.   Statement of Appellant

By denying my motion, the panel found that it did not have
"sufficient merit."

I express a belief, based upon a reasoned and studied judg-
ment, that the panel overlooked material facts and law.

Further, the panel decision is contrary to the following
decisions of this Court and the Supreme Court of the United States,
and consideration by the full Court is necessary to secure and
maintain uniformity of decisions in this Court, see Griffin v.
United States, 598 A.2d 1174 (D.C. 1991); Watson v. United States,

[A111]

*P105*

536 A.2d 1056 (D.C. 1987)(En Banc), cert. denied, 486 U.S. 1010 (1988); and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).[1]

I further express a belief, based upon a reasoned and studied judgment, that this appeal involves one or more questions of exceptional importance:

> Whether an appellant is denied due process and adequate and/or effective assistance of counsel when appointed counsel fail to inform this Court that: (a) the trial court denied appellant a full and fair fact hearing (see Motion To Recall Mandate at 13-16); (b) the trial court's judgment is plainly wrong or without evidence to support it (see Mot. at 17-21); and (c) the government knowingly permitted false or misleading evidence to go uncorrected before the trier of fact (see Mot. at 22-26).

I brought to the attention of this Court my dissatisfaction about, inter alia, Matthew W. Greene's handling of the appeal (App. No. 03-CO-321) and requested appointment of new appellate counsel. (See Correspondence from December 9, 2003 to June 8, 2004, attached hereto as Exhibit "B.")

Moreover, this Court knew [before oral arguments were held] that counsel failed to brief the following issues: (1) The trial court's denial of investigative services to substantiate §23-110 claims; (2) trial counsel's ineffective investigation: (3) trial counsel's ineffective cross-examination of Sandra Plummer (Re: Parkway Guest House stay); (4) trial court's erroneous factual findings regarding the guest house testimony and receipts; (5) the trial court's violation of stipulation agreement (Re: guest house records); and (6) trial court's denial of full and fair opportunity to litigate at 23-110 hearing. (See 3-29-04 letter to Matthew W. Greene, Exhibit B hereto)

---

1. See also <u>Cowan v. United States</u>, 331 A.2d 323 (D.C. 1975); <u>Oubre v. Dist. of Columbia</u>, 630 A.2d 699 (D.C. 1993); <u>Williams v. United States</u>, 576 A.2d 1339 (D.C. 1990); <u>Woodall v. United States</u>, 842 A.2d 690 (D.C. 2004);

--continued on next page--

-2-                                              [A112]

*P106*

3.  Statement of Facts

Appellant hereby repeats, realleges and reiterates the facts
and arguments set forth in Motion To Recall Mandate, as if set
forth here in full.

4.  ARGUMENT

A.  The Panel Overlooked Material Facts And Law

Rehearing is appropriate because the deciding panel overlooked
material facts and law.  Appellant contends that the trial court
denied him a full and fair opportunity to litigate his § 23-110
motion, thus rendering relief by motion inadequate and ineffective
to test the legality of detention.  (Mot. at 13-16)

Specifically, appellant requested the services of an investi-
gator to recover evidence to authenticate Parkway Guest House
records.  Parkway Guest House receipt No. 37108 shows that appel-
lant checked into room four at 7:30 a.m. and checked out at 3:30
p.m.  The receipts were offered by the government (GX-35), who
stipulated as to their authenticity.  (3/8/90 Tr. at 535). "Valid
stipulations as to evidence are binding on the parties thereto as
well as on the courts."  Cowan v. United States, 331 A.2d 323,
327 (D.C. 1975)(citing cases).  See also Oubre v. Dist. of Col.,
630 A.2d 699, 703 (D.C. 1993)(same).  However, the trial court
denied (indigent) appellant's request for investigative services
to authenticate the receipts attached to his motion.

Contrary to Cowan and Oubre, the trial court based its denial
of the ineffectiveness claim on its challenge to the correctness
of the departure time entered on appellant's receipt.  (See Mot.

1. Card v. United States, 776 A.2d 581 (D.C. 2001); and Napue v.
Illinois, 360 U.S. 264 (1959).

-3- **[A113]**

*P 107*

at 18)

Appellant submits that the panel overlooked the fact that: (1) the trial court prevented the recovery and presentation of authentication evidence; (2) violated a stipulation agreement that was binding on the parties as well as the courts; and (3) the trial court's denial of the ineffectiveness issue is grounded in an erroneous conclusion that appellant's receipt may have been tampered.

B.  The Trial Court's Judgment Is Plainly Wrong
    Or Without Evidence To Support It

Appellant argued to the division that the trial court's 11/19/92 judgment is plainly wrong or without evidence to support it. (See Mot. at 17-21)[2] Rehearing is appropriate because the panel overlooked the fact that there are a number of flaws in the trial court's ruling.

First, the court claims that careful examination of the records reflect that appellant and Plummer were registered at the guest house at the same time. (Tr. at 149-150)

To the contrary, the records show that appellant checked out of room four at 3:30 p.m., seven and a half hours before Plummer arrived. (See Receipt Nos. 37108 & 37118, App. G to Mot.)

Second, the court notes that "the coincidence concerning the room number, strongly suggest that these two folks were together at the same time." (Tr. at 150)

In actuality, appellant can quite easily explain this fact as an examination of the receipts reveals that the guest house in

---

2.  On November 19, 1992, Judge Greene found that cross-examining Plummer about the guest house records would not have assisted appellant's defense. (11-19-92 Tr. 149-151)

-4-    [A114]

$P/08$

question only appears to have eight rooms   (Id. App. G)

Third, the court states that the 3:30 p.m. check out time on appellant's receipt could have been 3:30 a.m. -- and that appellant could have left at 3:30 a.m. on the 24th (tr. at 150)

To the contrary, Mr. & Mrs. Bob Davis were registered in room four from 8:45-10:45 p.m. (see App. G, Receipt No. 37116) Thus appellant could not have left at 3:30 a.m. on the 24th.

The panel also overlooked the fact that the trial court's reasoning does not comport with the testimony/evidence, the prejudice to appellant's defense, and the law.  (See Mot. at 19-21)[3]

### C.   The Government Knowingly Permitted False or misleading Evidence To Go Uncorrected Before The Trier Of Fact

Appellant argued to the division that the government knowingly permitted false or misleading evidence to go uncorrected before the trier of fact.  (See Mot. at 22-26) Rehearing is appropriate because the panel overlooked material facts and law.

Specifically, the panel overlooked the following facts:  (1) that the prosecutions case included false testimony;[4] (2) that the

---

3.   This Court may set aside the trial court's judgment if there is an error of law or if the judgment is plainly wrong or without evidence to support it.   See D.C. Code §17-305(a)(1989); Williams v. United States, 576 A.2d 1339, 1342 (D.C. 1990).

4.   Plummer testified that she had been kidnapped -- forced to participate in a murder -- and then held hostage [by appellant] in a hotel and a guest house over the next two days.   Plummer testified that she and appellant arrived at the Parkway Guest House together and were continuously together until the next morning.

To the contrary, neither appellant nor Plummer could have been in the guest house from 3:30-10:45 p.m. on October 23, 1988. (See Receipt Nos. 37108 through 37117 -- App. B. to Mot.)   They were not registered in the same room at the same time.   Compare receipt nos. 37108 & 37118 (see id.).

*p l 09*

prosecution knew, or should have known, of the falsehood;[5] (3) that the prosecution failed to correct the false testimony; (4) that the false testimony could have affected the judgment of the jury;[6] (5) that the false testimony affected the judgment of the trial court;[7] and (6) that appellant was prejudiced.[8]

Further, the panel overlooked the following holdings: Napue v. Illinois, 360 U.S. 264, 269-272 (1959)("Prosecutors . . . have a constitutional obligation to report to the trial court whenever witnesses lie under oath."); Woodall v. United States, 842 A. 2d 690, 696 (D.C. 2004)("A prosecutor may not knowingly . . . permit evidence, known to be false [or misleading], to go uncorrected" before the trier of fact.); and Card v. United States, 776 A.2d 581, 601-02 (D.C. 2001)(Because a prosecutor's failure to correct

---

5. The United States had the Guest House receipts, in fact, it introduced them as its exhibits at trial (GX-35 -- 3/7/90 Tr. 335, 3/8/90 Tr. 535) and at the §23-110 motion hearing (GX-8 & 9 -- 11/19/92 Tr. 95-98). Having the receipts in its possession, it surely must be charged with knowledge of the inconsistencies of Plummer's grand jury and trial testimony with the receipts. In particular, appellant's receipt, the Davis receipt and Plummer's receipt.

6. The jury was never apprised of the fact that Plummer was not with appellant when he registered at the guest house -- they were not registered in the same room at the same time.

7. At §23-110 hearing, Judge Greene credited Plummer's testimony (see 11/19/92 tr. at 149-151). The court found that Plummer and appellant arrived together [were registered in the same room at the same time] and did not leave until the next morning (see id.).

8. The prejudice to appellant in this case is clear. Physical evidence that Plummer was **not** with appellant for the two days following the murder and that contradict her sworn testimony at trial and to the grand jury that she was at the guest house with appellant throughout the evening of the 23rd, casts doubt upon her testimony that appellant killed Golden. With Plummer properly corrected [impeached] the jury could have concluded that appellant was not present at the shooting, which was the essense of appellant's defense. (See Tr. 3/12/90 at 100)

P 110

known false or misleading testimony of a government witness violates due process, such failure requires reversal of a conviction unless there is no reasonable possibility that the falsehood affected the jury's verdict.)(citations omitted).

    D.  Rehearing Is Required To Secure Uniformity Of Decisions In This Court Applying The **Watson/ Strickland** Standard Of Review

Appellant argued to the division that counsel was ineffective by failing to present crucial issues.  Specifically, the trial court's denial of a full and fair opportunity to litigate; erroneous factual findings and ruling; the government's knowing use of false and misleading evidence (purjury) and its failure to correct.  See Mot. at 13-26; see also 4(A)-(C), supra.

The record makes clear that counsel failed to inform this Court of the issues raised by appellant's motion, the applicable law and the portions of the transcript pertinent to their argument.  Rather, counsel raised one issue:  that the trial court abused its discretion when it failed to reduce its oral ruling to a written judgment,[9] which bordered on frivolous.

Appellant contends that rehearing and rehearing en banc is appropriate in this case because the panel's denial of his motion, presumably, for lack of "sufficient merit," is in conflict with the Strickland/Watson standard of review.

---

9.  It is interesting to note that counsel was appealing appellant's second §23-110 motion, which raised, inter alia, trial counsel's ineffective cross-examination of Plummer (Re:  guest house registration records) and noted the United States complicity in failing to correct false and misleading testimony.  Since 1995, appellant has been trying to bring these issues before this Court for review.

*PIII*

In Watson v. United States, 536 A.2d 1056, 1069 (D.C. 1987)
(en banc), this Court noted the need for appellate counsel in
order to be constitutionally effective to inform the Court of the
"crucial issue . . . as well as the applicable law and its various
ramifications."

In determining whether a showing of "sufficient merit" has
been made to recall the mandate, this Court must address two
principal issues.  One is whether the performance of counsel "fell
below an objective standard of reasonableness."  Watson, supra,
536 A.2d at 1065 (quoting Strickland v. Washington, 466 U.S. 668,
688 (1984)).  The other inquiry addresses prejudice, i.e., "it
must be established that there is a 'reasonable probability that,
but for counsel's unprofessional errors, the result of the pro-
ceeding would have been different.'"  Watson supra, 536 A.2d at
1065 (quoting Strickland v. Washington, supra, 466 U.S. at 694.

In the case at bar, appellant does not make vague, conclusory,
or frivolous allegations.  On its face, appellant's motion shows
that the performance of counsel on appeal fell "below an objective
standard of reasonableness" and shows "there is a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different.

However, the panel's conclusion [without rhyme or reason]
that appellant's motion lacks "sufficient merit" is in conflict
with -- direct conflict with the Strickland/Watson standard of
review.  Moreover, the panel's decision suggests that the authorities
relied upon by appellant (see Petition, supra, at 2-3 &  n.1.)
nolonger has vitality.  Thus rehearing and rehearing en banc is
necessary to secure and maintain uniformity of decisions in this
Court.

*P112*

CONCLUSION

WHEREFORE, for the reasons stated above, Appellant, Craig Williams respectfully moves for rehearing and rehearing en banc by this Court of the case at bar.


Dated: *9-22-06.*          By: *Craig Allan Williams*

                                    Craig Allan Williams
                                    Reg. No. 05723-000
                                    U.S.P. Allenwood
                                    P.O. Box 3000
                                    White Deer, PA 17887


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing Petition was mailed first class, postage pre-paid, this *22nd* day of September, 2006, To:


                    Roy W. McLeese III, Esquire
                    United States Attorney's Office
                    555 Fourth Street, NW
                    Washington, D.C. 20001


*Craig Allan Williams*


[A119]

_9_

P116

LAW OFFICES

## SMITH & GREENE, P.L.L.C.

THE FORD BUILDING

3977 CHAIN BRIDGE ROAD, SUITE 201

FAIRFAX CITY, VA 22030-3308

TEL (703) 352-1178
FAX (703) 995-0399

KEVIN E. SMITH

MATTHEW W. GREENE
ALSO MEMBER DC BAR

OF COUNSEL
P. GREGORY BAUSERMAN
ALSO MEMBER TX BAR

JAMES M. TOWARNICKY
ALSO MEMBER DC, MD & OH (INACTIVE) BARS

SMITH & GREENE, P.L.L.C.
IS A VIRGINIA PROFESSIONAL
LIMITED LIABILITY COMPANY

December 29, 2003

Mr. Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
Post Office Box 3000
White Deer, PA 17887

Re:     **Craig Williams v. United States of America**

Dear Mr. Williams:

As you are probably aware, the D.C. Superior Court has denied my motion to withdraw from your case. Consequently, I have completed and filed the enclosed Appellant's Brief on your behalf.

Currently, the only open case before the Court concerns your appeal of the Superior Court's denial of your 23-110 motion in 1992. After reviewing the record in this case, I have concluded that your strongest argument lies in attacking the manner in which the Superior Court denied your motion. Specifically, when denying your motion in 1992, the Superior Court failed to reduce the denial to a written judgment. As a result, I have argued in the enclosed brief that this denial should be summarily reversed and the case remanded back to the Superior Court for further proceedings.

I anticipate the governments reply brief within the next six weeks. Of course, once I receive the government's brief, I will immediately forward a copy to you for your review. Should you have any questions or comments regarding this matter, please do not hesitate to write to me.

Very truly yours,

SMITH & GREENE, P.L.L.C.

By: _____
[A119.1]     Matthew W. Greene

Enclosure

*P117*

Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887

January 6, 2004

Matthew W. Greene, Esquire
3977 Chain Bridge Road
Suite 201
Fairfax City, Va. 22030-3308

        Re:  <u>Williams v. United States</u>, Appeal No. 03-CO-321

Dear Mr. Greene:

    I am in receipt of your most recent correspondence and I was not
aware that the D.C. Court of Appeals had denied your request to with-
draw from my case.
    By filing a brief without my knowledge you chose to deny me the
opportunity to maintain an active role in the development and presen-
tation of the appeal -- a position that I've maintained throughout
the pendancy of all proceedings -- and that really bothers me.
    Furthermore, I cannot appreciate the fact that my brief was hastily
prepared. Had you proof read it, you would have noticed the many
errors. For example, page 1 (Statement of Facts) is a blank page. At
several other points in the brief you agrue as if Bill is the appellant,
rather than me. And the brief is missing page 2, the continuation of
"The Statement of Facts." Is this what you filed in the Court? I
would like you to send me page 2 of The Statement of Facts to make my
copy complete.
    Okay now, I follow where you are going with the argument and note
that you are trying to break new ground. At what risk? Worst case,
the Court of Appeals deny the appeal, where do you go next? Do I get
a chance to appeal the issues that you failed to brief? What do you
intend to do and how long will you be with me this time before your
work is completed? I'd like you to answer these questions and be can-
did. Moving on to the final.
    In your December 29, 2003, you concluded that my strongest argu-
ment lie in attacking the manner in which the Superior Court denied
my motion. As noted, this argument has risks. The strongest argument
is "WHETHER THE TRIAL COURT ABUSED IT'S DISCRETION BY CHALLENGING
FACTS STIPULATED TO AT TRIAL." That argument goes like this:

    1.  The government introduced the Parkway Guest House and Days
Inn receipts. Government's Exhibit 35 & 36.  3-7-90 Tr. 335; 3-8-90
Tr. 535.
    2.  GX 35 shows a seven thirty a.m. and three thirty p.m., arrival
and departure on October 24, 1988.

                    **[A119.2]**

*P118*

3.  The Parties stipulated that a records custodian would not be needed for the guest house and Days Inn documents.  3-8-90 Tr. 535.
4.  The Court instructed the jury as to stipulations (". . . you may view anything that has been stipulated to in this case as undisputed evidence in this case").  3-12-90 Tr. 79.  Instructed as to the defense theory of the case. Tr. at 100.  And the jury sent in a note requesting the hotel receipts.  Tr. 112-113.

### AT 23-110 HEARING

5.  The court examined the sequence of the guest house receipts. The court stated:

> The record shows that he left at three thirty, p.m., on the 23rd.  But, when one looks at that three thirty p.m. on the 23rd, it appears that a change was made in the "p", and that it could have possible been an "a", and that indeed, Mr. Williams could have left at three thirty a.m. on the 24th.  So, if you look at these records carefully, I have to suscribe to Mr. Moore's conclusion, that -- that its very unlikely that they would have helped Mr. Williams' defense in this case.

Id. 11-19-92 Tr. 150-151.

### ARGUMENT

The trial court abused it's discretion by challenging the undisputed evidence.  A stipulation avoids the need to present evidence regarding the matters it covers.  The parties can stipulate as to the facts involved but they cannot stipulate as to the legal issues involved.  See Smith, Kirkpatrick & Co., Inc., v. Continental Autos, 184 F. Supp. 764, 766 (D.D.C. 1960).  Valid stipulations as to evidence are binding on the parties thereto as well as on the courts.  Cowan v. United States, 331 A.2d 323, 327 (D.C. 1975)(citing cases).

I am trusting that you will supplement the brief with this argument.  Had you said "Hey, the court denied my request -- our brief have to be filed by (   ) -- do you have any issues that you want me to consider", we wouldn't be having this problem.  I expect to receive a timely response to this letter and a timely copy of the government's brief when filed.

Sincerely,

Craig A. Williams

**[A119.3]**

*P119*

Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887

March 1, 2004

Chief Judge Annice M. Wagner
D.C. Court Of Appeals
500 Indiana Avenue, N.W.
Washington, D.C. 20001

        RE:  Craig A. Williams v. United States, Appeal No. 03-CO-321

Dear Chief Judge Wagner:

        This Court appointed Matthew W. Greene, Esquire, to represent me
in the above entitled matter.  I have lost confidence in Mr. Greene's
ability to provide competent representation because, inter alia, Mr.
Greene has shown a lack of interest in my case.
        At this point, I would like the Court to appoint new appellate
counsel, preferably, Christopher Warnock, Esquire.  Mr. Warnock has
agreed to accept the case if appointed.  He acted as co-counsel and
knows the case.  Mr. Warnock has provided competent representation
throughout the underlying proceedings.
        Alternatively, I would like the Court to direct Mr. Greene to
respond to my letters and refer this matter for Bar Counsel investi-
gation.
        Since 1988, I have played a very active role in the identifica-
tion, development and presentation of the issues presented and
several attorneys, including Mr. Greene, have complimented me on my
abilities.  Mr. Greene promised to keep me informed on the status of
my case and provide copies of all activities on a timely basis.
        By letter dated September 17, 2001, Mr. Greene advised that he
appeared for oral arguments in Appeal No. 98-CO-1911 and would report
back to me as soon as he know the result of the appeal.  Mr. Greene
failed to do so.  I learned of the result through a government brief
filed in a different case and a copy of the En Banc Opinion was not
mailed to me until December 17, 2001.  The case was decided on Oct.
18, 2001.
        Between March 20, 2002 and January 7, 2004, I have written at
least five (5) letters to Mr. Greene and he has not responded to any
of them.  The letters requested a copy of Judge Greene's Order deny-
ing my §23-110 motion and re-entering the denial, the notice of appeal,
the designation of the record on appeal; and I requested to be advised
on the status of F-14043-88 (during a tape recorded conversation Mr.
Greene said he would represent me in that case and indicated that he

**[A119.4]**

P120

would have the appeal consolidated with the instant appeal).  To this day, I have not received a customary response to my letters.

On July 2, 2003, Mr. Greene filed a motion to withdraw from the appeal.

Mr. Greene did not write me and say "Hey, the Court denied my motion to withdraw, your brief is due to be filed on (  ), do you have any issues that you want me to consider." Rather, Mr. Greene hastily filed a brief on my behalf (see my January 6, 2004, hereto), without my knowledge that he would do so and, by letter dated December 29, 2003, Mr. Greene advised that the government's brief would be due within the next six weeks.

Mr. Greene further provided that when he receive the government's brief he would immediately forward a copy for my review and that I should write to him if I were to have any questions.

At this point, I honestly don't believe that Mr. Greene will provide a timely copy of the government's brief [the government probably has filed it's brief].  Nor do I believe that he will respond to any questions that I may have; because he has been consistent in not responding.  And the fact that he has filed a sloppy brief and failed to respond to my letters really sends the wrong message.  Simply, Mr. Greene has caused me to lose all confidence and trust in him.

For all of the above reasons, I respectfully request the relief sought be this letter.

Sincerely,

Craig Allan Williams
Craig Allan Williams

[A119.5]

-2-

*P121*



District of Columbia Court of Appeals
500 Indiana Avenue, N. W.
Washington, D.C. 20001-2131

JOY A. CHAPPER
CHIEF DEPUTY CLERK

TELEPHONE 879-2722
AREA CODE 202

March 15, 2004

Matthew W. Greene, Esquire
3977 Chain Bridge Road
Suite 201
Fairfax, VA 22030

Re: No. 03-CO-321 - *Craig A. Williams v. United States*

Dear Mr. Greene:

Enclosed so that you may discuss with him the issues raised herein is correspondence the court has received from your client in the above matter.

You may advise your client that this court has appointed you as counsel for him in this appeal and that you will remain as counsel unless and until the court grants your motion to withdraw as counsel. Disagreements over legal and tactical matters, *e.g.*, the issues to be raised in the brief, or the question whether collateral proceedings are warranted, generally will not justify the replacement of appointed counsel. If the appellant is dissatisfied with your handling of the appeal and asks you to withdraw, and if you and your client are unable to resolve any disagreement, then you should file a motion for leave to withdraw. The motion must be served on your client and on the government. The grounds for the motion may be set forth, if necessary, in an *ex parte* statement or affidavit, which should accompany the motion, and which need not be served on the government.

Please advise the court in writing within 20 days how this matter has been resolved.

Sincerely,

Joy A. Chapper
Chief Deputy Clerk

Enclosure                    **[A119.6]**

P122

cc:  Craig A. Williams
     Fed Reg. #05723-000
     USP Allenwood
     P O Box 3000
     White Deer, PA 17887

[A119.7]

*p123*

LAW OFFICES

SMITH & GREENE, P.L.L.C.

THE FORD BUILDING

3977 CHAIN BRIDGE ROAD, SUITE 201

FAIRFAX CITY, VA 22030-3308

TEL (703) 352-1178
FAX (703) 995-0399

KEVIN E. SMITH

MATTHEW W. GREENE
ALSO MEMBER DC BAR

OF COUNSEL
P. GREGORY BAUSERMAN
ALSO MEMBER TX BAR

JAMES M. TOWARNICKY
ALSO MEMBER DC, MDS OH (INACTIVE) BARS

SMITH & GREENE, P.L.L.C.
IS A VIRGINIA PROFESSIONAL
LIMITED LIABILITY COMPANY

March 22, 2004

Mr. Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887

Re:    **Craig A. Williams v. United States of America**
       D.C. Court of Appeals Case No. 03-CO-321

Dear Mr. Williams:

This letter is in response to your January, 2004 letter to me and your March, 2004 letter to the D.C. Court of Appeals. Additionally this letter serves as a status report on your case, currently pending before the D.C. Court of Appeals.

First, I disagree with you that you did not know that I had filed a motion with the Court to withdraw from the above case. I clearly recall a telephone conversation with you prior to my filing the motion, wherein I indicated that my docket was so busy, I could not spare the time to work on your case. I clearly recall you expressing disappointment that I was going to move to withdraw, but that you were encouraged that if the Court were to allow my removal from the case, it would appoint you other counsel to represent you.

Next, I researched and made the best arguments I could find on your case. Your January letter to me indicates that pages were missing. Enclosed, please find my file copy of the brief containing all of the pages to it. In abundance of caution, I have sent to the D.C. Court of Appeals pages 1 and 2 that you claim were missing.

Next, I reviewed the proposed argument you made in your January, 2004 letter to me. I note that you have suggested this argument to me in the past, we have discussed its absolute lack of merit, and I have repeatedly informed you that I will not present that argument to the Court. Let me reiterate: I will not present that argument to the Court because it is frivolous.

**[A119.8]**

*pl 24*

March 22, 2004
Page 2

Next, I have reviewed my files and contrary to your assertions to the Court in your March, 2004 letter, I have responded to your correspondence and you and I have spoken a number of times over the telephone about the status of your case. I'm sorry you're not happy with the frequency of my contact with you, but I remain firm in my belief that I have kept you apprised and part of your case to the best of my ability.

Finally, I am enclosing a copy of the government's reply brief. You are correct that I have not sent you a copy of this brief earlier, and for that I apologize. In sum, I thought I had mailed you a copy of the government's brief, but upon reviewing my file to respond to you in this letter, I saw that I had not done so.

As soon as there are any developments in this case, I will so inform you.

Very truly yours,

SMITH & GREENE, P.L.L.C.

By:_____
    Matthew W. Greene

**[A119.9]**

#125

Craig Allan Williams
Reg. # 05723-000
U.S. P. Allenwood
P.O. Box 3000
White Deer, PA 17887

March 29, 2004

Matthew W. Greene, Esquire
3977 Chain Bridge Road
Fairfax City, Va 22030-3308

Re: Wms v. U.S., App. No. 03-CO-321

Dear Mr. Greene:

This letter is in response to Joy Chapper's March, 2004 letter and your March 22, 2004 letter to me. I shouldn't dignify your bullshit, lame response with a reply. However, for the sake of argument, I will entertain your baseless assertions.

Paragraph 2: "First, I disagree with you that you did not know that I had filed a motion with the Court to withdraw..."

[A119.10]

P126

**Response.** The referenced letters do not deny knowledge of your filing. You disagree with an issue of your own creation to avoid addressing the real issue which is: (1) That we had a longstanding agreement that you would keep me informed and provide a copy of all filings on a timely basis; (2) you broke our agreement by failing to timely inform me of the outcome of your motion to withdraw; (3) you broke our agreement by filing a Brief without my knowledge and participation; and (4) you broke our agreement by failing to inform me on other issues and by failing to disclose the documents of my requests (Re: Jan 8, 2002 Order of Superior Court vacating its 11-19-92 Order & re-entering it; Feb 1, 2002 Notice of Appeal; Docketing Statement & Designation Of Records).

**Paragraph 3:** "I researched and made the best arguments I could find on your case."

[A119.11]

P127

Response. I disagree with you that you
made the best arguments in my case.
I also understand that you make the
ultimate decision on the issues to be
raised in the brief. However, you
failed to raise the following issues:
(1) The denial of investigative services;
(2) ineffective investigation; (3) ineffec-
tive cross examination (Guest House
stay); (4) erroneous factual finding
regarding the guest house testimony
and receipts; (5) the court's violation
of the stipulation agreement as to
the evidence; (6) the denial of a full
and fair opportunity to litigate at
23-110 hearing (request denied for
investigator to authenticate records
vs. the trial court's challenge to records)
You ignored these issues [without consult-
ing me] because you knew I would
object.

Rather, you chose to try and break
new ground and, to this day, you
fail to answer my questions about
the risks. Moreover, your March 22,
2004 letter is intended to respond to
my January 6, 2004, but fail to answer
the question in para 4 of my letter.

[A119.12]

P128

This is the kind of "scheming" and "elusive" shit which causes one to question loyalty and trust.

Further, you challenge the Court's disposal of the insanity defense issue. Had you thoroughly examined the 23-110 transcripts and/or told me your intentions — you would have known that we withdrew the insanity defense issue in F-14042-88.

Further, you cite no authority for the ineffective investigation issue. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived — even where those arguments raised constitutional issues."

Mr. Breene, you just threw together a pre-fabricated argument from the Hill case. How long did it take you?, want an hour or two. Insert a disc, block out information, insert my information and hit print. Had you proof read the finished product you would have noticed that you failed to block out appellant Hill's name.

[A119.13]

P/29

_Paragraph 4_: "... I note that you have suggested this argument to me in the past, we have discussed its absolute lack of merit, and I have repeatedly informed you that I will not present that argument to the Court."

_Response_. The argument was discovered after you expressed your intent to withdraw from the appeal. I never discussed the argument with you, we never discussed the issue of merit, and you have not repeatedly informed me of anything with respect to the referenced argument.

Further, I intentionally placed three (3) telephone calls to you on a monitored phone. (They were transcribed and I have a copy) I have also reviewed the correspondence file. Identify the basis of your claims, i.e., the support.

_Paragraph 5_: "I have reviewed my files and contrary to your assertions ... I have responded to your correspondence and you and I have spoken a number of times over the telephone about the status of your case."

[A119.14]

P130

*Response.* I disagree with you for the reasons stated supra. You have not responded to the specifics of my correspondence.

You have strategically avoided my concerns. You have strategically kept me uninformed to work the calendar and hinder my ability to maintain an active role in the appellate process. And you have waived the referenced issues without consulting me.

Mr. Greene, we have come to that fork in the road where there's irreconcilable differences. I want you to file a motion for leave to withdraw from my appeal; because you have caused me to lose trust and confidence in your promises and legal advice, which causes me to question your loyalty and ability to bring about a positive outcome in my appeal.

Sincerely,

Craig A. Williams

[A119.15]

*P131*

LAW OFFICES

# SMITH & GREENE, P.L.L.C.

THE FORD BUILDING

3977 CHAIN BRIDGE ROAD, SUITE 201

FAIRFAX CITY, VA 22030-3308

TEL (703) 352-1178
FAX (703) 995-0399

KEVIN E. SMITH

MATTHEW W. GREENE
ALSO MEMBER DC BAR

OF COUNSEL
P. GREGORY BAUSERMAN
ALSO MEMBER TX BAR

JAMES M. TOWARNICKY
ALSO MEMBER DC, MD & OH (INACTIVE) BARS

SMITH & GREENE, P.L.L.C.
IS A VIRGINIA PROFESSIONAL
LIMITED LIABILITY COMPANY

April 6, 2004

Mr. Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887

Re:   **Craig A. Williams v. United States of America**
      D.C. Court of Appeals Case No. 03-CO-321

Dear Mr. Williams:

I've received your most recent letter and needless to say I disagree with your characterizations of my work to date.

As you've requested, I've filed a motion to withdraw from this case.

As soon as the Court rules, I will so advise you.

Very truly yours,

SMITH & GREENE, P.L.L.C.

By: _____
      Matthew W. Greene

**[A119.16]**

P/32

DISTRICT OF COLUMBIA
COURT OF APPEALS

No. 03-CO-321
CRAIG ALLAN WILLIAMS,

                                APPELLANT,                    F-14042-88

        V.

UNITED STATES,

                                Appellee.

NOTICE TO THE COURT

Appellant, Craig Williams, would like the Court to notice the following.

By letter dated March 15, 2004, Joy A. Chapper, Chief Deputy Clerk, advised Matthew W. Greene, Esq., counsel of record, on the circumstances in which he should file a motion for leave to withdraw and that a copy of such motion **must** be served on Appellant.

By letter dated April 6, 2004, counsel advised Appellant that a motion to withdraw had been filed.

By letter dated April 13, 2004, Appellant wrote to counsel requesting a copy of the withdrawal motion to no avail. (A copy of Appellant's April 13th was forwarded to the Chief Deputy Clerk)

Responding to Appellant's April 13th, the Chief Deputy Clerk forwarded to Appellant a copy of the record on appeal along with the Court's 4-14-04 Order, which denied counsel's motion for leave to withdraw.

As of the date of this motion, Appellant have not received a copy of counsel's motion to withdraw. Nor has Appellant been afforded an opportunity to be heard on the matter.

[A119.17]

*p133*

Counsel of record has caused Appellant to lose confidence and trust in counsel's promises and legal advice. Counsel has also failed to keep Appellant properly imformed on matters and address Appellant's written concerns; thus raising questions of counsel's loyalty and ability to bring about a positive outcome in this appeal.

Appellant submits that there are irreconcilable differences between counsel and Appellant which have not been properly brought before the Court.

For all of the above reasons, Appellant respectfully requests appointment of new counsel to represent the instant appeal.[1]

Alternatively, Appellant respectfully requests a **STAY OF THE PROCEEDINGS** and an opportuinty to be heard on the instant matter.

Dated:  April 28, 2004            By:  *Craig A. Williams*
                                       Craig Allan Williams
                                       Reg. No. 05723-000
                                       U.S.P. Allenwood
                                       P.O. Box 3000
                                       White Deer, PA 17887

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true copy of the foregoing was mailed first class, postage prepaid, this 28th day of April 2004 to the following:

Matthew W. Greene, Esquire
3977 Chain Bridge Road, #201
Fairfaz, VA 22030-3308

John R. Fisher, Esquire
Assistant U.S. Attorney
555 Fourth Street, N.W. Rm. 8104
Washington, D.C. 20001

*Craig Allan Williams*
CRAIG ALLAN WILLIAMS

_____

1/  Christopher Warnock, Esquire, represented Appellant in the under-lying proceedings and acted as co-counsel during the En Banc proceeding. Mr. Warnock is willing to accept the appointment.

**[A119.18]**

*P134*



District of Columbia Court of Appeals
500 Indiana Avenue, N. W.
Washington, D.C. 20001-2131

JOY A. CHAPPER
CHIEF DEPUTY CLERK

TELEPHONE 879-2722
AREA CODE 202

May 6, 2004

Matthew W. Greene
3977 Chain Bridge Road
Suite 201
Fairfax, VA  22030-3308

RE:  No. 03-CO-321 - <u>Craig A. Williams v. United States</u>

Dear Mr. Greene:

 Enclosed is a copy of a letter received by this court from your client, Craig A. Williams.  I am referring this letter to you so you may contact Mr. Williams concerning the matter mentioned in his letter.

    Sincerely,

    *Joy A. Chapper*
    Joy A. Chapper
    Chief Deputy Clerk

Enclosure

cc:  Craig A. Williams
  Reg #05723-000
  USP Allenwood
  P O Box 3000  **[A119.19]**
  White Deer, PA 17887

P135

Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887

May 17, 2004

Matthew W. Greene
3977 Chain Bridge Road
Suite 201
Fairfax, VA 22030-3308

Re:  No. 03-CO-321 - Williams ·v. United States

Dear Mr. Greene:

    This is to confirm that I have received your May 4, 2004 mailing
(re:  Appellant's Motion To Withdraw & DCCA's 4-14-04 Order denying
said motion).  I believe the Court denied the motion because it was
general, you failed to properly advise the Court that there are irrec-
oncilable differences between us.  I still want you off my case and
new counsel appointed.  Should your omissions prejudice my concerns I
will be filing a legal mal-negligence action against you.
    On April 28, 2004, I served on the Court and interested parties
A "Notice To The Court."  The Court was put on Notice of my wish to
be heard on the motion to withdraw and request for appointment of new
counsel.
    On May 10, 2004, I received a copy of Joy Chapper's letter dated
May 6, 2004, wherein she characterizes my April 28th filing as a
letter to the Court and referred the matter to you so you can contact
me.  Being that you have failed to contact me in the past, I expect
that you will not be contacting me regarding this matter?
    At this point, I would like to duly note that you have not re-
sponded to any of the specific concerns and requests noted in my
letter of January 6, 2004 (see para. 4) and letter of March 29, 2004
(see para. 3-6).  Because you have not advised me, I don't know what
your intentions will be should the Court deny my appeal.
    At this point, I have two specific requests in the event the
Court denies my appeal: 1) I want you to file a motion to stay the
mandate, pursuant to D.C. App. R. 41(b); and 2) file an application
for certiorari review.
    If you do not want to file the certiorari petition, I would like
you to file a motion asking the Court to appoint me counsel to pre-
pare my certiorari petition.  As for the motion to stay the mandate,
I want you to timely file this motion, or timely advise me on the
status of my appeal so I can timely file the motion myself.
    If you have filed a Reply Brief in my case?, I would like to re-
ceive a copy.

[A119.20]

*P136*

Be advised that I will be sending someone to retrieve my case files at the conclusion of the case.

Sincerely,

Craig Allan Williams

cc: Joy A. Chapper
    Chief Deputy Clerk
    D.C. Court of Appeals
    500 Indiana Ave. N.W.
    Washington, D.C. 20001-2131

Attention Joy Chapper,

I would like to know whether my April 28, 2004, "Notice To The Court" properly appear on the Court's docket sheet.

[A119.21]

*P137*



District of Columbia Court of Appeals
500 Indiana Avenue, N. W.
Washington, D.C. 20001-2131

JOY A. CHAPPER
CHIEF DEPUTY CLERK

TELEPHONE 879-2722
AREA CODE 202

May 25, 2004

Matthew W. Greene, Esquire
3977 Chain Bridge Road
Suite 201
Fairfax, VA  22030-3308

RE:  No. 03-CO-321 - Craig A. Williams v. United States

Dear Mr. Greene:

Enclosed is a copy of a letter received by this court from your client, Craig A. Williams.  I am referring this letter to you so you may contact Mr. Williams concerning the matter mentioned in his letter.

Sincerely,

Joy A. Chapper
Chief Deputy Clerk

Enclosure

cc:    Craig A. Williams
       Reg # 05723-000
       USP Allenwood
       P O Box 3000
       White Deer, PA 17887

JAC:sl

[A119.22]

*P138*

Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887


June 8, 2004


Matthew W. Greene, Esquire
3977 Chain Bridge Road
Suite 201
Fairfax City, VA 22030-3308


    RE:  No. 03-CO-321 - <u>Williams v. United States</u>

Dear Mr. Greene:

    I am in receipt of your June 1, 2004 correspondence to me.  The following constitutes my reply.

    First, we both agree that its best for you to withdraw from this case.  I think I will pass on your request that I prepare a motion for your exhibit.  I'd rather you move again to withdraw, this time noting "irreconcilable differences."  The grounds for the motion should be set forth in an ex parte statement or affidavit with the following correspondence attached:  Your Dec. 29, 2003; my Jan. 6, 2004 & Mar: 1, 2004 to Chief Judge Wagner; Joy Chapper's Mar. 15, 2004; your Mar. 22, 2004; my Mar. 29, 2004; your Apr. 6, 2004; my Apr. 28, 2004 Notice To The Court; my May 17, 2004; your Jun. 1, 2004; and my Jun. 8, 2004 (this letter).

    Second, the assertions I have made are supported by the record. I have not made [a]ny "slanderous and incorrect comments" against your person.  Further response is not necessary, because you fail to identify the remarks complained of.

    Third, I don't appreciate being threatened by you.  Thanks for the warning anyways.

    Fourth, I have not tried to sabotage our relationship.  In fact, I thought we had a good relationship up until the Court denied your request to withdraw.

    We had a longstanding agreement that you would keep me timely advised on the status of my case.  I held on to the issues I wanted considered on appeal because I thought you would be taken off the case.  You filed a brief without my knowledge and participation ---- you kept me uninformed on the status of my case, i.e., that the Court had denied your motion to withdraw.  You fail to respond to several of my letters.  Your response to my March 22, 2004 is full of double-

*P/39*

speak and untruths designed to avoid responding to the real issue.
To this day, you still have not addressed my specific concerns and
requests (see may 17, 2004 and earlier letters).

Mr. Greene, you are the saboteur -- not I.  I trust that this
adequately responds to your June 1, 2004.

Sincerely,

*Craig Allan Williams*

Craig Allan Williams


cc:   Joy A. Chapper
      Chief Deputy Clerk
      D.C. Court of Appeals
      500 Indiana Avenue, NW
      Washington, D.C. 20001

[A119.24]

P003

<div align="center">

**District of Columbia**
**Court of Appeals**

</div>



No. 03-CO-321

CRAIG A. WILLIAMS,

            Appellant,

                      F14042-88

   v.

UNITED STATES,

            Appellee.

BEFORE:  Washington, Chief Judge; Farrell, Ruiz, *Reid, Glickman, Kramer, **Fisher, Blackburne-Rigsby, and Thompson, Associate Judges; *Wagner and *Nebeker, Senior Judges..

<div align="center">

O R D E R

</div>

On consideration of appellant's *pro se* motion for leave to file the lodged petition for rehearing or rehearing en banc, it is

ORDERED that the motion is granted and the Clerk is directed to file the lodged petition for rehearing or rehearing en banc.  It is

FURTHER ORDERED by the merits division* that the petition for rehearing is denied; and it appearing that no judge of this court has called for a vote on the petition for rehearing en banc, it is

FURTHER ORDERED that the petition for rehearing en banc is denied.

<div align="center">

PER CURIAM

</div>

**Associate Judge Fisher has recused himself from this case.

Judge Wagner was Chief Judge of this court at time of decision.  Her status changed to Senior Judge on December 21, 2005.

<div align="right">

[A120]

</div>

*missing Page 241*

1    SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2              CRIMINAL DIVISION

3    - - - - - - - - - - - - - x
                               :
4    UNITED STATES OF AMERICA   :
                               :        Criminal Action Number
5              v.               :
                               :            F14042-88
6    CRAIG A. WILLIAMS,         :
                               :
7              Defendant        :
                               :
8    - - - - - - - - - - - - - x

9                                      Washington, D.C.

10                                     Tuesday, March 6, 1990

11         The above-entitled action came on for trial before
     the Honorable HENRY F. GREENE, Associate Judge, and a jury
12   duly empaneled, in Courtroom Number 319, commencing at
     approximately 10:27 a.m.

13

14         THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN
           OFFICIAL REPORTER, ENGAGED BY THE COURT, WHO
15         HAS PERSONALLY CERTIFIED THAT IT REPRESENTS
           HER ORIGINAL NOTES AND RECORDS OF TESTIMONY
16         AND PROCEEDINGS OF THE CASE, AS RECORDED.

17         APPEARANCES:

18         On behalf of the Government:

19         G. PAUL HOWES, Esquire
           Assistant United States Attorney

20         On behalf of the Defendant:

21         SEAN MOORE, Esquire
           Washington, D.C.

22              * * * * *

23

24                        [A121]

25   DARLENE B. SWARINGER
     Official Court Reporter              Telephone:  879-10.

3/6/90

1  immunity from prosecution.

2           THE COURT:  Okay.

3           MR. HOWES:  Also, the defense in this case may well

4  be -- I don't know this, but may well be, from statements

5  that have been made to the Government witnesses, that Ms.

6  Plummer killed David Golden.  The scenario, as the Govern-

7  ment's evidence will show, is that the car was still running,

8  parked at the corner of Forty-sixth Street and H Street,

9  Northeast on Saturday morning, the 22nd of October, 1988,

10  Mr. Williams in the back seat, his girlfriend, Sandra Plummer,

11  in the front passenger seat, David Golden in the driver's,

12  the driver.

13           There was one shot, the Government's evidence

14  would argue, to the -- right to the neck, that partially

15  severed David Golden's spine.  Sandra Plummer bolted either

16  just before the shot or at the time of the shot, got out

17  of the car and went to an alley ten or twelve, fifteen feet

18  from the car.  Mr. Williams then slipped from the back seat

19  into the front seat, kneeling at the passenger side, removed

20  a gun from David Golden's waistband, and then he put three

21  more bullets in his chest, and we have witnesses who will

22  corroborate the sequence but not make an identification.

23           Ms. Plummer then was in the company of Mr. Williams

24  for the next two days at various  locations, and we'll be

25  able to tie that up.

[A122]

14

1        SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                  CRIMINAL DIVISION

3  - - - - - - - - - - - - x
                        :

4  UNITED STATES OF AMERICA    :
                        :    Criminal Action Number

5        v.          :
                        :      F14042-88

6  CRAIG A. WILLIAMS,       :
                        :

7        Defendant      :

8  - - - - - - - - - - - - x

9                        Washington, D.C.

10                   Wednesday, March 7, 1990

11        The motion hearing and trial in the above-entitled action resumed before the Honorable HENRY F. GREENE, Associate Judge, and a jury duly empaneled and sworn, in Courtroom

12  Number 319, commencing at approximately 10:27 a.m., pursuant to the continuance on Tuesday, March 6, 1990.

13

14        APPEARANCES:

15        (As heretofore noted.)

16             * * * * *

17

18

19

20

21

22

23

24            [A123]

25

3/7/90

1    Q.   Who else was there?

2    A.   Tony.

3    Q.   During that evening and the next morning, into

4    Saturday, the 22nd, did you see a weapon on Mr. Williams?

5    A.   Yes.

6    Q.   What kind?

7    A.   A .45 automatic.

8    Q.   And where did he have it?

9    A.   He had it, again, in his front belt, stuck down in

10   his pants to the left.

11   Q.   And do you know -- did you see or did he tell you

12   whether or not that weapon, on Friday evening and Saturday

13   morning, was loaded?

14          MR. MOORE:   That's leading, Your Honor.

15          THE COURT:   I'm going to overrule the objection.

16          BY MR. HOWES:

17   Q.   Do you know if the .45 that Mr. Williams had stuck

18   in his pants was loaded?  Did it have bullets in it?

19   A.   Yes.

20   Q.   The following morning, ma'am, what happened on

21   Saturday morning?

22   A.   On Saturday morning, early Saturday, we left the

23   apartment at Benning and H, first stopped at the Giant and

24   bought something to eat.  From there, Craig, Tony and I rode

25   over to the twenty-two hundred block of Hunter Place.

[A124]

294

3/7/90

1    THE COURT: Went over to where, ma'am?

2    THE WITNESS: The twenty-two hundred block of

3    Hunter Place.

4    BY MR. HOWES:

5    Q.    How far from where you went do you live on Hunter

6    Place?

7    A.    I'm not understanding you.  Could you clarify --

8    Q.    When you went to the twenty-two hundred block of

9    Hunter Place, how close were  you to your house?

10    A.    Some feet away.

11    Q.    Where were you -- where was your attention?  What

12    was your goal?  Where were you headed?

13    A.    To David's apartment.

14    Q.    Did Mr. Williams tell you why he wanted to go to

15    Hunter Place to David's?

16    A.    Yes.

17    Q.    What did he say?

18    A.    Mr. Williams said he was going to do David on

19    that day.  He said that he was going to tell Dave a story

20    of some fictitious Jamaican guys who had been giving him

21    trouble at the Benning Road and H Street address.  He pro-

22    ceeded to -- he said he was going to tell Dave  that he

23    needed him to help him.

24    THE COURT: That he needed what, ma'am?

25    THE WITNESS:  That he needed Dave to go with him

[A125]                                295

3/7/90

1    MR. MOORE:  I will withdraw it.

2    THE COURT:  Okay.

3

4

5

6    (Thereupon, the proceedings had at the bench are

7    concluded, counsel return to their seats at counsel table,

8    and the witness returns to the witness stand and testifies

9    further, as follows:)

10    BY MR. HOWES:

11    Q.    Ms. Plummer, did there come a time when Mr. Williams

12    asked you anything about your brother?

13    A.    Yes.

14    Q.    What did he say?

15    A.    Craig asked me if there were any woods, or parking

16    lot or any type of vacant area around near where my brother

17    lived.

18    Q.    What was your brother's name?

19    A.    My brother's name is Bobby.

20    Q.    And where did Bobby live in October of 1988?

21    A.    Bobby lived in the unit block of Forty-sixth Place,

22    Northeast.

23    Q.    And what did you say to Mr. Williams when he asked?

24    A.    Well, first I asked him why.

25    Q.    And what did he say?

[A126]                        297

3/7/90

1    A.    He said, "Because I'm planning on doing somebody."

2    Q.    What did you say?

3    A.    I said, "Craig, you're not planning on doing me,

4    are you?"

5    Q.    What did he say?

6    A.    He said, "No.  Dave."

7    Q.    What happened then?

8    A.    He proceeded to go on, and I said, "Craig, no.  My

9    brother lives there."  I said, "Why don't you try talking to

10   Dave first?  Why don't you get your money?" and he said, "No.

11   I'm going to do him," and he looked at me and he said, "Are

12   you with me or what?"  I said, "Craig, I prefer not to."

13   He reached for his gun and put it --

14          THE COURT REPORTER:  I'm sorry.  He did what?

15          THE WITNESS: He reached for his gun, taking it out

16   of his belt, and with it in his right hand, rested it on his

17   hip.  He looked at me again and said, "Are you with me or

18   not?" and I said, "Craig, okay, I'll go.  I will go."

19          BY MR. HOWES:

20   Q.    How long was it between that conversation and the

21   time you went to get something to eat, ma'am?

22   A.    Approximately forty-five minutes.

23   Q.    And where did you go to get something to eat?

24   A.    We went to the Giant food store.

25   Q.    And did you have something to eat?

298

[A127]

3/7/90

1    A.    Yes.

2    Q.    Who was with you when you had something to eat?

3    A.    Craig and Tony.

4    Q.    And did you have any conversation with Mr. Williams

5    after you had something to eat?

6    A.    Yes.

7    Q.    What did you say to him?

8    A.    I asked Craig to just drop me by my brother's house

9    and meet me there later.

10   Q.    What did he say?

11   A.    He looked at me, he said, "Bitch, are you with me

12   or not?" and again I said, "Okay, Craig.  I'll go.  I promise."

13   Q.    What happened then?

14   A.    Then we drove off and headed to the twenty-two

15   hundred block of Hunter Place.

16   Q.    Who was with you when you got to the twenty-two

17   hundred block of Hunter Place?

18   A.    Craig and Tony.

19   Q.    When you got there, what -- who was driving?

20   A.    Tony.

21   Q.    What did you do when you got there?

22   A.    Upon arriving there, we sat in the car for a while.

23   Q.    Was there any conversation in the car?

24   A.    Yes, there was.

25   Q.    Did Mr. Williams say anything?

[A128] 

299

3/7/90

1   A.   Yes.

2   Q.   What did he say?

3   A.   Craig went into details telling Tony everything he

4   had planned to do, the plan of the Jamaican guys and his plan

5   of doing Dave, and he had said to Tony, "This is what I want

6   you to do.  I want you -- when we get out and go into Dave's

7   apartment, I want you to leave and meet us on the corner of

8   Hillside Road where you live."

9   Q.   What did you do then?

10  A.   I asked Mr. Williams could I get out of the car

11  because I needed some air.

12  Q.   Did you get out of the car?

13  A.   Yes.  He let me out.

14  Q.   When you got out of the car, what did you do?

15  A.   I attempted to back away up the street toward my

16  home.

17  Q.   What happened?

18  A.   Craig noticed me.  He jumped out the car and said,

19  "Bitch, if you try it, I'll kill you."

20  Q.   Did he touch you?

21  A.   Yes.

22  Q.   What happened?

23  A.   Craig grabbed me by my arm, led me across the

24  street with the pistol in my side, the .45

25  Q.   When you went across the street, where did you go?

[A129]

300

3/7/90

1    A.    We went across the street to -- into the apartment

2 building where David lived.

3    Q.    Who was in Dave's apartment when you got there?

4    A.    Dave and his girlfriend, as far as I know.

5    Q.    What was Dave doing when you got there?

6    A.    Upon first knocking on the door, Dave's girlfriend

7 said, "Dave's sleep."  Craig siad, "Tell him it's Craig.

8 Wake him up," and Dee proceeded to do so.

9    Q.    Did you see Mr. Golden after that?

10    A.    Yes.

11    Q.    Did Mr. Williams have a conversation with Mr.

12 Golden in your presence?

13    A.    Yes.

14    Q.    What did Mr. Williams say?

15    A.    Mr. Williams went over the story of these Jamaicans

16 who were giving him trouble.

17    Q.    Did he tell him where?

18    A.    Yes.

19    Q.    Where?

20    A.    At the Benning Road and H Street address.

21    Q.    What happened then?

22    A.    He went on to say to him, "Man, put your clothes

23 on.  I need your help."

24    Q.    Did he tell Mr. Golden what kind of help he wanted?

25    A.    Yes.

[A130]                          301

3/7/90

1    A.    Mr. Golden raised his sweater and he stuck the nine

2    millimeter down inside of his belt on the left, same location

3    as Craig, and he pulled the sweater down over the gun.

4    Q.    Ms. Plummer, had you had any conversation with Mr.

5    Williams about what should happen when you came out of David

6    Golden's apartment?

7    A.    Yes.

8    Q.    What was that?

9    A.    I was to pretend to want to sit in the front seat.

10    Craig was to go down and attempt to have me sit in the back,

11    and I was to tell him I don't want to sit in the back, I want

12    to sit up front, and Craig was to say something to the effect

13    of, "Ladies are spoiled," but he, of course, was to go ahead

14    and let me sit up front.

15    Q.    What did you do, ma'am?

16    A.    Just that.    I went down to the car, Craig raised

17    the seat up for me to get into the back, and I said, "I want

18    to sit up front," and Craig looked at me and he did a little

19    laugh, and he said, "You're spoiled."    He sat in the back and

20    I got in the front.

21    Q.    How was Mr. Golden dressed that morning, do you

22    recall?

23    A.    Yes.

24    Q.    What did he have on?

25    A.    Mr. Golden had on dark jeans, a tee shirt, I know

[A131]

303

3/7/90

1   a sweater, a grayish-white-and black sweater, a black leather

2   cap, black sunshades and black shoes.

3        Q.   Let me ask you -- it was shown to Defense counsel

4   earlier, Government's Exhibit Fifteen.  Do you recognize

5   Government's Exhibit Number Fifteen?

6        A.   Yes.

7        Q.   What do you recognize it as, ma'am?

8        A.   It appears to be the black leather cap that Dave

9   wore on that day.

10       Q.   Ma'am, did there come a time when you got in the

11  car in the front seat?

12       A.   Yes.

13       Q.   And who drove?

14       A.   Dave.

15       Q.   What kind of car did you get in?

16       A.   A blue Ford or something, with a tan vinyl top, I

17  believe.

18       Q.   New or used car, ma'am?

19       A.   It was a used car.

20       Q.   And had you ever been in this car before?

21       A.   No, I had not.

22       Q.   Had you ever seen that car before?

23       A.   Yes, once.

24       Q.   When?

25       A.   On the used car lot.

[A132]                    304

3/7/90

1   confess. I know what you did with the money."

2       Q.    What did Dave say?

3       A.    At first, Dave was saying, "Motherfucker." He put

4   on brakes and he said, "Craig, I told you you'll get your

5   money," and he asked Craig, "You want to go back and get it

6   now?"

7       Q.    What did Craig say?

8       A.    Craig waid to him, "Naw. That's all right, man.

9   You may as well go ahead and keep it. You're going to pay

10  for it."

11      Q.    Where was Mr. Williams when he said that?

12      A.    It was at the intersection of Alabama and H Street

13  or F. Alabama and F Street, Southeast.

14      Q.    Did he do anything when he said that?

15      A.    He laughed.

16      Q.    What did David do?

17      A.    David proceeded to drive on.

18      Q.    Did Mr. Williams give him any directions?

19      A.    Yes.

20      Q.    Where did Mr. Williams tell him to go?

21      A.    He had him go on up and to take a right on H Street.

22  He told him to go straight out H and, once at Benning Road

23  and H Street, he had told Dave to turn right up into the alley

24  of the apartment complex.

25      Q.    And the apartment complex was where, ma'am?

[A133]                              310

3/7/90

1     A.     At Benning Road and H Street.  I'm sorry.

2     Q.     What did Dave do?

3     A.     Dave said, "Naw, man.  I don't want my car sitting

4  here."

5     Q.     Did Mr. Williams say anything?

6     A.     Yes.

7     Q.     What was that?

8     A.     Mr. Williams said, "Okay.  Well, pull back down

9  here."  He had him drive up and down H Street.

10     Q.     What happened next?

11     A.     Finally --

12     Q.     Let me ask you, did you drive on H Street?

13     A.     Yes.

14     Q.     How many times on H Street, ma'am?

15     A.     Three or four times.

16     Q.     Having previously shown Defense counsel, and having

17  marked as Government's Exhibit Number Fourteen, let me ask

18  you if you recognize the diagram on Fourteen.

19     A.     Yes.

20     THE COURT:  Is there any objection to this being

21  displayed?

22     MR. MOORE:  No.

23     THE COURT:  Let's put it over there.

24     MR. HOWES: We offer Government's Exhibit Number

25  Fourteen.

[A134]               311

3/7/90

1    MR. MOORE: No objection.

2    THE COURT:  It will be received.

3                    (The diagram marked Government's
                     Exhibit 14 for identification
4                    is received in evidence.)

5    BY MR. HOWES:

6    Q.    Ma'am, do you recognize what's drawn on Govern-

7    ment's Exhibit Fourteen?

8    A.    Yes.

9    Q.    And consistent with what you just said, can you

10   find Forty-sixth Street and H Street?  Is that consistent

11   with where you told us you were?

12   A.    Yes.

13   Q.    And was it on H Street that you drove two or three

14   times?

15   A.    Yes.

16   Q.    What were you doing on H Street when you were

17   driving there?

18   A.    Trying to find a place to park which Craig was

19   comfortable with, and also David.

20   Q.    I'm sorry?

21   A.    Trying to find a parking place which Craig was

22   comfortable with, and also David.

23   Q.    Did there come a time when you found a parking

24   place?

25   A.    Yes, they did.

312

[A135]

3/7/90

1      Q.   Let me direct your attention to where this

2   diagram has a mark right underneath the words "1977 Ford."

3   Is that consistent with where he parked the car?

4      A.   Exactly.

5      Q.   What did you do, Ms. Plummer, when the car was

6   parked?

7      A.   The car is parked.  I reached out for the handle

8   of the door to get out of the car.

9      Q.   Why?

10      A.   Because I knew what was going to happen, and I

11   didn't want to be there.

12      Q.   What was going to happen, Ms. Plummer?

13      A.   Craig was going to shoot Dave.

14      Q.   Why didn't you try to stop him?

15      A.   I was scared of Craig.  I --

16           THE COURT:  No, no. You've answered the question.

17           BY MR. HOWES:

18      Q.   What did you do?

19      A.   Again, I reached for the door to get out.

20      Q.   At that point, what happened?

21      A.   Before I could get out, I heard a loud pow in my

22   ear.  I pushed the door open, jumped out of the car and ran.

23      Q.   Ms. Plummer, what did you have on that morning?

24      A.   I had on a burgundy-and-bone-colored, bold-striped,

25   button-up, long-sleeved shirt, blue jeans and a long, light-

[A136]

313

3/7/90

1    A.    Yes.

2    Q.    Would you do that, please?

3    A.    (The witness complies with the request.)

4    Q.    And then can you write C.W. and draw a circle

5    around it?

6    A.    (The witness complies with the request.)

7    Q.    Did Mr. Williams say anything to you at that point?

8    A.    Yes.

9    Q.    What did he say?

10    A.    Said, "Come on."

11    Q.    Did he do anything at that point?

12    A.    Yes.

13    Q.    What was that?

14    A.    He grabbed me through my arm and proceeded through

15    the alley with me.

16    Q.    Did you see the gun that you told us about that

17    Mr. Golden had?

18    A.    Yes.

19    Q.    Where was it?

20    A.    On my side, pointing on my side.

21    Q.    What did you do?

22    A.    I ran with him.

23    Q.    Ma'am, why did you come back?  When you got out

24    of the car, why did you come back?

25    A.    From where?  (Indicating) From here?

319

[A137]

3/7/90

1    Q.    When Tony came in, did Mr. Williams speak to Tony?

2    A.    Yes, he did.

3    Q.    What did Mr. Williams say?

4    A.    Mr. Williams told Tony, "It's done.  I did him."

5    Q.    What happened then?

6    A.    Then Mr. Williams came to the table, the dining

7    room table where I was seated.  He put money, drugs and both

8    guns on the table.

9         I noticed two police officers on foot.  I got up

10   to go to the window.  Craig looked at me and said, "See that,

11   bitch, you're going to fuck up and I'm going to have to do

12   you."  I said, "Craig, I promise I won't.  I won't."

13        He proceeded back to the table.  He smoked some.

14   He let me smoke some, and then I sat there.  Craig himself

15   made phone calls and he talked to Tony again.  Again, Tony

16   was trying to bring to his attention police officers who

17   appeared to be coming directly to the apartment.  He kept

18   suggesting to Craig that he should let him, Tony, get rid

19   of the guns.

20   Q.    What did Mr. Williams say to Mr. Fletcher?

21   A.    I don't remember everything, because there was an

22   argument and he told him he'd better leave him alone or

23   something, but he wouldn't let Tony take the guns out.

24   Q.    What happened next?

25   A.    Next, Mr. Williams kept talking on the phone.  From

[A138]

324

3/7/90

1    time to time, I would get up and run to the window, sit back

2    down and look at Craig.  After a while, the both of us sat

3    down on the couch in the living room directly at the front

4    window facing Hillside Road.  I'm sorry, facing Forty-sixth

5    Street.  Around 1:30, two o'clock, the three of us, Craig,

6    Tony and myself prepared to leave.

7        Q.    Whose idea was that?

8        A.    Craig's idea.

9        Q.    Did you know where -- had Mr. Williams said where

10   he was going?

11       A.    Not at that particular time, no.

12       Q.    Where did you go?

13       A.    We went to the Days Inn Hotel in Arlington,

14   Virginia.

15       Q.    How did you get there?

16       A.    Tony drove us.

17       Q.    Did Mr. Williams speak to Mr. Fletcher about taking

18   you there?

19       A.    Yes, he did.

20       Q.    What did he say?

21       A.    He asked him to take us there and drop us off, and

22   he would be getting back in contact with him later on.

23       Q.    How long were you at Mr. Fletcher's?

24       A.    Approximately three hours.

25       Q.    And when you left Mr. Fletcher's, did you see any

325

[A139]

3/7/90

1  police in the area at that time?

2     A.   Very, very few.

3     Q.   Ms. Plummer, did Mr. Williams do anything with the

4  guns before leaving Mr. Fletcher's?

5     A.   No.  He put them -- well, yes. He put them into a

6  brown paper bag.

7     Q.   Did he bring the guns with him?

8     A.   Yes.

9     Q.   When you got to the Days Inn, what happened?

10    A.   I could not register us because we needed a valid

11 driver's license, and I only had a student i.d. and voter's

12 registration card.  Tony's driver's identification was used

13 to register us into the hotel, and which, under all of his

14 information, my name and address was written down.

15    Q.   And were you at the counter to do that?

16    A.   Yes.

17    Q.   Was Mr. Fletcher, also?

18    A.   Yes.

19    Q.   And Mr. Williams?

20    A.   Yes.

21    Q.   Having shown Defense counsel what's marked as

22 Government's Exhibit Thirty-four, I'm going to ask you if

23 you recognize Government's Exhibit Thirty-four.

24    A.   Yes, I do.

25    Q.   What is Thirty-four, ma'am?

326

[A140]

3/7/90

1    A.    Thirty-four is the receipt from the hotel, from the

2   Days Inn Hotel.

3    Q.    And is there anything on Thirty-four that you

4   recognize as yours?

5    A.    Yes.

6    Q.    What is it?

7    A.    My name, my address and my signature.

8    Q.    On what date did you sign that document at the

9   Days Inn?

10   A.    It should have been -- well, this is signed October

11   23rd.  It should be October 22nd.

12   Q.    And the  day that you checked into the hotel was

13   what date?

14   A.    October 22nd.

15   Q.    And did you list, at the Days Inn, your address

16   as 2200 Hunter Place, Southeast?

17   A.    No; 2220.

18   Q.    I'm sorry.  I misspoke.  Twenty-two Twenty.

19   A.    Yes.

20   Q.    Where did you go after you checked in, ma'am?

21   A.    We went up to the room.

22   Q.    What happened then?

23   A.    When we first went in, for a while, we were just

24   sitting around.  Craig spoke some about having to do what

25   he did to David.

[A141]                                          327

3/7/90

1    Q.   What did he say?

2    A.   He said, "Man, I'm sorry.  That's fucked up."  I --

3    I was trying to console him by rubbing his shoulders --

4    Q.   Why?

5    A.   -- And I -- I was trying to console him.

6    Q.   Why were you trying to console him?

7    A.   Because when Craig gets like that, the least thing

8    I say or do, he would snap.

9    Q.   Did there come a time when Mr. Williams made any

10   phone calls?

11   A.   Yes.

12   Q.   When was that?

13   A.   It was later on in the evening after we had regis-

14   tered.

15   Q.   During the making of those phone calls, where were

16   you?

17   A.   At first, in the hotel room with him.

18   Q.   And did you go anywhere else, ma'am?

19   A.   At one time, yes.

20   Q.   Where was that?

21   A.   I was told to go into the bathroom of the hotel and

22   close the door.

23   Q.   Could you hear  anything in the room from where you

24   were in the bathroom?

25   A.   Yes.

[A142]                                    328

3/7/90

1    Q.    What could you hear?

2    A.    I could hear loud music, as well as Craig's voice

3    talking over the music.

4    Q.    Do you know to whom Mr. Williams was speaking?

5    A.    Yes.

6    Q.    How do you know who it was?

7    A.    He was calling out his name.

8    Q.    What name did he call?

9    A.    Moe.

10    Q.    And what were they talking about, ma'am?  What

11    could you hear Mr. Williams say?

12    A.    I heard Mr. Williams go detail by detail how he

13    had done David Golden and why he had done him.

14    Q.    Ma'am, did he tell you -- did you hear him say in

15    that phone conversation how many times he shot David Golden?

16    A.    No, not in the phone conversation.

17    Q.    Ma'am, on that morning, the 22nd of October, do

18    you know if Mr. Williams had a watch on?

19    A.    Yes.

20    Q.    What kind was it?

21    A.    A Rare Essence watch with a black leather band.

22    Q.    And did there come a time when Mr. Williams did

23    anything with that watch?

24    A.    Yes.

25    Q.    What was that?

329

[143]

3/7/90

1      A.  He gave it to David in exchange for his own Rolex

2  watch.

3      Q.  Was it a real Rolex?

4      A.  No.

5      Q.  And what time -- where were you and what part of

6  the day was it on Saturday when the watches were exchanged?

7      A.  It was as we were driving down Sixteenth Street

8  that morning.

9      Q.  Did Mr. Williams make any comment about the watch

10  that he got back?

11      A.  Yes.

12      Q.  What did he say?

13      A.  He mentioned something of a scratch being on the

14  crystal or something.

15      Q.  Now, let me ask you, while you were in the bathroom

16  -- did there come a time when you came out of the bathroom

17  and spoke to Mr. Williams?

18      A.  Yes.

19      Q.  What did you say?

20      A.  I said to him, "Craig, you're talking too loud."

21  I was going to let him know he was talking over the music,

22  but he looked at me, "Bitch, you trying to be nosey?" so I

23  went back into the bathroom and I closed the door, and I

24  didn't come back until he asked me to.

25      Q.  When you came back out, was there ever a time when

[A144]

330

3/7/90

1    Mr. Williams discussed with you what you should say about

2    what happened?

3        A.    Yes.

4        Q.    When was that?

5        A.    It was later on.  Well, it was later into the

6    evening well into the next morning, early hours of the next

7    morning.

8        Q.    And what did he say?

9        A.    He said to me he -- he had devised a story, which

10    it was half truth and lies.

11        Q.    And who were you to tell that to?

12        A.    I was to tell the police -- any police officers

13    or detectives if -- in the event I was picked up and ques-

14    tioned about the David Golden event.

15        Q.    Ms. Plummer, during this time, did you see Mr.

16    Williams do anything with the guns?

17        A.    Yes, I did.

18        Q.    What was that?

19        A.    I saw him take the guns totally apart, using a

20    towel to wipe off fingerprints and clean inside the barrel,

21    and then he wrapped them into another towel.

22        Q.    What happened after that, ma'am?

23        A.    After that, there was a short period of getting

24    high again, and then going over the story again constantly,

25    constantly.

[A145]                                    331

3/7/90

1    Q.   Did Mr. Williams say to you -- in what you were to

2    say, did he tell you where you should say you were when David

3    Golden got killed?

4    A.   Yes.

5    Q.   What was that?

6    A.   At first, I was to be where I was, in the front

7    passenger seat.

8    Q.   And did that story change?

9    A.   Yes.

10   Q.   How did that change?

11   A.   After, it's when we were to pick up this fictitious

12   guy, Black.  I let Black sit in the front and I got into the

13   back seat with Craig, in no particular location, just in the

14   back seat.

15   Q.   And in the account that you were told to tell, were

16   you there when Mr. Golden was killed?

17   A.   Excuse me?

18   Q.   In the account that Mr. Williams told you to tell,

19   were you to have been there when Mr. Golden was killed?

20   A.   No.

21   Q.   Was Mr. Williams to have been there --

22   A.   No.

23   Q.   -- When he was killed?

24       Where were the two of you to have been?

25   A.   The two of us were to have been around Craig's

[A146]

332

3/7/90

1    father's house.  No.  I'm sorry, around Tony's house, because

2    I didn't want to go to Craig's father's house.

3         Q.   How close does Craig's father live from Mr.

4    Fletcher?

5         A.   Through an alley.

6         Q.   What time did you leave Days Inn.

7         A.   Approximately 6:45, 7:15 on the morning of October

8    23rd.

9         Q.   When you say Arlington, is that also known as

10   Crystal City?

11        A.   Yes.

12        Q.   And when you left Crystal City that morning, who

13   paid the bill?

14        A.   Craig.

15        Q.   And were you with him when that happened?

16        A.   Yes, I was.

17        Q.   And how did you leave Crystal City?

18        A.   By a cab.

19        Q.   And where did you go?

20        A.   We caught the cab here into D.C. to an apartment

21   located on Wade Road or Street, Southeast.

22        Q.   Do you know who lives there?

23        A.   Yes.

24        Q.   Who lives  there?

25        A.   Moe.

[A147]                              333

3/7/90

1    Q.   And is that consistent with the name you heard in

2    the telephone conversation the day before?

3    A.   Yes, it is.

4    Q.   What happened when you got to Moe's?

5    A.   We got to Moe's, again Craig went over what he

6    had done to David, and he asked Moe something about leaving

7    the .45 there with him and, also, there was talk of a file

8    that could be used in the barrel, or some kind of way to

9    change the results of ballistics.

10   Q.   Did Mr. Williams do anything with the gun?

11   A.   Yes. He left it there with Moe.

12   Q.   And did he go anywhere then?

13   A.   Yes.

14   Q.   Where did he go?

15   A.   The two of us left there and walked to a guest

16   house, if you want to call it that, on Talbert Street, South-

17   east.

18   Q.   And how far was that from Moe's?

19   A.   Five, six blocks, going back down Martin Luther

20   King Avenue.

21   Q.   And when you got to -- did you go to the guest

22   house?

23   A.   Yes, we did.

24   Q.   When you got to the guest house, did you register?

25   A.   Yes.

[A148]

334

3/7/90

1    Q.    Were you with Mr. Williams when he did that?

2    A.    Yes.

3    Q.    Did you see him do anything in terms of registering?

4    A.    If I'm not mistaken, I was the one to put my name

5    on the registration.

6    Q.    Let me ask you if you recognize or have you ever

7    seen, having shown Defense counsel previously, Government's

8    Exhibit Number Thirty-five.  Do you recognize that?

9    A.    Yes.

10    Q.    What is Thirty-five?

11    A.    Exhibit Thirty-five are receipts, one in particular

12    from Craig and myself, the very first receipt.

13    Q.    Do you recognize anything on Government's Exhibit

14    Thirty-five that you've seen before?

15    A.    Yes.

16    Q.    What is that?

17    A.    Craig's name and his writing, his exact handwriting.

18    Q.    Ms. Plummer, throughout the course of your rela-

19    tionship, have you had the opportunity to write to and to

20    receive letters from Mr. Williams?

21    A.    Yes.

22    Q.    Have you seen his signature before?

23    A.    Many times.

24    Q.    And is what -- the signature you've seen, is it

25    consistent with what's on Government's Exhibit Thirty-five?

335

[A149]

3/7/90

1     A.   Yes, it is.

2     Q.   And the day you checked into the guest house was

3 what morning, ma'am, what day?

4     A.   It was the morning of Sunday, October 23rd, yes.

5     Q.   And did you see Mr. Williams check in?  Were you

6 with him when he did that?

7     A.   Yes.  I was mistaken.  The first time, he did.

8 Sorry.

9     Q.   How long -- on the way there, did you stop anywhere

10 else?

11     A.   No.

12     Q.   How long were you at that guest house on the 23rd?

13     A.   Into the morning Monday, the 24th.

14     Q.   And what did you do on the 23rd at the guest house?

15     A.   We slept practically all day.

16     Q.   On the morning of the 24th, did you go anywhere

17 with Mr. Williams?

18     A.   Yes.

19     Q.   Where was that?

20     A.   We were to go to my house.  However, before doing

21 so, Craig wanted to stop at the apartment where Dave had

22 lived.

23     Q.   Did you do that?

24     A.   Yes, we did.

25     Q.   And who did you see there?

336

[A150]

1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2

CRIMINAL DIVISION

3

- - - - - - - - - - - - - x

4

UNITED STATES OF AMERICA        :

                           :        Criminal Action Number

5

       v.        :

                           :        F14042-88

6

CRAIG A. WILLIAMS,        :

                           :

7

      Defendant        :

8

- - - - - - - - - - - - - x

9

Washington, D.C.

10

Thursday, March 8, 1990

11

      The trial in the above-entitled action resumed

12

before the Honorable HENRY F. GREENE, Associate Judge, and
a jury duly empaneled and sworn, in Courtroom Number 319,
commencing at approximately 10:25 a.m., pursuant to the

13

continuance on Wednesday, March 7, 1990.

14

      APPEARANCES:

15

      (As heretofore noted.)

16

          * * * * *

17

18

19

20

21

22

23

24

[A151]

25

351

3/8/90

1    Q.    Now, this is a residential neighborhood over here,

2    isn't it?

3    A.    Yes.

4    Q.    (Indicating) You didn't continue running up the

5    alley over to Hillside or this area after that shot, did you?

6    A.    No.

7    Q.    You did not run and say, "Call the police.    Someone

8    has been shot," did you?

9    A.    No.

10   Q.    (Indicating) When you were standing here in the

11   alley, the man who had shot Mr. Golden was still up by the

12   car, isn't that right?

13   A.    Yes.

14   Q.    So you had what, twenty-five, thirty yards distance

15   between him and you?

16   A.    Yes.

17   Q.    But you went to a motel in Arlington that afternoon,

18   correct?

19   A.    Yes.

20        MR. MOORE:    May I have the folio exhibit?

21        THE COURT:    The folio exhibit?

22        MR. MOORE:    The receipt -- motel receipt exhibit.

23                          (A pause)

24        BY MR. MOORE:

25   Q.    Ma'am, I'm going to hand you what's been marked as

                                                    417

[A152]

3/8/90

1    Government's Exhibit Thirty-four.  You remember seeing that

2    yesterday, do you not, ma'am?

3         A.   Yes, I do.

4         Q.   That is a receipt from the Days Inn, correct?

5         A.   Yes.

6         Q.   Ms. Plummer, would you tell us how many people --

7    it appears on that receipt as to how many people were in the

8    party that checked in?

9         A.   Yes.

10        Q.   How many were in the party?

11        A.   Two.

12        Q.   At the very top, whose name appears on there?

13        A.   Mine.          *Compare supra*

14        Q.   And is your address on there?

15        A.   Yes, it is.

16        Q.   What's your address?  What's the address that's on

17   there?

18        A.   Twenty-two Twenty Hunter Place, Southeast --

19        Q.   Is there another --

20        A.   -- Washington, D.C.

21        Q.   Okay.  Thank you.

22             Is there another name, a male name on there?

23        A.   On the receipt, yes.

24        Q.   Would you tell us what that name is?

25        A.   Marvin Tony Fletcher.

**3/8/90**

1    Q.    Is there an address that's given?

2    A.    Yes.

3    Q.    What's the address?

4    A.    Twenty-four Sixteen Elvans Road, Southeast, Washing-

5    ton.

6    Q.    I'm going to hand you what's been marked as Govern-

7    ment's Exhibit Thirty-five.  Do you remember seeing that

8    yesterday?

9    A.    Yes.

10    Q.    Do you see a receipt with Mr. Williams' name on

11    there?

12    A.    Yes.

13    Q.    Ma'am, what's the date on that receipt?

14    A.    October 24th.

15    Q.    Does it have a year?

16    A.    Nineteen Eighty-eight.  I'm sorry.

17    Q.    Thank you.

18         So, Mr. Fletcher's name appears on the receipt of

19    October 22nd, is that right?

20    A.    Yes.

21    Q.    Mr. Williams' name appears on the receipt of

22    October 24th, isn't that right?

23    A.    Yes.

24    Q.    Ma'am, you testified yesterday that while at the

25    Days Inn, you consoled Mr. Williams.

419

[A154]

3/8/90 STIPULATION--GX 34 & 35

1  don't object.

2         MR. HOWES:  Your Honor, I'll withdraw Thirty-one.

3         THE COURT:  All right.

4         MR. HOWES:  Thirty-two, I'm not offering.  Thirty-

5  three and Thirty-five -- Thirty-four and Thirty-five are the

6  registration, Your Honor.

7         THE COURT:  You mean for the vehicle?

8         MR. HOWES:  The guest house and Days Inn.  We have

9  stipulated that we will not need a records custodian for

10  those two documents.

11         THE COURT:  Any objection?

12         MR. MOORE:  No.  What were the numbers again?

13         MR. HOWES:  Thirty-four and Thirty-five.

14         MR. MOORE:  No objection to those, Your Honor.

15         MR. HOWES:  Thirty-three, I may use tomorrow with

16  one of the detectives, but that remains to be seen.  That's

17  the rights card.  Thirty-six was the mobile crime report that

18  I'm not offering.

19         THE COURT:  Okay.

20                              (The shell casings, medallion,
                                chain link, glove, slugs, frag-
21                              ment, hat, photographs, certifi-
                                cate and receipts marked Govern-
22                              ment's Exhibits 2 through 13,
                                15, 18 through 30, 34 and 35 for
23                              identification are received in
                                evidence.)

24         THE COURT:  Counsel, I don't know if we're going to

25  get to closing arguments tomorrow or not, but I don't see

[A155]

535

1    SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2    CRIMINAL DIVISION

3    - - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA        :

5          vs.                      :    Criminal Action No. F 14042-8

6    CRAIG A. WILLIAMS,             :

7          Defendant               :    Vol. 1 of 5

8    - - - - - - - - - - - - - - x

9                                    Washington, D. C.

10                                   Monday, March 12, 1990

11         The above-entitled action came on for trial before
     the Honorable HENRY F. GREENE, Associate Judge, and a jury
12   duly empaneled and sworn, in Courtroom Number 319, commencing
     at approximately 10:20 a.m., pursuant to the continuance of
13   March 9th, 1990.

14         THIS TRANSCRIPT REPRESENTS THE PRODUCT OF
           AN OFFICIAL REPORTER, ENGAGED BY THE COURT,
15         WHO HAS PERSONALLY CERTIFIED THAT IT REPRE-
           SENTS THE TESTIMONY AND PROCEEDINGS OF THE
16         CASE AS RECORDED.

17              APPEARANCES:

18              On behalf of the Government:

19              G. PAUL HOWES, Esquire
                Assistant United States Attorney

20

21              On behalf of the Defendant:

22              SHAWN MOORE, Esquire
                Washington, D. C.

23

24   DANIEL T. FINNERIN                          879-1063
25   OFFICIAL COURT REPORTER

                    [A156]

(Folder 4 of 5)

### 3/12/90--DEFENSE THEORY

1    Now you were instructed that the term pistol means

2   any firearm with a barrel less than twelve inches in length.

3    The term firearm means any weapon which will expel

4   a projectile by means of an explosive.

5    A pistol is carried openly or concealed on or about

6   the defendant's person if it is located in such proximity to

7   his person to be convenient of access and within reach.

8    Now, ladies and gentlemen, the defense in this case

9   is simply that Mr. Williams was not present at the killing of

10  Mr. Golden, and that the killing was done by persons other

11  than Mr. Williams.

12    Ladies and gentlemen, we are to the point where I

13  have a few final things to say to you before you begin your

14  deliberations in this case.

15    First of all, the question of the punishment that

16  the defendant will receive if he is convicted in this case

17  should not enter into or influence your deliberations in any

18  way.  The duty of imposing sentence in the event of convic-

19  tion rests only with the Court, and you should weigh the

20  evidence in the case and you should decide the guilt or the

21  innocence of the defendant based only on the evidence and

22  without any consideration of the matter of punishment.

23    Now, there were numerous exhibits that were re-

24  ceived in evidence in this case, so I will not be sending the

25  exhibits which have been received in evidence with you as you

100

[A157]

3/12/90--NOTE FROM JURY

1  let them do that and tell them to advise the jury to stop

2  deliberating during that period of time.

3          You gentlemen have any objections to my following

4  those procedures?

5          MR. MOORE:  No objection.

6          MR. HOWES:  No objection.

7          THE COURT:  Thank you very much.

8          Mr. Moore, I further thought this is not very neat.

9  I will just retype it with the right date --

10          MR. MOORE:  -- Very well.

11          THE COURT:  -- and give them the verdict form with

12  the right date.

13          Thank you.

14          MR. MOORE:  Very well.

15          [Whereupon the above case was recessed at

16   3:06 p.m. and reconvened at 4:47 p.m.]

17          THE COURT:  Have Mr. Williams out?

18          These are copies of the new verdict form.  No

19  substantial change from the other one.

20          Okay, Mr. Williams is now before the Court.

21          We have one note from the jury and that note indi-

22  cated that the jury asked for the hotel receipt and all of the

23  other evidence, is that right?

24          THE DEPUTY CLERK:  Yes, sir.

25          THE COURT:  It says we would like to have the hotel

[A158]                                    112

3/12/90

1   receipt and other evidence in the case, so I sent them all of

2   the exhibits in response to that note.  That was about ten

3   minutes ago.  I was almost going to wait until tomorrow, but

4   then I thought if there was just this one thing on their mind

5   I would not delay it.

6          The jury also took a ten-minute break at one point.

7          THE DEPUTY CLERK:  I showed counsel the note.

8          THE COURT:  Okay.  Is there anything before the jury

9   comes in, Mr. Howes?

10         MR. HOWES:  No, Your Honor.

11         THE COURT:  Mr. Moore?

12         MR. MOORE:  No, sir.

13         THE COURT:  Okay.  I'm going to let them be excused

14   until tomorrow at nine thirty.  I will ask them to come back

15   and then resume their deliberations.

16         All right, thank you, Mr. Lindsey?

17         [Whereupon the jury entered the courtroom at

18      4:51 p.m.]

19         THE COURT:  Ladies and gentlemen -- thank you.

20         If the jury has selected a foreperson, could the

21   foreperson please raise his or her hand?

22         What is your number, sir?

23         THE FOREPERSON:  Uh -- Seat number --

24         A VOICE:  -- Fourteen.

25         THE COURT:  No, juror number?

[A159]

113

$(Vol 1, 56)$

1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA            :
                                    :
        v.                          :        Criminal Case
                                    :
CRAIG ALLEN WILLIAMS                :        F14042-88
                                    :
- - - - - - - - - - - - - - - - - x

Grand Jury No. 1
Superior Court of the
 District of Columbia
555 Fourth Street, NW
Washington, D.C.

Thursday, December 22, 1988

The testimony of SANDRA KAREN PLUMMER was taken in

the presence of a full quorum of the Grand Jury, commencing

at 11:47 a.m., before:

BARRY TAPP
Assistant United States Attorney

[A160]

12/22/88

56

1    A    The hotel in Arlington?

2    Q    The hotel; I'm sorry.

3    A    Yes.    We left the hotel about 6:30, 7 o'clock,

4    the morning of the 23rd.    We left there, caught a cab over

5    to Wade Street in Southeast Washington where the guy, Mo,

6    lives.    We went there to Mo's place.    I started going to

7    sleep.

8         Craig had wanted to leave the .45, the one that he

9    used to shoot Dave -- he wanted to leave that with Mo and

10   there was some talk of some file that could be used to

11   change the barrel; okay?

12        He left the gun there, and we left Mo's and walked

13   to Talbert Street.    There is a guest house, or whatever you

14   call it, in Southeast Washington, on Talbert Street.    There

15   we slept all the day of the 23rd, on into the 24th.    That

16   morning, we walked from Talbert Street -- we were going to

17   my home, but before crossing the street to my home, Craig

18   stopped by Dave's apartment.

19        He stopped there, basically, just to find out what

20   she had told the police, if anything at all, and to find out

21   if they had any suspects.

22   Q    Who was "she?"

23   A    Her name is Dee.    I'm sorry; Dave's girlfriend.

24   Q    She was David's girlfriend?

25   A    David's girlfriend.

[A161]

# W RLDFAX
NETWORK

# INFORMATION SHEET
## INTERNAL USE ONLY
(Not for customer or guest u

CHECK BOX BELOW:

☑ SEND

☐ RECEIVED

To _MR. BARRY TAPP_

Dept _ROOM 3106_

Company _US ATTORNEY'S OFFICE_

Fax # _272-4101_

Phone # _____

Comments:

Time _2:45_

DATE _01-25-89_

Total Pages _2_
(INCLUDING THIS INFORMATION SH

[A162]

From _MATHEW LANNON_

Dept _____

Company _DAYS HOTEL CRYSTAL C_

Fax # _920-2840_

Phone # _920-8600_

ROOM NO.  430   NAME   DEPART   RATE   FOLIO NUMBER 019679

LAST NAME  *Plummer*   FIRST  *Sandra*

STREET ADDRESS  2220  Hunto   OCT. 23  7:28 PM '8

CITY  WDC   STATE  2020

I AGREE TO VACATE BY 11:00 A.M.   SIGNATURE  X _____ O____

MARVIN TONY FLE HER         430    1  6800  8  PLUM

| | | |
|---|---|---|
| OCT 22 | PREV BAL | .00 |
| OCT 23 | CASH | 74.46- |
| 224035 | ROOM  430-1 | 74.46 |
| OCT 22 | PREV BAL | 74.46 |
| OCT 22 | ROOM | 68.00 |
| OCT 22 | SALE TAX | 6.46 |
| 214218 | ROOM  430-1 | .00 |
| OCT 22 | PREV BAL | .00 |
| OCT 22 | LOCAL PH | 2.50 |
| 314405 | ROOM  430-1 | 2.50 |
| OCT 23 | PREV BAL | 2.50 |
| OCT 23 | CASH | 2.50- |
| 114463 | ROOM  430-1 | .00 |
| | CHECKOUT-05:59AM | |

MARVIN TONY FLE HER
416 ELVANS RD
WASHINGTON DC
DC · 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

019679

CORPORATE BILLING INFORMATION
FIRM NAME
STREET ADDRESS
CITY, STATE, ZIP
AREA CODE  TELEPHONE

I AGREE THAT MY LIABILITY FOR THIS BILL IS NOT WAIVED AND AGREE TO BE HELD PERSONALLY LIABLE IN THE EVENT THE INDICATED PERSON, COMPANY OR ASSOCIATION FAILS TO PAY FOR ANY PART OR FULL AMOUNT OF THESE CHARGES.

SIGNATURE

**DAYS INN CRYSTAL CITY HOTEL**
2000 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VIRGINIA 22202
(703) 920-8600

[A163]

①

Appeal of second 23-110 in <u>US v. Williams</u>, F-14042-88 (*aff'd* 90-CF-627)
(*in* 10/12/95)

<u>First 23-110 motion</u>

• Hearing before Judge Evans on 11/18/92 => denied

• Subsequent to this hearing, NOA not properly filed

• DCCA in 10/12/95 opinion => necessary steps to effectuate appeal of 23-110 denial not taken (note 1 @ 1)

<u>Second 23-110 motion</u>

<u>8/5/98</u> => 2d 23-110 motion filed, gov't filed opp. + T/C denied it w/out a hearing (9/15/98)

=> NOA timely filed (10/13/98).

<u>Facts of underlying case</u>

<sup>≠ 10/22/88</sup>

• π killed long time acquaintance David Golden b/c Golden had borrowed $300.00 to by drugs + then instead bought a car

• Gov't's primary witness: Sandra Plummer => present during planning + commission of murder

• <u>Plummer</u>: on 10/23/88, she went w/ π, after the shooting to a "guest house" on Talbut St., SE (3/6/90 Tr. @ 334)
: both checked in + both signed receipts
: Plummer stayed fr. AM of 10/23 to AM of 10/24 w/ π - they both slept all day + then went to her house on AM of 10/24

(@ 23-110 #1)    ②

• <u>Guest House Receipts</u> : π testified that he checked into
guest house in AM of 10/23/88

: receipt bore wrong date of 10/24 b/c
he wrote down the wrong date.

: receipt # 37108 (one he signed) preceeded #37107
dated 10/23/88 + followed # 37108 dated 10/23/88

π : check in time: 7:30 am into Room 4 on 10/23
check out time : 3:30 PM - same day

Plummer : check in time : 11:00 pm into room 4 on 10/23
check out time : 8:00 AM next day (#37118)

• <u>π testified</u> he was not w/ M. Plummer @ the guest house on either
10/23 or 10/24, but met her in the general vicinity on AM of 10/23

• <u>2d 23-110 motion</u> : another receipt for another guest (# 37116)
shows someone else checked in @ 8:45 PM +
checked out @ 10:45 PM into Room 4 on
10/23/88

[A165]

③

- Requests for relief in 2d 23-110 motion

  ① Vacate instant conviction due to IAC

  ② re-enter order denying first 23-110 motion.

~~DCCA law both @ this in 2d opp:~~
~~① Due to IAC in failing to notice appeal in first 23-110~~

> Receipts contradict Plummer's assertion that
>
> ↳ 1) π was with her at the guest house & that they both registered
>
> 2) that she & π slept practically all day on 10/23/88
>
> 3) that she was w/ π in morning of 10/24 & that they both went to her house.

4) ↳ Check out time on π's receipt  3:30 PM or AM ⇒ even if AM, this would still mean that π left 4½ hrs. < Plummer

5) ↳ These receipts were offered into evidence by the gov't.

6) Finally ⇒ checkin & checkout times of the Davis· contradicts Plummer's testimony that she & π slept all day in Room 4.

**[A166]**

④

[ Why it was IAC for trial counsel not to point
these inconsistencies out

1) Gov't had admitted these receipts, so they were before
   the jury anyways.

2) Trial counsels tactical reason for non-use "problem of sequence
   of dates" => no impact on impeachment evidence


=> since Plummer was lead witness, her credibility was)
   at issue + ∴ the above impeachment could have)
   reasonably led to an acquittal.

[A167]

⑤

✓ <u>Lee v. US</u>, 597 A.2d 1353 (DC 1991)
↳ b/c no absolute right to counsel in 23-110 motion, there
is ∴ no constitutional right to effective assistance of counsel

* ( 23-110 Counsel's performance ⇒ BAD )  *

　　1) he failed to properly & timely notice an appeal fr. the
　　denial of the 23-110 motion

✓ 　* in such cases covered by <u>Strickland</u>, appropriate remedy
　　is trial court vacates sentence + resentences ≠ in order
　　to permit a timely appeal
　　　↳ <u>Hagett</u>, 380/1005 (1977)
　　　　<u>Hines</u>, 237/827 (1968)

( TIC erred in failing to hold hearing on 2d 23-110 motion )

　1. Presumption in favor of a hearing { <u>Gibson</u>, 388/1214 (R78)
　　　　　　　　　　　　　　　　　　　　　　　　　 23-110(c)

[A168]

## CAUSE & PREJUDICE                               ⑥

<u>Shepard</u>, 533/1278 (DC 1987)

    ↳ if π is aware of IAC argument during pendency of appeal + doesn't then raise it, said failure acts as a procedural bar to DCCA consideration

<u>Head</u>, 489/450 (DC 1985)

    ↳ 23-110 appropriate vehicle for relief for those matters in w/ π was prevented by exceptional circumstances from on direct appeal

    ↳ but he must show cause + prejudice to avoid this procedural bar.

       <u>See</u>: <u>Norris v. US</u>, 687 F.2d 899 (7th Cir. 1982)
           <u>US v. Frady</u>, 456 US. 152 (1982)
           <u>Engle v. Isaac</u>, 456 US 107 (1982)

AO 240  (Rev. 6/86)  Application to Proceed

# United States District Court

*O8-1053*

FOR THE MIDDLE _____ DISTRICT OF _____ PENNSYLVANIA

CRAIG ALLAN WILLIAMS

V.

R. MARTINEZ, Warden

**APPLICATION TO PROCEED IN FORMA PAUPERIS, SUPPORTING DOCUMENTATION AND ORDER**

**FILED**

CASE NUMBER:

**SCRANTON**

**MAY 30 2008**

PER _____

DEPUTY CLERK

I, **Craig Allan Williams** _____, declare that I am the (check appropriate box)

☒ petitioner/plaintiff          ☐ movant (filing 28 U.S.C. 2255 motion)

☐ respondent/defendant        ☒ **filing 28 USC §§ 2241/2254 motion**
                                              other

in the above-entitled proceeding; that, in support of my request to proceed without being required to prepay fees, cost or give security therefor, I state that because of my poverty, I am unable to pay the costs of said proceeding or give security therefor; that I believe I am entitled to relief. The nature of my action, defense, or other proceeding or the issues I intend to present on appeal are briefly stated as follows:

> I am being held unlawfully because my appellate counsel was ineffective in failing to present crucial issues on first appeal of criminal conviction.

In further support of this application, I answer the following questions.

1. Are you presently employed?                                    Yes ☒    No ☐

   a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer. (list both gross and net salary)

   **I earn between $14.00 & $19.00 prison pay per month.**

   b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.

   **N/A**

2. Have you received within the past twelve months any money from any of the following sources?

   a. Business, profession or other form of self-employment       Yes ☐    No ☒

   b. Rent payments, interest or dividends?                        Yes ☐    No ☒

   c. Pensions, annuities or life insurance payments?             Yes ☐    No ☒

   d. Gifts or inheritances?                                       Yes ☐    No ☒

   e. Any other sources?                                           Yes ☒    No ☐

AO 240 Reverse

If the answer to any of the above is "yes," describe each source of money and state the amount received from each during the past twelve months.

During the past 12 months I received $475 from my wife. (Support funds)

3. Do you own any cash, or do you have money in checking or savings accounts?

Yes ☒    No ☐    (Include any funds in prison accounts.)

If the answer is "yes," state the total value of the items owned.

-374

4. Do you own or have any interest in any real estate, stocks, bonds, notes, automobiles or other valuable property (excluding ordinary household furnishings and clothing)?

Yes ☐    No ☒

If the answer is "yes," describe the property and state its approximate value.

N/A

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

NONE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  5-23-08          Craig A. Williams
             (Date)                 Signature of Applicant

---

**CERTIFICATE**
*(Prisoner Accounts Only)*

I certify that the applicant named herein has the sum of $ _____
on account to his credit at the _____
institution where he is confined. I further certify that the applicant likewise has the following securities to his credit according to the records of said institution: _____

_____

I further certify that during the last six months the applicant's average balance was $ _____

_____
Authorized Officer of Institution

---

**ORDER OF COURT**

| The application is hereby denied | The application is hereby granted. Let the applicant proceed without prepayment of cost or fees or the necessity of giving security therefor. |
|---|---|
| _____  _____ <br> United States Judge          Date | _____  _____ <br> United States Judge          Date <br> or Magistrate |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


CRAIG ALLAN WILLIAMS
Fed. Reg. No. 05723-000
U.S. Penitentiary Allenwood
Post Office Box 3000
White Deer, Pennsylvania 17887

                    Petitioner,

        v.                          Case No.: 08-1053


R. MARTINEZ, Warden
U.S. Penitentiary Allenwood
Post Office Box 3500
White Deer, Pennsylvania 17887

                    Respondent,

        v.                          **FILED**
                                    **SCRANTON**

                                    MAY 3 0 2008

                                    PER _____
KENNETH L. WAINSTEIN                    DEPUTY CLERK
United States Attorney
For The District of Columbia
555 Fourth Street, N.W.
Washington, D.C.       20001

        Additional Respondent.


PETITION FOR WRIT OF HABEAS CORPUS
(Under 28 U.S.C. §§ 2241(a)(3) & 2254(a))

1.  **Name and location of court which entered the judgment of con-
    viction under attack:**  D.C. Superior Court, 500 Indiana Ave.,
    N.W. Washington, D.C. 20001.

2.  **Date of judgment of conviction:**  March 16, 1990.  **Sentencing
    date:**  April 11, 1990.

3.  **Length of sentence:**    20 years to life imprisonment and 1
    year.

4.  **Nature of offense involved:**  First degree murder while armed

(D.C. Code §§ 22-2401 & 3202) and carrying a pistol without a license (D.C. Code § 22-3204).

5.  **What was your plea?**  Not guilty.

6.  **Did you have a jury trial?**  Yes.

7.  **Did you testify at trial?**  No.

8.  **Did you appeal from the judgment of conviction?**  Yes.

9.  **If you did appeal, answer the following:**

    **(a)(1)  Name of court:**  D.C. Superior Court.

      **(2)  Nature of proceeding:**  Records remand to supplement direct appeal -- petitioner filed motion under D.C. Code § 23-110 [alleging ineffective assistance of trial counsel] in conformity with Shepard v. United States, 533 A.2d 1278 ( D.C. 1987).

      **(3)  Grounds raised:**  Erroneous advice on impeachment; delayed/failing to conduct proper investigation; ineffective cross-examination of Sandra Plummer; mental health and drug problems.  (See Appendix to Petition For Writ of Habeas Corpus (hereinafter "A") at 3-6.)

      **(4)  Did you receive an evidentiary hearing on your motion?**  Yes.

      **(5)  Result:**  Motion denied.  Oral reasons are part of the transcript of the proceedings.  (A. at 31-32)

      **(6)  Date of result and citation:**  November 19, 1992. United States v. Williams, Cr. No. F-14042-88 (D.C. Superior Court)--Transcript of 11/19/92 (A. at 16, 27-32).

    **(b)(1)  Name of court:**  District of Columbia Court of

-2-

Appeals ("DCCA").

(2) **Nature of proceeding:** Direct Appeal.

(3) **Grounds raised:** (a) Statements in custody were inadmissible; (b) other crimes evidence improperly admitted; (c) government's opening statement improper; (d) Plummer cross-examination ineffective; (e) government's closing argument improper; (f) a mistrial should have been granted; and (g) the trial court lacked authority and jurisdiction to enter post-trial orders to pay costs. (A. at 34)

(4) **Result:** Judgment on appeal affirmed. (A. at 54)

(5) **Date of result and citation:** January 17, 1995. Williams v. United States, 1995 WL 929016 (D.C. 1995). (A. at 52)

10. **Other than a direct appeal from judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgement in any court, state or federal?** Yes.

11. **If your answer to 10 was "yes," give the following:**

(a)(1) **Name of court:** DCCA.

(2) **Nature of proceeding:** 1/19/96 Petition for rehearing.

(3) **Grounds raised:** (a) Ineffectiveness of trial counsel; (b) the prosecutor's violation of a pretrial order in opening statement was plain error; and (c) the admission of evidence regarding prior drug sales by the defendant under the "opening the door" rationale was error.

-3-

(4) **Result:** Petition for rehearing denied without pre-
judice to appellant seeking further relief before
the trial court.

(5) **Date of result and citation:** DCCA 6/13/96 order.
<u>Williams v. United States</u>, App. Nos. 90-CF-627 &
93-CO-144.

(b) **As to any second petition, application or motion give the
same information:**

(1) **Name of court:** United States Supreme Court.

(2) **Nature of proceeding:** Petition for writ of certiorari
to review the judgment on direct appeal.

(3) **Result:** Petition for writ of certiorari denied.

(4) **Date of result and citation:** May 19, 1997. <u>Williams
v. United States</u>, No. 96-8695.

(5) **Grounds raised:** Same as (9)(b)(3) above.

(c) **As to any third petition, application or motion give the
same information:**

(1) **Name of court:** D.C. Superior Court.

(2) **Nature of proceeding:** August 5, 1998, motion to
vacate conviction or sentence or, in the alternative,
to reenter <u>nunc pro tunc</u> the order denying the pre-
vious 23-110 motion.  (A. at 55)

(3) **Grounds raised:** (a) Previous 23-110 counsel was in-
effective in perfecting an appeal from the denial of
petitioner's first 23-110 motion (A. at 60); (b) the
23-110 hearing previously held should be reopened as
prior 23-110 counsel was ineffective in presenting
evidence of trial counsel's ineffectiveness to the

-4-

court (A. at 61); (c) the trial proceedings should
be recommenced as trial counsel was ineffective in
discrediting the chief witness against the defendant
(A. at 65); and (d) the prosecutor's failure to cor-
rect knowingly false and misleading evidence (A. at
67).

(4) **Did you receive an evidentiary hearing?** No.

(5) **Result:** Motion denied for reasons asserted in the
government's opposition.

(6) **Date of result and citation:** September 15, 1998
Memorandum and order. United States v. Williams,
Cr. Case No. F-14042-88.

(d) **As to any fourth petition, application or motion give the
same information:**

(1) **Name of court:** DCCA.

(2) **Nature of proceeding:** Appeal from the D.C. Superior
Court's August 5, 1998, denial of § 23-110 motion to
vacate conviction or reduce sentence.

(3) **Grounds raised:** (a) trial counsel's failure to pre-
sent the Guest House Receipts constituted ineffective
assistance of counsel; (b) 23-110 counsel's perform-
ance was seriously deficient; and (c) it was erro-
neous for the trial court to fail to hold a hearing
on the second § 23-110 motion.

(4) **Result:** Judgment on appeal affirmed. (A. at 69-70)

(5) **Date of result and citation:** October 5, 2000.
Williams v. United States, 760 A.2d 205 (D.C. 2000)
(Appeal No. 98-CO-1911).

-5-

(e) As to any fifth petition, application or motion give the
    same information:

    (1) **Name of court:** DCCA.

    (2) **Nature of proceeding:** Petition for rehearing and re-
    hearing en banc.

    (3) **Grounds raised:** (a) The panel's misapplication of
    the holding of Lee v. United States; (b) petitioner's
    second § 23-110 motion was not successive; (c) peti-
    tioner's § 23-110 motion was not collateral to his
    direct appeal.

    (4) **Result:** Petition for rehearing en banc granted and
    the judgment of October 5, 2000, are vacated. Matter
    scheduled for argument and new briefing before the
    DCCA en banc. (A. at 71)

    (5) **Date of result and citation:** April 5, 2001. Williams
    v. United States, 770 A.2d 560 (D.C. 2001)(Appeal No.
    98-CO-1911).

(f) As to any sixth petition, application or motion give the
    same information:

    (1) **Name of court:** DCCA.

    (2) **Nature of proceeding:** Petition for rehearing en banc.

    (3) **Grounds raised:** (a) Whether an attorney, appointed
    to represent a defendant on appeal under the criminal
    justice act, who files a contemporaneous motion to
    vacate sentence pursuant to D.C. Code § 23-110, pos-
    sesses a statutory duty to preserve the lower court's
    denial of said motion for appellate review; (b) whether
    breach of appointed counsel's statutory duty to appeal

-6-

the denial of a D.C. Code § 23-110 motion litigated contemporaneous with the direct appeal violates due process, constitutes "cause," and therefore excuses the failure to note an earlier appeal in a subsequent collateral proceeding; (c) even if no statutory duty exists, the right to effective assistance of counsel on direct appeal includes the obligation of counsel to preserve for appeal the denial of a contemporaneous D.C. Code § 23-110 motion.

(4) **Result:** The court vacated the denial of petitioner's second § 23-110 motion and remanded the case with directions for the Superior Court to vacate and re-enter the November 19, 1992, order denying petitioner's first § 23-110 motion so that an appeal from that order may be noted in the required manner. (A. at 76)[1]

(5) **Date of result and citation:** October 18, 2001. Williams v. United States, 783 A.2d 598 (D.C. 2001)(Appeal No. 98-CO-1911).

(g) **As to any seventh petition, application or motion give the same information:**

(1) **Name of court:** DCCA.

(2) **Nature of proceeding:** Appeal from 11/19/92 decision of the trial court denying petitioner's first § 23-110 motion.

---

1. By order dated 1/8/02, the Superior Court vacated and reenter-ed its 11/19/92 order denying petitioner's first § 23-110 motion (A. at 82) and a timely notice of appeal followed.

-7-

(3)  **Grounds raised:**  Whether the lower court abused its discretion and committed reversible error in its original denial of Mr. Hill's § 23-110 motion when: (1) Contrary to D.C. Code § 23-110(f), and D.C. Super.Ct.Civ.R. 58, it failed to reduce the ruling to a written judgment; and (2) this failure to reduce the ruling to a written judgment effectively deprived the DCCA from conducting an adequate review.

(4)  **Result:**  Judgment on appeal affirmed.

(5)  **Date of result and citation:**  June 30, 2005. Williams v. United States, 878 A.2d 477 (D.C. 2005) (Appeal No. 03-CO-321).

(h) **As to any eighth petition, application of motion give the same information:**

(1)  **Name of court:**  DCCA.

(2)  **Nature of proceeding:**  Pro se motion to recall mandate [in Appeal Nos. 90-CF-627 & 03-CO-321], pursuant to D.C. App. R. 41(c).  (A. at 83)

(3)  **Grounds raised:**  Denial of due process and effective assistance of appellate counsel by failing to present crucial issues on first appeal.  (A. at 86)[2]

(4)  **Result:**  Pro se motion to recall mandate denied. (A. at 109)

---

2.  Failing to argue (1) the denial of a full and fair fact hearing (A. at 95), (2)trial counsel's ineffective cross-examination of Sandra Plummer (A. at 96, 98-102), (3) that the trial court's judgment is plainly wrong or without evidence to support it (A. at 99), and (4) the government knowingly permitted false or misleading evidence to go uncorrected before the trier of fact.  (A. at 104)

(5) Date of result and citation: September 1, 2006. <u>Williams v. United States</u>, App. Nos. 90-CF-627 & 03-CO-321.[3]

(i) As to any ninth petition, application or motion give the same information:

(1) Name of court: DCCA.

(2) Nature of proceeding: Pro se petition for rehearing and rehearing en banc, pursuant to D.C. App. R. 40. (A. at 111)

(3) Grounds raised: (1) The panel overlooked material facts and law (A. at 113); (2) the trial court's judgment is plainly wrong or without evidence to support it (A. at·114); (3) the government knowingly permitted false or misleading evidence to go un-corrected before the trier of fact (A. at 115); and (4) rehearing is required to secure uniformity of decisions in this court applying the <u>**Watson/Strickland**</u> standard of review. (A. at 117)

(4) Result: Pro se petition for rehearing and rehearing en banc denied. (A. at 120)

(5) Date of result and citation: January 12, 2007. <u>Williams v. United States</u>, App. No. 03-CO-321.

(j) As to any tenth petition, application or motion give the same information:

(1) Name of court: United States Supreme Court.

_____

3. On December 5, 2006, the DCCA denied pro se motion for expla-nation of the court's denial of motion to recall mandate. (A. at 110)

(2) **Nature of proceeding:** Petition for writ of certiorari
to review DCCA denial of pro se motion to recall
mandate and pro se petition for rehearing and rehear-
ing en banc.

(3) **Result:** Petition for writ of certiorari denied.

(4) **Date of result and citation:** June 18, 2007. <u>Williams</u>
<u>v. United States</u>, No. 06-11320.

(5) **Grounds raised:** (a) Whether the DCCA contravened
<u>Evitts v. Lucey</u> and <u>Strickland v. Washington</u> when it
failed to address petitioner's claim that appellate
counsel's performance was deficient and prejudicial;
(b) whether the DCCA contravened <u>Evitts v. Lucey</u> and
<u>Strickland v. Washington</u> when it concluded that peti-
tioner's claim [that the trial court denied petitioner
a full and fair fact hearing and rendered relief by
motion inadequate or ineffective to test the legality
of the petitioner's detention] lacked sufficient merit
to recall mandate; (c) whether the DCCA contravened
<u>Evitts v. Lucey</u> and <u>Strickland v. Washington</u> when it
concluded that petitioner's claim [that the trial
court's determination was plainly wrong or without
evidence to support it] lacked sufficient merit to
recall the mandate; and (d) whether the DCCA contra-
vened <u>Evitts v. Lucey</u> and <u>Strickland v. Washington</u>
when it concluded that petitioner's claim [that the
government knowingly permitted false or misleading
evidence to go uncorrected before the trier of fact]
lacked sufficient merit to recall mandate.

12.  **State concisely every ground on which you claim that you are being held unlawfully.**

(a) **Ground one:**  Denial of due process and effective assistance

-9.2-

of counsel on first appeal of criminal conviction.

Matthew W. Greene, petitioner's appellate counsel, was ineffective in failing to raise trial counsel's ineffective cross-examination of Sandra Plummer and argue that the trial court's determination [that the Parkway Guest House records would not have helped the petitioner's defense] was plainly wrong and without evidence to support it.

**Supporting FACTS (state briefly without citing cases or law):**

In the original murder trial, the prosecution had only one alleged witness to the murder of David Golden. Sandra Plummer testified petitioner committed the murder.

Several witnesses were called who testified that they heard or saw portions of the shooting, however no witnesses identified petitioner as the shooter. (A. at 42-43) At least two witnesses viewed petitioner's photo array but did not identify him. (Id.) There was no physical evidence that linked petitioner to the murder. (A. at 44) Fingerprints on Golden's car did not match petitioner's. (Id.) The credibility of Sandra Plummer was the central issue in this case.

Ms. Plummer testified that she had been kidnapped, forced to participate in the murder and then held hostage in a hotel and a guest house over the next two days. (A. at 127-129, 136-141 & 147-150)

Ms. Plummer testified that she had registered together with petitioner at the Parkway Guest House sometime in the morning of 10/23/88. (A. at 147-149) She testified that she was with petitioner from the 23rd continuously into the morning of the

-10-

24th, when she left with petitioner. (A. at 149-150)[4] So
the evidence at trial was that petitioner and Plummer arrived
together, did not leave until the 24th and they left together
at that time. (Id)

Ms. Plummer's trial testimony was consistent with her grand
jury testimony. Plummer testified to the Grand Jury that she
and petitioner "slept all the day of the 23rd on into the 24th"
at the Guest House and that they left together in the morning
of the 24th. (A. at 161)

The Parkway Guest House registration records (GX-35) show
that petitioner checked into room four at 7:30 a.m. and
checked out at 3:30 p.m. on the same day (Receipt #37108)(A. at
11); Mr. & Mrs. Bob Davis checked into room four at 8:45 p.m.
and checked out at 10:45 p.m. on October 23, 1988 (Receipt #
37116)(A. at 14); and Ms. plummer checked into room four at 11
p.m. on October 23, 1988, and checked out at 8 a.m. on October
24th (Receipt # 37118)(A. at 14).

However, Ms. Plummer was never cross-examined regarding
this evidence and it was never introduced to the jury.

In conformity with the DCCA decision in Shepard v. United
States, 533 A.2d 1278 (D.C. 1987), Michael J. Dennis, appellate
counsel, filed a motion in Superior Court under §23-110 alleging,
among other things, that trial counsel was ineffective in cross-
examining Plummer to show that she and petitioner were not to-
gether at the Parkway Guest House, as she testified on direct

---

4. In support of this, the United States showed Ms. Plummer several
receipts from the Guest House, of which she discussed only the one
petitioner signed. (Id.) These guest house receipts were submitted
into evidence (GX-35) by the United States, who stipulated as to
their authenticity. (A. at 155)

examination. (A. at 5-6) Consistent with its usual practice,
the court stayed petitioner's direct appeal (Appeal No. 90-
CF-627) pending decision on the § 23-110 motion.

Following a hearing on the motion, Judge Greene found that
cross-examining Plummer about the Guest House records would
not have assisted petitioner's defense. (A. at 30) Ruling
from the bench, Judge Greene stated, in relevant part:

> With regard to the alleged ineffectiveness in cross-
> examining Ms. Plummer, that allegation is basically,
> as I understand it, that Mr. Moore [petitioner's trial
> counsel] failed to show, through the Guest House
> registration records, that she and the defendant were
> not registered there at the same time. I believe
> that, when one examines those records, as Government
> counsel showed today, and as a careful examination
> of the records reflects, that one can conclude, from
> those records, that indeed, the defendant and Ms.
> Plummer were there at the same time. And thus, Mr.
> Moore's conclusions that those records would not
> have assisted Mr. Williams' defense, I think is well
> taken.
>
> The Guest House registration shows, there is one with
> Mr. Williams' name, that shows registration, that
> shows a seven thirty a.m., and a three thirty p.m.,
> arrival and departure on October the 24th. But, as
> Mr. Williams' testimony made clear, the sequence of
> other records makes it clear, that that occurred on
> October 23rd. Ms. Plummer's receipt shows an eleven
> p.m. arrival on the 23rd, and an eight a.m., departure
> from the same room, on the 24th. Thus, even the re-
> cords themselves, particularly given the coincidence
> concerning the room number, strongly suggest that
> these two folks were together at the same time.
>
> Now, Ms. Plummer's testimony corroborates the time of
> the defendant's arrival at the Guest House on October
> 23rd, but she says they registered in her name, when
> in fact, it was in the defendant's name. She says
> they left the Guest House on October 24th, and the re-
> cords shows that while she left on the 24th, he left
> at 3:30, p.m., on the 23rd. But, when one looks at
> that three thirty p.m. on the 23rd, it appears that a
> change was made in the "P", and that it could [possibly]
> been an "a", and that indeed, Mr. Williams could have
> left at three thirty a.m. on the 24th.
>
> So, if you look at these records carefully, I have to
> subscribe to Mr. Moore's conclusion, that -- that it's

very unlikely that they would have helped Mr. Williams
defense in this case.

(A. at 28-30)  And counsel noted an appeal.[5]

On direct appeal, counsel did not brief any issues re-
lating to the trial court's denial of the § 23-110 motion
-- a transcript of the § 23-110 proceeding was not avail-
able and counsel advised petitioner that new appellate
counsel would be appointed to pursue those matters.

Rather, based solely on the trial record, appellate
counsel argued that trial counsel was ineffective in cross-
examining the government's chief witness.  (A. at 40, 45-46
& 48-49)  However, the DCCA refused to consider or resolve
this issue.  As reasons, the court stated: "We do not con-
sider or resolve in this appeal issues relating to the
denial of relief by the trial court as to assertions of
ineffective assistance of counsel," concluding that the
necessary steps to effectuate an appeal on those issues had
not been accomplished.  (A. at 52, 54 n.1 & 69)

Through new appellate counsel (Matthew W. Greene), peti-
tioner accomplished an appeal (appeal no. 03-CO-321) to the
denial of his § 23-110 motion.  (A. at 76, 82; see also 11
(f)(1)-(5) & (g)(1)-(5) supra)[6]

---

5.  In compliance with the 11/29/94 order of the DCCA in Appeal No.
90-CF-627, appellate counsel advised the court [on 12/14/94] that
petitioner wishes to pursue the appeal from the denial of his §
23-110 motion, respectively, through  new appellate counsel.

6.  Because the DCCA deferred its ruling on the issue of trial
counsel's ineffective cross-examination of Sandra Plummer, the §
23-110 appeal (appeal no. 03-CO-321)  of that issue constitutes a
continuation of activities related to petitioner's direct appeal,
for which effective counsel is required.
                (Footnote 6 continued on next page)

Initially, appellate counsel moved to withdraw from the appeal, then hastily filed a brief [on December 31, 2003] without petitioner's knowledge that he was going to do so (A. at 119.1-119.3 & 119.11); because counsel knew that petitioner would object to counsel's failure to brief the § 23-110 motion issues (A. at 119.2), which petitioner had been trying to bring before the DCCA for review since 1992.

Thereafter, over a 90 day period, petitioner wrote to the court complaining about court-appointed counsel and disclosed attorney-client communications for review (A. at 119.4-119.24).[7] Petitioner informed the court several times that there were irreconcilable differences between petitioner and appointed counsel. (A. at 119.7, 119.20 & 119.23)

The DCCA knew [long before oral arguments were held] that appointed counsel failed to brief the following issues: (1) The trial court's denial of investigative services to substantiate § 23-110 claims; (2) trial counsel's ineffective investigation; (3) trial counsel's ineffective cross-examination

---

(footnote 6 continued)

Moreover, a pendent § 23-110 motion consolidated with the direct appeal is an integral part of the first appellate review of a defendant in the Superior Court. While technically collateral, a pendent § 23-110 proceeding is not undertaken "after the exhaustion of direct appellate review" or "beyond the first appeal" or after the defendant "had already one appeal of right." A pendent § 23-110 proceeding is a remand for further findings of fact in order to create a sufficient record for the court of appeals to decide the issues presented (typically ineffective assistance of counsel) on the initial appellate review.

7.  A. 119.1-119.24 [Correspondence from December 29, 2003 to June 8, 2004] were received by the DCCA.

of Ms. Plummer regarding Parkway Guest House stay; (4) the
trial court's erroneous factual findings regarding Parkway
Guest House testimony and receipts; (5) trial court's vio-
lation of stipulation agreement regarding Parkway Guest
House records; and (6) the trial court's denial of a full
and fair opportunity to litigate at § 23-110 hearing. (A.
at 112 & 119.12)[8]  And petitioner requested the appoint-
ment of new counsel and the opportunity to be heard on the
matters (A. at 119.17-18 & 119.23-24)---to no avail.

Appellate counsel was ineffective in failing to raise
two significant and obvious issues:  (1) Whether trial
counsel was ineffective in cross-examining Ms. Plummer to
show that she and petitioner were not together at the Guest
House, as she testified on direct examination (A. at 150),
and (2) whether the trial court's determination [that it's
very unlikely that the Guest House records would have helped
petitioner's defense (A. at 30)] is plainly wrong or without
evidence to support it.

As to the first issue, trial counsel's cross-examination
of Ms. Plummer was ineffective.  Had he used the Guest House
registration records, he could have shown that she and peti-
tioner were not registered there at the same time, which
was material to the issue of whether she was with petitioner
at all, including at the time of Golden's shooting.

---

8.  In preparation for the appeal in **Williams v. United States**, 760
A.2d 205 (D.C. 2000)(A. at 69), appellate counsel reviewed the under-
lying record and discovered issues (2)-(4) above.  (See Counsel's
Notes, A. at 164-168)

The Guest House registration records (introduced at trial
as GX 35) show that Plummer was at the Guest House on October
23, 1988, but not in the morning with petitioner (as she
testified).[9]  Rather, she registered at 11 p.m. at night and
stayed until the next morning at 8 a.m.  The registration re-
cord, which the government introduced to show that petitioner
registered on October 23, 1988, however, shows that he regis-
tered at 7:30 a.m. and departed at 3:30 p.m. on the same day.
(Note:  Petitioner dated the registration with the apparently
incorrect date of "Oct 24, 1988" when all the other registra-
tions in sequence are for October 23rd.)

Because Ms. Plummer was the chief government witness against
petitioner, this failure of counsel "blotted out" an opportu-
nity to show her lack of credibility and trustworthiness on
an essential element of the crime -- whether or not petitioner
was present with Plummer at the scene of the crime.  Proper
cross-examination on her testimony on this point could have
led to her admission that petitioner was not present at the
shooting of Golden and that the killing was done by another,
which was the essence of petitioner's defense.  (A. at 157)

---

9.  Neither petitioner's counsel nor the government pointed out that
another Parkway Guest House receipt shows another couple registered
in the same room, from 8:45 p.m. to 10:45 p.m., on the 23rd, where
Plummer alleges she and petitioner were staying.  (Receipt for Mr.
and Mrs. Davis, No. 37116)(GX 35 at trial).  This receipt was key
because it helped prove that neither petitioner nor Ms. Plummer
could have been in the Guest House from 8:45-10:45 p.m. on October
23, 1988.  However, this key evidence was never argued at trial.

As to the second issue, the trial court's determination is plainly wrong and without evidence to support it.

First, the court claimed that careful examination of the records reflect that petitioner and Ms. Plummer were there at the same time. (A. at 28-29)

To the contrary, the records show that petitioner checked into room 4 at 7:30 a.m. and checked out at 3:30 p.m., seven and a half hours before Ms. Plummer arrived. (A. at 11 & 14 -- Receipt Nos. 37108 & 37118)

Second, the court noted that "the coincidence concerning the room number strongly suggests that these two folks were together at the same time." (A. at 29)

In actuality petitioner can quite easily explain this fact as an examination of the receipts reveals that the Guest House in question only appears to have eight rooms. (A. at 9-15)

Third, the court states that the 3:30 p.m. check out time on petitioner's receipt could have been 3:30 a.m. -- and that petitioner could have left at 3:30 a.m. on the 24th. (A. at 29-30)

To the contrary, Mr. & Mrs. Bob Davis were registered in room four from 8:45-10:45 p.m. (id. at page 11 supra; see also n. 9 and accompaning text); therefore petitioner could not have departed from room four at 3:30 a.m. on October 24, 1988.

Further, the court's reasoning does not comport with the testimony. Ms. Plummer testified that she was at the Guest

House with petitioner from the 23rd continuously into the morning of the 24th, when she left with petitioner. (A. at 149-150)[10] So the testimony is that petitioner and Ms. Plummer spent a little over twenty-four (24) hours [in Rm. 4] at the Guest House. (Id.)

To the contrary, neither petitioner nor Ms. Plummer could have been registered in room 4 at the Guest House from 3:30-10:45 p.m. on October 23, 1988. (Id. Receipt # 37116, A. at 14)

Clearly, the trial court's ruling does not comport with neither Ms. Plummer's testimony nor the documentary evidence in this case. Rather, the court's determination reveals a bias against petitioner and favor for the government.[11]

In a continuing effort to play down the importance of the receipts, the trial court ignore the fact that "BLS" (the initials of the Parkway Guest House clerk who executed the bottom portion of the receipts) had been on duty for more than 36 hours. (See A. at 9-11, Receipt Nos. 37101-37108) Thus it is more probable that BLS mistakenly wrote a.m. on petitioner's receipt (GX 35) due to fatigue from working long hours and made the p.m. correction.

The trial court erred when it subscribed to trial counsel's

_____

10. Ms. Plummer's trial testimony was consistent with her Grand Jury testimony. (A. at 161)

11. It is interesting to note that when the receipts contradict Ms. Plummer's testimony the court dismisses them as inaccurate or ambiguous. Curiously, however, these same receipts are deemed accurate by the court when they show that Plummer and petitioner registered in the same room albeit at different times.

conclusion that the receipts would not have helped the petitioner's defense.[12]  Trial counsel was clearly wrong to base his refusal to use the receipts as impeachment evidence on their sequence; the sequence was a major aid to establishing facts favorable to petitioner.  The prejudice in this case is clear.  Physical evidence that Ms. Plummer was not with petitioner for the two days following the murder [evidence that contradicts her sworn testimony at trial and to the Grand Jury that she was at the Guest House with petitioner throughout the evening of the 23rd] casts doubt upon her testimony that petitioner killed Golden.  The Jury agreed.  It sent a note about an hour and forty-five minutes into deliberations which specifically requested to see "the hotel receipt and all of the other evidence."  (A. at 158-159)  The fact that Plummer and petitioner were not registered in the same room at the same time[13] undermines the credibility of all her testimony -- from forced participation to having been kidnapped and held hostage in a hotel and a Guest House for two days following the murder.

12.  Trial counsel stated that he did not think the receipts would be helpful in impeaching Plummer and offered only one reason to support that bald conclusion, that there was a problem with the sequence of the dates.  (A. at 21)  The trial court held that the sequence of the dates rather than being a negative factor actually supported petitioner's testimony.  (A. at 29)

13.  The record reflects that Ms. Plummer and Fletcher were the only two registered in the same room at the same time (Days Inn Hotel receipt [GX 34], A. at 155, 162-163) and the record strongly suggests that these two folks stayed together [after the shooting] for a substantial period.

-19-

Appellate counsel was demonstrably aware of the afforementioned issues[14] but chosen instead to concentrate on questions of dubious legal validity.  (<u>See</u> 11(g)(3) supra.)

**(b) Ground two:**  Denial of due process and effective assistance of counsel on first appeal of criminal conviction.

Michael J. Dennis and Matthew W. Greene were ineffective in failing to argue that the government violated petitioner's right to due process when it knowingly permitted false or misleading evidence to go uncorrected before the trier of fact.

---

14.  Same as footnote 8.

-19.5-

Supporting FACTS (state briefly without citing cases or law):

According to the testimony, petitioner kidnapped Ms. Plummer and forced her to participate in Golden's murder. (A. at 126-128)

Plummer testified that petitioner led her into Golden's apartment building at gunpoint (A. at 129-130); grabbed her by the arm and led her away from the murder scene at gunpoint (A. at 136-137); and then kept her continuously by his side in a hotel and a Guest House over the next two days (A. at 139, 147-150 & 161).[15]

The United States had the Guest House receipts. It introduced them as its exhibits at trial (GX 35, A. at 149 & 155) and at the § 23-110 motion hearing (GX 8 & 9, A. at 22-25).

Having the receipts in its possession, the United States must be charged with knowledge of the inconsistencies of these receipts with Ms. Plummer's grand jury and trial testimony: in particular, the Davis receipt, petitioner's receipt and Ms. Plummer's receipt.

---

15. According to Ms. Plummer's testimony, she spent a little over twenty-four (24) hours at the Guest House with petitioner in room 4.

The receipts raise a significant issue that Ms. Plummer presented false testimony on the Guest House stay -- namely that she was at the Guest House with petitioner when he registered and that they were together continuously until morning -- yet the prosecutor let the testimony stand.  The prejudice in this case is clear.  (<u>See</u> page 19 supra.)

13.  If any of the grounds listed in 12(a),(b), and (c) were not previously presented in any other court, state or federal, state briefly what grounds were not so presented, and give your reasons for not presenting them:  N/A.

14.  Do you have any petition now pending in any court, either state or federal, as to the judgment under attack?  No.

15.  Give the name and address, if known, of each attorney who re-presented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing:  Shawn Moore, Public Defender Service, 633 Indiana Avenue, N.W., Washington, D.C. 20004.

(b) At arraignment and plea:  Same as (a) above.

(c) At trial:  Same as (a) above.

(d) At sentencing:  Same as (a) above.

(e) On Appeal:  Michael J. Dennis, Dennis Law Corporation, 1255--23rd Street, N.W., 5th Floor, Washington, D.C. 20037-1194.

(f) In any post-conviction proceeding:  Same as (e) above and Brian C. Plitt, 1239 C. Street, S.E., Ste. 4, Washington, D.C. 20003-2234.

    (g) On appeal from any adverse ruling in a postconviction
        proceeding: Matthew W. Greene, Smith & Greene, P.L.L.C.
        3977 Chain Bridge Road, Suite 201, Fairfax, Virginia
        22030-3308.

16. Were you sentenced on more than one count of an indictment,
    or on more than one indictment, in the same court and at
    the same time?  Yes.

17. Do you have any future sentence to serve after you complete
    the sentence imposed by the judgment under attack?  Yes.

    (a) If so, give name and location of court which imposed
        sentence to be served in the future: D.C. Superior
        Court, 500 Indiana Avenue, N.W., Washington, D.C. 20001.

    (b) Give date and length of the above sentence:  April 11,
        1990.  35 years to life imprisonment.

    (c) Have you filed, or do you contemplate filing, any
        petition attacking the judgement which imposed the
        sentence to be served in the future?  No.


    WHEREFORE, petitioner prays that the Court grant petitioner
relief to which he may be entitled in this proceeding.

_Craig Allan Williams_
Signature of Petitioner

I declare under penalty of perjury that the foregoing is true and
correct.  Executed on

_May 27, 2008_
Date

_Craig Allan Williams_
Signature of Petitioner

-22-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original and two copies of my "Petition For Writ of Habeas Corpus" and "Appendix To Petition For Writ of Habeas Corpus" was mailed via U.S. Mail, first class, postage prepaid this 27th day of _May_ 2008, to:

United States District Court
Middle District of Pennsylvania
Attn:  Office Of The Clerk
235 North Washington Avenue
Post Office Box 1148
Scranton, Pennsylvania 18501

_Craig Allan Williams_
Signature of Petitioner

AO 240  (Rev. 6/86)  Application to Proceed ®

08-cv-01053

# United States District Court

FOR THE MIDDLE _____ DISTRICT OF _____ PENNSYLVANIA

CRAIG ALLAN WILLIAMS

V.

R. MARTINEZ, Warden

**APPLICATION TO PROCEED IN FORMA PAUPERIS, SUPPORTING DOCUMENTATION AND ORDER**

CASE NUMBER:

RECEIVED
SCRANTON

JUN 05 2008

PER _____ DEPUTY CLERK

I, Craig Allan Williams _____, declare that I am the (check appropriate box)

- [X] petitioner/plaintiff
- [ ] respondent/defendant
- [ ] movant (filing 28 U.S.C. 2255 motion)
- [X] **filing 28 USC §§ 2241/2254 motion**
  other

in the above-entitled proceeding; that, in support of my request to proceed without being required to prepay fees, cost or give security therefor, I state that because of my poverty, I am unable to pay the costs of said proceeding or give security therefor; that I believe I am entitled to relief. The nature of my action, defense, or other proceeding or the issues I intend to present on appeal are briefly stated as follows:

I am being held unlawfully because my appellate counsel was ineffective in failing to present crucial issues on first appeal of criminal conviction.

FILED
SCRANTON

JUN 05 2008

PER ___ DEPUTY CLERK

In further support of this application, I answer the following questions.

1. Are you presently employed?                                    Yes [X]   No [ ]
   a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer. (list both gross and net salary)

   I earn between $14.00 & $19.00 prison pay per month.

   b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.

   N/A

2. Have you received within the past twelve months any money from any of the following sources?
   a. Business, profession or other form of self-employment    Yes [ ]   No [X]
   b. Rent payments, interest or dividends?                     Yes [ ]   No [X]
   c. Pensions, annuities or life insurance payments?          Yes [ ]   No [X]
   d. Gifts or inheritances?                                    Yes [ ]   No [X]
   e. Any other sources?                                        Yes [X]   No [ ]

If the answer to any of the above is "yes," describe each source of money and state the amount received from each during the past twelve months.

**During the past 12 months I received $475 from my wife. (Support funds)**

3. Do you own any cash, or do you have money in checking or savings accounts?

   Yes [X]   No [ ]   (Include any funds in prison accounts.)

   If the answer is "yes," state the total value of the items owned.

   .374

4. Do you own or have any interest in any real estate, stocks, bonds, notes, automobiles or other valuable property (excluding ordinary household furnishings and clothing)?

   Yes [ ]   No [X]

   If the answer is "yes," describe the property and state its approximate value.

   **N/A**

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

   **NONE**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _5-23-08_          _Craig A. Williams_
              (Date)                      Signature of Applicant

---

## CERTIFICATE
### (Prisoner Accounts Only)

I certify that the applicant named herein has the sum of $ .37 on account to his credit at the _USP Allenwood_ institution where he is confined. I further certify that the applicant likewise has the following securities to his credit according to the records of said institution: _N/A_

I further certify that during the last six months the applicant's average balance was $ _15.40_

_C. Hoekm_ _FCC Allenwood / Inmate Accounts_
              Authorized Officer of Institution   _5/28/08_

---

## ORDER OF COURT

| | |
|---|---|
| The application is hereby denied | The application is hereby granted. Let the applicant proceed without prepayment of cost or fees or the necessity of giving security therefor. |
| _____  _____ <br> United States Judge      Date | _____  _____ <br> United States Judge      Date <br> or Magistrate |



Date: 05/28/2008
Time: 8:10:50 am

Federal Bureau of Prisons
TRUFACS
**Inmate Statement**
Sensitive But Unclassified

Facility: ALX

Start Date: 10/01/2007
End Date: 05/28/2008
Inmate Reg #: 05723800
Account Status: All
Institution: All

Date: 05/28/2008
Time: 8:10:50 am

# Federal Bureau of Prisons
## TRUFACS
## Inmate Statement
### Sensitive But Unclassified

Facility: ALX

## General Information

| | |
|---|---|
| Inmate Reg#: | 05723000 |
| Inmate Name: | WILLIAMS, CRAIG A |
| Current Site Name: | Allenwood FCC |
| Housing Unit: | ALP-A-A |

| | |
|---|---|
| Living Quarters: | A02-213L |
| Arrived From: | BUX |
| Transferred To: | |
| Account Creation Date: | 5/29/2002 |

## Transaction Details

| Alpha Code | Date/Time | Reference# | Payment# | Receipt# | Transaction Type | Transaction Amount | Encumbrance Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| ALX | 10/16/2007 03:30:21 AM | TX101607 | | | Transfer - In from TRUFACS | $0.72 | | $0.72 |
| | **Total Transactions:** | **1** | | | | | | |
| BUX | 10/16/2007 03:30:21 AM | TRN1016 | | | Phone Withdrawal | $0.04 | | $0.72 |
| BUX | 10/16/2007 03:30:21 AM | TX101607 | | | Transfer - Out to TRUFACS | ($0.72) | | $0.00 |
| | **Total Transactions:** | **2** | | | | | | |
| ALX | 12/07/2007 12:31:14 PM | HIPP1107 | | | Payroll - IPP | $20.20 | | $20.92 |
| ALX | 12/08/2007 01:05:42 PM | TRN1208 | | | Phone Withdrawal | ($2.00) | | $18.92 |
| ALX | 12/08/2007 06:01:06 PM | TRN1208 | | | Phone Withdrawal | ($2.00) | | $16.92 |
| ALX | 12/10/2007 09:47:15 PM | TRN1210 | | | Phone Withdrawal | ($2.00) | | $14.92 |
| ALX | 12/12/2007 03:17:37 PM | HICP1207 | | | Inmate Co-pay | ($2.00) | | $12.92 |
| ALX | 12/20/2007 08:36:42 PM | TRN1220 | | | Phone Withdrawal | ($2.00) | | $10.92 |
| ALX | 12/21/2007 11:36:22 AM | TRN1221 | | | Phone Withdrawal | ($1.00) | | $9.92 |
| ALX | 12/21/2007 11:48:06 AM | TRN1221 | | | Phone Withdrawal | ($1.00) | | $8.92 |
| ALX | 12/31/2007 05:29:39 PM | TRN1231 | | | Phone Withdrawal | ($2.00) | | $6.92 |
| ALX | 12/31/2007 11:48:06 AM | TRN1231 | | | Phone Withdrawal | ($1.00) | | $5.92 |
| ALX | 01/01/2008 06:19:30 PM | TRN0101 | | | Phone Withdrawal | ($1.00) | | $5.92 |
| ALX | 01/01/2008 06:24:31 PM | TRN0101 | | | Phone Withdrawal | ($5.00) | | $0.92 |
| ALX | 01/03/2008 11:07:44 AM | 33306908 | | | Western Union | $150.00 | | $150.92 |
| ALX | 01/03/2008 03:14:24 PM | TFN0103 | | | Phone Withdrawal | ($3.00) | | $147.92 |
| ALX | 01/03/2008 07:38:15 PM | TFN0103 | | | Phone Withdrawal | ($2.00) | | $145.92 |
| ALX | 01/04/2008 12:03:05 PM | 73 | | | Sales | ($69.45) | | $76.47 |
| ALX | 01/04/2008 03:00:52 PM | HIPP1207 | | | Payroll - IPP | $18.00 | | $94.47 |
| ALX | 01/04/2008 07:21:50 PM | TRN0104 | | | Phone Withdrawal | ($10.00) | | $84.47 |
| ALX | 01/05/2008 03:45:34 PM | TRN0105 | | | Phone Withdrawal | ($2.00) | | $82.47 |
| ALX | 01/05/2008 08:12:05 PM | TRN0105 | | | Phone Withdrawal | ($2.00) | | $80.47 |
| ALX | 01/06/2008 03:56:48 PM | TRN0106 | | | Phone Withdrawal | ($2.00) | | $78.47 |
| ALX | 01/06/2008 06:52:51 PM | TRN0106 | | | Phone Withdrawal | ($2.00) | | $76.47 |
| ALX | 01/07/2008 08:31:16 AM | | 2197 | | Books | ($60.00) | | $16.47 |
| ALX | 01/08/2008 01:58:43 PM | | 81 | | Sales | ($9.70) | | $6.77 |

Date: 05/28/2008
Time: 8:10:51 am

Federal Bureau of Prisons
TRUFACS
**Inmate Statement**
Sensitive But Unclassified

Facility: ALX

| | |
|---|---|
| Inmate Reg#: | 05723000 |
| Inmate Name: | WILLIAMS, CRAIG A |
| Current Site Name: | Allenwood FCC |
| Housing Unit: | ALP-A-A |

**General Information**

| | |
|---|---|
| Living Quarters: | A02-213L |
| Arrived From: | BUX |
| Transferred To: | |
| Account Creation Date: | 5/29/2002 |

**Transaction Details**

| Alpha Code | Date/Time | Reference# | Payment# | Receipt# | Transaction Type | Transaction Amount | Encumbrance Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| ALX | 01/08/2008 09:19:48 PM | TFN0108 | | | Phone Withdrawal | ($2.00) | | $4.77 |
| ALX | 01/09/2008 10:48:54 AM | TFN0109 | | | Phone Withdrawal | ($3.00) | | $1.77 |
| ALX | 01/11/2008 09:19:39 AM | TFN0111 | | | Phone Withdrawal | ($1.00) | | $0.77 |
| ALX | 02/06/2008 07:52:14 AM | 2197-C | | | Books | $60.00 | | $60.77 |
| ALX | 02/06/2008 03:29:52 PM | TFN0206 | | | Phone Withdrawal | ($10.00) | | $50.77 |
| ALX | 02/07/2008 12:18:42 PM | 67 | | | Sales | ($41.65) | | $9.12 |
| ALX | 02/07/2008 01:09:10 PM | 3330P408 | | | Western Union | $138.05 | | $147.17 |
| ALX | 02/08/2008 01:00:23 PM | HIPP0108 | | | Payroll - IPP | $18.00 | | $165.17 |
| ALX | 02/08/2008 08:17:46 PM | TFN0208 | | | Phone Withdrawal | ($5.00) | | $160.17 |
| ALX | 02/09/2008 09:33:50 PM | TFN0209 | | | Phone Withdrawal | ($2.00) | | $158.17 |
| ALX | 02/10/2008 02:51:08 PM | TFN0210 | | | Phone Withdrawal | ($3.00) | | $155.17 |
| ALX | 02/10/2008 03:49:09 PM | TFN0210 | | | Phone Withdrawal | ($3.00) | | $152.17 |
| ALX | 02/12/2008 05:04:30 PM | TFN0212 | | | Phone Withdrawal | ($3.00) | | $149.17 |
| ALX | 02/13/2008 08:07:31 PM | TFN0213 | | | Phone Withdrawal | ($2.00) | | $147.17 |
| ALX | 02/14/2008 12:17:01 PM | 77 | | | Sales | ($81.25) | | $65.92 |
| ALX | 02/14/2008 02:38:59 PM | 108 | | | Sales | $0.00 | | $65.92 |
| ALX | 02/14/2008 02:43:26 PM | 111 | | | Sales | ($55.25) | | $10.67 |
| ALX | 02/15/2008 08:46:10 PM | TFN0215 | | | Phone Withdrawal | ($2.00) | | $8.67 |
| ALX | 02/15/2008 09:39:39 PM | TFN0215 | | | Phone Withdrawal | ($1.00) | | $7.67 |
| ALX | 02/22/2008 09:07:39 PM | TFN0222 | | | Phone Withdrawal | ($1.00) | | $6.67 |
| ALX | 02/23/2008 07:44:06 PM | TFN0223 | | | Phone Withdrawal | ($1.00) | | $5.67 |
| ALX | 02/26/2008 06:39:46 PM | TFN0226 | | | Phone Withdrawal | ($1.00) | | $4.67 |
| ALX | 03/05/2008 09:30:42 PM | TFN0305 | | | Phone Withdrawal | ($1.00) | | $3.67 |
| ALX | 03/06/2008 01:09:34 PM | 33311408 | | | Western Union | $50.00 | | $53.67 |
| ALX | 03/06/2008 09:15:05 PM | TFN0306 | | | Phone Withdrawal | ($1.00) | | $52.67 |
| ALX | 03/06/2008 09:24:50 PM | TFN0306 | | | Phone Withdrawal | ($2.00) | | $50.67 |
| ALX | 03/07/2008 12:12:08 PM | HIPP0208 | | | Payroll - IPP | $16.00 | | $66.67 |
| ALX | 03/07/2008 12:23:25 PM | 002040 | | | FRP Quarterly Pymt | ($25.00) | | $41.67 |
| ALX | 03/09/2008 08:37:53 PM | TFN0309 | | | Phone Withdrawal | ($1.00) | | $40.67 |
| ALX | 03/09/2008 09:19:01 PM | TFN0309 | | | Phone Withdrawal | ($1.00) | | $39.67 |

Date: 05/28/2008
Time: 8:10:51 am

**Federal Bureau of Prisons**
**TRUFACS**
**Inmate Statement**
Sensitive But Unclassified

Facility: ALX

**General Information**

| | |
|---|---|
| Inmate Reg#: | 05723000 |
| Inmate Name: | WILLIAMS, CRAIG A |
| Current Site Name: | Allenwood FCC |
| Housing Unit: | ALP-A-A |

| | |
|---|---|
| Living Quarters: | A02-213L |
| Arrived From: | BUX |
| Transferred To: | |
| Account Creation Date: | 5/29/2002 |

**Transaction Details**

| Alpha Code | Date Time | Reference# | Payment# | Receipt# | Transaction Type | Transaction Amount | Encumbrance Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| ALX | 03/10/2008 02:33:13 PM | TRN0310 | | | Phone Withdrawal | ($1.00) | | $38.67 |
| ALX | 03/11/2008 06:10:55 AM | HRP03008 | | | FRP Excess With | $25.00 | | $63.67 |
| ALX | 03/11/2008 06:10:55 AM | HRP03008 | 3632 | | FRP Treasury Pymt | ($25.00) | | $38.67 |
| ALX | 03/11/2008 08:42:18 AM | 1 | | | Sales | ($6.65) | | $32.02 |
| ALX | 03/11/2008 08:43:41 AM | 2 | | | Sales | ($1.10) | | $30.92 |
| ALX | 03/11/2008 10:51:13 AM | TRN0311 | | | Phone Withdrawal | $29.92 | | $29.92 |
| ALX | 03/11/2008 11:01:11 AM | TRN0311 | | | Phone Withdrawal | ($1.00) | | $28.92 |
| ALX | 03/12/2008 06:28:52 PM | TRN0312 | | | Phone Withdrawal | ($1.00) | | $27.92 |
| ALX | 03/13/2008 01:53:52 PM | 82 | | | Sales | ($25.35) | | $2.57 |
| ALX | 03/13/2008 03:09:37 PM | 3632-V | | | FRP Treasury Pymt | $25.00 | | $27.57 |
| ALX | 03/13/2008 03:09:49 PM | 3632 | | | FRP Treasury Pymt | ($25.00) | | $2.57 |
| ALX | 03/17/2008 10:23:36 AM | HICP03008 | 3725 | | Inmate Co-pay | ($2.00) | | $0.57 |
| ALX | 04/04/2008 12:36:24 PM | HIPP03008 | | | Payroll - IPP | $16.60 | | $17.17 |
| ALX | 04/05/2008 06:57:19 PM | TRN0405 | | | Phone Withdrawal | ($4.00) | | $13.17 |
| ALX | 04/09/2008 06:51:58 PM | TRN0409 | | | Phone Withdrawal | ($1.00) | | $12.17 |
| ALX | 04/09/2008 07:02:46 PM | TRN0409 | | | Phone Withdrawal | ($1.00) | | $11.17 |
| ALX | 04/12/2008 05:55:45 PM | TRN0412 | | | Phone Withdrawal | ($1.00) | | $10.17 |
| ALX | 04/16/2008 05:46:56 PM | TRN0416 | | | Phone Withdrawal | ($1.00) | | $9.17 |
| ALX | 04/17/2008 07:42:31 PM | TRN0417 | | | Phone Withdrawal | ($1.00) | | $8.17 |
| ALX | 04/18/2008 10:42:51 AM | TRN0418 | | | Phone Withdrawal | ($1.00) | | $7.17 |
| ALX | 04/27/2008 11:31:46 AM | TRN0427 | | | Phone Withdrawal | ($1.00) | | $6.17 |
| ALX | 04/27/2008 08:44:53 PM | TRN0427 | | | Phone Withdrawal | ($1.00) | | $5.17 |
| ALX | 04/29/2008 01:28:24 PM | TRN0429 | | | Phone Withdrawal | ($1.00) | | $4.17 |
| ALX | 05/02/2008 02:37:36 PM | TRN0502 | | | Phone Withdrawal | ($1.00) | | $3.17 |
| ALX | 05/07/2008 07:38:04 PM | TRN0507 | | | Phone Withdrawal | ($1.00) | | $2.17 |
| ALX | 05/08/2008 07:19:38 PM | TRN0508 | | | Phone Withdrawal | ($1.00) | | $1.17 |
| ALX | 05/08/2008 09:49:08 PM | TRN0508 | | | Phone Withdrawal | ($1.00) | | $0.17 |
| ALX | 05/09/2008 12:10:32 PM | HIPP0408 | | | Payroll - IPP | $19.20 | | $19.37 |
| ALX | 05/11/2008 03:09:45 PM | TRN0511 | | | Phone Withdrawal | ($2.00) | | $17.37 |
| ALX | 05/11/2008 08:28:56 PM | TRN0511 | | | Phone Withdrawal | ($2.00) | | $15.37 |

Date: 05/28/2008
Time: 8:10:51 am

Federal Bureau of Prisons
TRUFACS
**Inmate Statement**
Sensitive But Unclassified

Facility: ALX

## General Information

| | | | |
|---|---|---|---|
| Inmate Reg#: | 05723000 | Living Quarters: | A02-213L |
| Inmate Name: | WILLIAMS, CRAIG A | Arrived From: | BUX |
| Current Site Name: | Allenwood FCC | Transferred To: | |
| Housing Unit: | ALP-A-A | Account Creation Date: | 5/29/2002 |

## Transaction Details

| Alpha Code | Date Time | Reference# | Payment# | Receipt# | Transaction Type | Transaction Amount | Encumbrance Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| ALX | 05/13/2008 09:13:35 PM | 33316208 | | | Western Union | $100.00 | | $115.37 |
| ALX | 05/14/2008 12:19:33 PM | 72 | | | Sales | ($100.00) | | $15.37 |
| ALX | 05/15/2008 08:18:36 PM | TFN0515 | | | Phone Withdrawal | ($3.00) | | $12.37 |
| ALX | 05/16/2008 08:32:51 PM | TFN0516 | | | Phone Withdrawal | ($1.00) | | $11.37 |
| ALX | 05/16/2008 08:46:10 PM | TFN0516 | | | Phone Withdrawal | ($2.00) | | $9.37 |
| ALX | 05/17/2008 07:46:17 PM | TFN0517 | | | Phone Withdrawal | ($2.00) | | $7.37 |
| ALX | 05/17/2008 08:48:26 PM | TFN0517 | | | Phone Withdrawal | ($2.00) | | $5.37 |
| ALX | 05/22/2008 07:52:34 PM | TFN0522 | | | Phone Withdrawal | ($3.00) | | $2.37 |
| ALX | 05/22/2008 09:32:14 PM | TFN0522 | | | Phone Withdrawal | ($1.00) | | $1.37 |
| ALX | 05/26/2008 06:36:07 PM | TFN0526 | | | Phone Withdrawal | ($1.00) | | $0.37 |
| | **Total Transactions:** | **93** | | | **Totals:** | **($0.31)** | | **$0.00** |

## Current Balances

| Alpha Code | Available Balance | Pre-Release Balance | Debt Encumbrance | SPO Encumbrance | Other Encumbrance | Outstanding Instruments | Administrative Holds | Account Balance |
|---|---|---|---|---|---|---|---|---|
| ALX | $0.37 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.37 |
| **Totals:** | **$0.37** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.37** |

## Other Balances

| National 6 Months Deposits | National 6 Months Withdrawals | National 6 Months Avg Daily Balance | Local Max. Balance - Prev. 30 Days | Average Balance - Prev. 30 Days | Commissary Restriction Start Date | Commissary Restriction End Date |
|---|---|---|---|---|---|---|
| $546.05 | $546.40 | $15.40 | $115.37 | $9.85 | N/A | N/A |

Page 5

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) *Finance Office* | DATE: *May 23, 2008* |
|---|---|
| FROM: *Craig A. Williams* | REGISTER NO.: *05723-000* |
| WORK ASSIGNMENT: *Education 1* | UNIT: *1A C/213 USP* |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.)

*I would like you to complete page 2 of
"Application To Proceed In Forma Pauperis,
Supporting Documentation and Order."
Upon completion, the form should be
mailed to the Court or returned to me.
The address is: United States District Court,
Middle District of PA, 235 North
Washington Avenue, Post Office Box
1148, Scranton, PA 18501.*

*Thank You Very Much*

(Do not write below this line)

DISPOSITION: *You will find a printout of your balances
and a printout for 6 months ~~from~~ of your account
It is your responsibility to mail it out.*

| Signature Staff Member | Date |
|---|---|
| *Hoehm* | *5/28/08* |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

Craig Allan Williams
Reg. No. 05723-000
U.S.P. Allenwood
P.O. Box 3000
White Deer, PA 17887

May 30, 2008

United States District Court
Middle District Of Pennsylvania
235 North Washington Avenue
Post Office Box 1148
Scranton, Pennsylvania    18501

Dear Clerk:

Please find enclosed "Application To Proceed In Forma Pauperis, Supporting Documentation and Order," which was returned to me yesterday by the institutions finance officer. My Petition For Writ Of Habeas Corpus was mailed to the Court on May 28th under separate cover.

Sincerely,

Craig A. Williams



Craig Allan Williams
Reg. No. PA-15000
U.S.P. Allenwood
P.O. Box 3000
White

PM     JUN  3     2008     HARF

RECEIVED
SCRANTON

JUN 0 5 2008

MARY E. D'ANDREA CLERK
Per
DEPUTY CLERK

United States District Court
Middle District Of Pennsylvania
235 North Washington Avenue
Post Office Box 1148
Scranton, Pennsylvania     18501

MAILED FROM
U.S. PENITENTIARY

JUN 0 3 2008